UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

08-60322

CASE NO. CR-COHN
18 U.S.C. § 371

MAGISTRATE JUDGE
SELTZER

UNITED STATES OF AMERICA

vs.

RAOUL WEIL,

Defendant.
_____/

## INDICTMENT

The Grand Jury charges that:

### INTRODUCTION

At all times relevant to this Indictment, unless otherwise indicated:

1. The Internal Revenue Service ("IRS") was an agency of the United States Department of Treasury responsible for administering and enforcing the tax laws of the United States and collecting the taxes owed to the Treasury of the United States.

2. An entity identified as "Swiss Bank" was one of Switzerland's largest banks. Swiss Bank owned and operated banks, investment banks, and stock brokerage businesses throughout the world, also operating in the Southern District of Florida and elsewhere in the United States. Because of Swiss Bank's ownership of banks and investment brokerages in the United States, United States tax laws applied to Swiss Bank and to its United States clients.

3. Swiss Bank operated a cross-border banking business with United States clients ("United States cross-border business"). The United States cross-border business employed

1

approximately 60 private bankers and had offices in Geneva, Zurich, and Lugano, Switzerland. These private bankers frequently traveled to the United States to meet with and to conduct business with their United States clients.

4.  The United States cross-border business provided private banking services to approximately 20,000 United States clients with assets worth approximately $20 billion. Approximately 17,000 of the 20,000 cross-border clients concealed their identities and the existence of their Swiss Bank accounts from the IRS. Many of these clients willfully failed to pay tax to the IRS on income earned on their Swiss Bank accounts. Swiss Bank assisted these United States clients conceal the income earned on Swiss Bank accounts by failing to report IRS Form 1099 information to the IRS. From 2002 through 2007, the United States cross-border business generated approximately $200 million a year in revenue for Swiss Bank.

**The Conspirators**

5.  From 2002 through 2007, defendant RAOUL WEIL was head of Swiss Bank's wealth management business, which included the United States cross-border business and other businsses. As such, defendant RAOUL WEIL and others had the authority to expand, maintain, or discontinue the United States cross-border business. In July 2007, defendant RAOUL WEIL was promoted and became the Chief Executive Officer of a division that oversaw the United States cross-border business and world-wide private banking.

6.  Some Swiss Bank's executives ("Executives") are unindicted co-conspirators not named as defendants herein. These Executives occupied positions at the highest levels of management within Swiss Bank, including positions on the committees that oversaw legal, compliance, tax, risk, and regulatory issues related to the United States cross-border business.

2

7. Some Swiss Bank's employees who managed the United States cross-border business ("Managers") are unindicted co-conspirators not named as defendants herein. These Managers were responsible for overseeing the United States cross-border business operations. These Managers were responsible for regulatory and compliance issues, as well as issues related to bankers' incentives and compensation. These Managers were also responsible for traveling to the United States to meet with Swiss Bank's wealthiest United States clients. These Managers reported directly to Executives, including defendant RAOUL WEIL.

8. Swiss Bank's employees who managed the bankers servicing the United States cross-border business ("Desk Heads") are unindicted co-conspirators not named as defendants herein. These Desk Heads exercised direct management over the day-to-day operations of the business. In addition to having management duties, Desk Heads traveled to the United States to conduct unlicensed banking and investment advisory activity for Swiss Bank's United States clients. These Desk Heads reported directly to Managers.

9. Swiss Bank private bankers who serviced the United States clients ("Bankers") are unindicted co-conspirators not named as defendants herein. These Bankers were not licensed to engage in banking and investment advisory activity in the United States. However, these Bankers routinely traveled to the United States to conduct unlicensed banking and investment advisory activity for Swiss Bank's United States clients. While in Switzerland, these Bankers routinely communicated with their clients in the United States about banking and investment advice. These Bankers reported directly to the Desk Heads. Swiss Bank Executives and Managers authorized and encouraged through incentives Bankers' activities with respect to their United States clients.

10. Some of Swiss Bank's 20,000 United States clients are unindicted co-conspirators not named as defendants herein. These United States clients knowingly concealed from the United States government, including the IRS, approximately $20 billion in assets held at Swiss Bank and willfully evaded United States income taxes owed on the income earned on these secret Swiss Bank accounts. United States clients were required to report and pay taxes to the IRS on income they earned throughout the world, including income earned from the Swiss Bank account.

## COUNT ONE
(18 U.S.C. § 371)

11. The allegations contained in paragraphs 1 through 10 of the Introduction are re-alleged and incorporated herein.

12. From in or a time unknown to the Grand Jury and continuing up to and including the date of the return of this Indictment, in the Southern District of Florida, and elsewhere, the defendant,

**RAOUL WEIL**

together with his co-conspirators, unlawfully, willfully and knowingly, did combine, conspire, confederate and agree together and with each other to defraud the United States and an agency thereof, to wit, the Internal Revenue Service of the United States Department of Treasury in the ascertainment, computation, assessment and collection of federal income taxes.

## OBJECT OF THE CONSPIRACY

13. It was a part and an object of the conspiracy that defendant RAOUL WEIL and his co-conspirators, would and did increase the profits of Swiss Bank by providing unlicensed and unregistered banking services and investment advice in the United States and other activities intended to conceal from the IRS the identities of Swiss Bank's United States clients, who willfully evaded their income tax obligations by, among other things, filing false income tax returns and failing to disclose the existence of their Swiss Bank account to the IRS.

## MEANS AND METHODS OF THE CONSPIRACY

Among the means and methods by which defendant RAOUL WEIL and his co-conspirators would and did carry out the conspiracy were the following:

14. It was part of the conspiracy that defendant RAOUL WEIL, Executives, Managers, Desk Heads, and Bankers utilized nominee entities, encrypted laptops, numbered accounts, and other counter surveillance techniques to conceal the identities and offshore assets of United States clients from authorities in the United States.

15. It was part of the conspiracy that Swiss Bank expanded their business beyond the borders of Switzerland by purchasing a large United States stock brokerage firm. Executives at Swiss Bank voluntarily entered into an agreement, known as the Qualified Intermediary Agreement ("QI Agreement") with the IRS that required Swiss Bank to report to the United States income and other identifying information for its United States clients who held an interest in United States securities in an account at Swiss Bank. Further, this agreement required Swiss Bank to withhold taxes from United States clients who directed investment activities in foreign securities from the United States.

16. It was part of the conspiracy that defendant RAOUL WEIL, Executives, and Managers entered into the QI Agreement and represented to the IRS that Swiss Bank was in compliance with the terms of the QI Agreement, while knowing that the United States cross-border business, was not conducted in a manner which complied with the terms of the QI Agreement.

17. It was part of the conspiracy that defendant RAOUL WEIL, Executives, and Managers mandated that Desk Heads and Bankers increase the United States cross-border business, knowing that this mandate would cause Bankers and Desk Heads to have increased unlicensed contacts with the United States, in violation of United States law and the QI Agreement.

18. It was further part of the conspiracy that defendant RAOUL WEIL, Executives, and Managers, who referred to the United States cross-border business as "toxic waste" because they knew that it was not being conducted in a manner that complied with United States law and the QI Agreement, put in place monetary incentives that rewarded Desk Heads and Bankers who increased the United States cross-border business.

19. It was further part of the conspiracy that Managers, Desk Heads, and Bankers solicited new investments in the United States cross-border business by marketing Swiss bank secrecy to United States clients interested in attempting to evade United States income taxes, in particular by claiming that Swiss bank secrecy was impenetrable.

20. It was further part of the conspiracy that Managers, Desk Heads, and Bankers provided unlicensed and unregistered banking services and investment advice to United States clients in person while on travel to the United States and by mailings, email, and telephone calls to and from the United States.

21. It was further part of the conspiracy that when approached about the continuous unregistered and unlicensed contacts with the United States associated with the United States cross-border business, defendant RAOUL WEIL and other Executives would not implement effective restrictions on the United States cross-border business because the business was too profitable for Swiss Bank.

22. It was further part of the conspiracy that Managers, Desk Heads, and Bankers assisted United States clients in preparing IRS Forms W-8BEN that falsely and fraudulently stated that nominee offshore structures, and not the United States clients, were the beneficial owners of offshore bank and financial accounts maintained in foreign countries, including accounts in Switzerland at Swiss Bank.

23. It was further part of the conspiracy that some United States clients prepared and filed with the IRS income tax returns that falsely and fraudulently omitted income earned on their undeclared Swiss Bank account and that falsely and fraudulently reported that United States citizens did not have an interest in, or a signature or other authority over, financial accounts located in a foreign country.

24. It was further part of the conspiracy that the United States clients failed to file with the Department of Treasury a Report of Foreign Bank and Financial Accounts, Form    TD F 90-22.1, which would have disclosed the existence of and their interest in, or signature or other authority over, a financial account located in a foreign country.

## OVERT ACTS

In furtherance of the conspiracy and to achieve the object and purpose thereof, at least one of the co-conspirators committed at least one of the following overt acts, among others, in the Southern District of Florida and elsewhere:

25. On or about July 6, 2000, Manager # 1 authorized Bankers to refer United States clients to outside lawyers and accountants to create offshore structures to conceal from the IRS United States clients' Swiss Bank accounts, while knowing that creating these structures constituted helping the United States clients commit tax evasion.

26. On or about July 14, 2000, Managers changed the wording on Swiss Bank Document 61393, Declaration for US Taxable Persons, from "I would like to avoid disclosure of my identity to the US IRS" to "I consent to the new tax regulations . . . ." after United States clients expressed fears that the form as originally drafted could be used as evidence against them for tax evasion.

27. On or about July 11, 2002, Manager # 3 and others instructed Bankers to tell United States clients who were contemplating transferring their assets to another offshore bank that Swiss Bank has the largest number of United States clients among all banks outside the United States, creates jobs in the United States, has better lobbying possibilities in the United States than any other foreign bank and would not be pressured by United States authorities to disclose the clients' identities.

28. On or about September 19, 2002, defendant RAOUL WEIL and other Executives on Swiss Bank's executive board knowingly failed to disclose to the IRS deficiencies in implementing Swiss Bank's requirements to report and withhold taxes for clients of the United States cross-border business that were discovered after the completion of an internal audit.

29. On or about September 26, 2002, Desk Head # 1 instructed Bankers that if they have unauthorized contact with United States clients in the United States, that the Bankers should not report the contact in Swiss Bank's internal computer system.

30. In or about December 2002, defendant RAOUL WEIL and other Executives authorized Manager # 2 and Manager # 3, to institute a temporary five month travel ban to the United States. The ban coincided with an IRS initiative relating to identifying holders of offshore credit cards.

31. On or about January 22, 2003, after being advised by outside lawyers to take immediate action in order to build a defense against a possible future criminal case brought against Swiss Bank, Manager # 2 instructed Manager # 3 to limit written communications relating to offshore structures created for United States clients and instructed Manager # 3 to begin issuing Form 1099 information to clients, but not to the IRS, for certain Swiss Bank accounts where Swiss Bank officials served as a manager for the offshore structures.

32. On or about January 24, 2003, Manager # 2 and Manager # 3 issued a form letter to United States clients reminding them that since at least 1939 Swiss Bank has been successful in concealing account holder identities from United States authorities and that even after Swiss Bank's presence in the United States recently increased after the purchase of a large United States brokerage firm, Swiss Bank was still dedicated to the protection of their identities.

33. On or about July 9, 2004, Swiss Bank represented to the IRS that its United States based operations had failed to provide Form 1099 information to the IRS, failed to withhold the appropriate tax when required to do so, and failed to properly document the owners of certain accounts, but failed to inform the IRS that the United States cross-border business continued to fail

to provide Form 1099 information to the IRS, continued to fail to withhold the appropriate tax when required to do so, and continued to fail to properly document the owners of certain accounts.

34. On or about August 17, 2004, Manager # 1 and Manager # 3, organized a meeting in Switzerland with outside lawyers and accountants to discuss the creation of structures and other vehicles for clients who wanted to conceal their Swiss Bank accounts and income derived therefrom tax authorities in the United States and Canada.

35. In or about September 2004, Desk Heads and Bankers received training in Switzerland on how to avoid detection by authorities when traveling in the United States on Swiss Bank business.

36. During calendar year 2004, approximately 32 Bankers traveled to the United States and met with United States clients approximately 3,800 times to provide unlicensed and unregistered banking services and investment advice relating to the clients' Swiss Bank account.

37. On or about April 15, 2005, United States client identified as I.O. filed his United States Individual Income Tax Return, Form 1040, for the 2004 tax year, listing an address in Lighthouse Point, Florida that fraudulently omitted income earned from offshore assets and falsely represented that I.O. did not have an interest in, and signature and other authority over, financial accounts located in a foreign country.

38. On or about April 25, 2005, defendant RAOUL WEIL and other Executives instructed Managers, Desk Heads, and Bankers to grow the United States cross-border business.

39. In or about early December 2005, Desk Heads and Bankers solicited new business from existing and prospective United States clients at Art Basel Miami Beach in Miami Beach, Florida.

40. On or about March 31, 2006, Executive # 2 and other Executives, enacted restrictions that would have "little" or "some impact" on the profitability of the United States cross-border business.

41. In or about August 2006, defendant RAOUL WEIL and Executive # 1, refused to approve the recommendations of Managers # 2 and # 4 to wind down, sell, or spin off the United States cross-border business, as too costly and requiring public disclosures that would harm Swiss Bank.

42. On or about September 26, 2006, Desk Heads and Bankers were trained at Swiss Bank on how to conduct business discreetly by using mail that would not show Swiss Bank's name and address, by changing hotels while traveling, and by using encrypted laptop computers when traveling to the United States on Swiss Bank business and when meeting with United States clients.

All in violation of Title 18, United States Code, Section 371.

GRAND JURY FOREPERSON

_____
R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY

_____
KEVIN M. DOWNING
MICHAEL P. BEN'ARY
TRIAL ATTORNEYS

_____
JEFFREY A. NEIMAN
ASSISTANT U.S. ATTORNEY

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

**UNITED STATES OF AMERICA**

VS.

RAOUL WEIL

CASE NO. _____

## CERTIFICATE OF TRIAL ATTORNEY*

**Superseding Case Information**:
New Defendant(s)          Yes ____   No ____
Number of New Defendants  ____
Total number of counts    ____

**Court Division**: (Select One)

____ Miami      ____ Key West
_X_  FTL        ____ WPB      ____ FTP

I do hereby certify that:

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3. Interpreter:       (Yes or No)  No
   List language and/or dialect _____

4. This case will take _7-10_ days for the parties to try.

5. Please check appropriate category and type of offense listed below:
   (Check only one)                (Check only one)

   I    0 to 5 days      ____      Petty     ____
   II   6 to 10 days     _X_       Minor     ____
   III  11 to 20 days    ____      Misdem.   ____
   IV   21 to 60 days    ____      Felony    _X_
   V    61 days and over ____

6. Has this case been previously filed in this District Court? (Yes or No)  No
   If yes:
   Judge: _____     Case No. _____
   (Attach copy of dispositive order)

   Has a complaint been filed in this matter?  (Yes or No)  No
   If yes:
   Magistrate Case No.  _____
   Related Miscellaneous numbers:  U.S. v BIRKENFELD 08-60099-CR-Zloch
   Defendant(s) in federal custody as of  _____
   Defendant(s) in state custody as of    _____
   Rule 20 from the _____  District of _____

   Is this a potential death penalty case? (Yes or No)  No

7. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to October 14, 2003?   ____ Yes   _X_ No

8. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to September 1, 2007?   ____ Yes   _X_ No

                                    _____
                                    Jeffrey A. Neiman
                                    ASSISTANT UNITED STATES ATTORNEY
                                    Court Bar No. 544469

*Penalty Sheet(s) attached                                   REV. 4/8/08

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA
# PENALTY SHEET

Defendant's Name: __RAOUL WEIL__   No.: _____

**Count #1:**
Conspiracy; in violation of 18 U.S.C. §371

*Max Penalty: Five years' imprisonment; $100 special assessment; and $250,000 fine

**Count # :**

*Max Penalty:

**Count # :**

*Max Penalty:

**Count # :**

*Max Penalty:

**Count # :**

*Max Penalty:

**Count # :**

*Max Penalty:

**Count # :**

*Max Penalty:

**Count # :**

*Max Penalty:

**Count # :**

*Max Penalty:

*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms or forfeitures that may be applicable.

REV. 12/12/96