# Exhibit A



Eidgenössische Finanzmarktaufsicht FINMA
Autorité fédérale de surveillance des marchés financiers FINMA
Autorità federale di vigilanza sui mercati finanziari FINMA
Swiss Financial Market Supervisory Authority FINMA

# BULLETIN
# 1/2010

**BULLETIN
1/2010**

**Impressum**

**Herausgeberin:**    Eidgenössische Finanzmarktaufsicht FINMA
Einsteinstrasse 2
CH-3003 Bern
Tel. +41 (0)31 327 91 00
Fax +41 (0)31 327 91 01
info@finma.ch
www.finma.ch

**Gestaltung:**    BBF AG, Basel

**Druck:**    Jost Druck AG, Hünibach

09.10  2000  860249180

| | | |
|---|---|---|
| Vorwort | | 4 |
| Avant-propos | | 6 |
| Prefazione | | 8 |

| 1 | Gruppenweise Emissionshaustätigkeit | 10 |
|---|---|---|

| 2 | Beschwerdelegitimation der FINMA | 36 |
|---|---|---|

| 3 | Décision en constatation d'infraction grave au droit de la surveillance | 44 |
|---|---|---|

| 4 | Differenzierte Anfechtbarkeit von superprovisorischen Verfügungen | 60 |
|---|---|---|

| 5 | Rechts- und Reputationsrisiken bei der Umsetzung des Qualified Intermediary Agreement | 76 |
|---|---|---|

| 6 | Rechts- und Reputationsrisiken im grenzüberschreitenden Geschäft | 102 |
|---|---|---|

| 7 | Rückstellungen in der Krankenzusatzversicherung bei unbewilligter Tätigkeit | 122 |
|---|---|---|

# Vorwort

Mit der Aufnahme ihrer Tätigkeit am 1. Januar 2009 trat die Eidgenössische Finanzmarktaufsicht FINMA an die Stelle der Eidgenössischen Bankenkommission (EBK), des Bundesamtes für Privatversicherungen (BPV) sowie der Kontrollstelle für die Bekämpfung der Geldwäscherei (Kst GwG). Im Sinne der Kontinuität wurde damit jedoch nicht alles neu, sondern zum Teil auf Bewährtes aufgebaut und Sinnvolles weitergeführt. So soll auch das mit der Ausgabe 51/2008 letztmals erschienene Bulletin der Bankenkommission, das über Jahre einem breiten Publikum von Spezialisten die Praxis der Aufsichtsbehörde näherbrachte, nicht einfach abgeschafft, sondern in Form des FINMA-Bulletins weitergeführt werden. Dies insbesondere im Bestreben, nicht nur im bankenspezifischen Bereich wichtige Entscheide zu veröffentlichen, sondern eine Gesamtschau der Aufsichtstätigkeit nach den Finanzmarktgesetzen unter dem Dach des Finanzmarktaufsichtsgesetzes (FINMAG) zu geben. Das FINMA-Bulletin erscheint zwar in neuem Kleid, nimmt sich aber konzeptionell in weiten Teilen das EBK-Bulletin zum Vorbild.

Das FINMA-Bulletin hat zum Ziel, wichtige rechtskräftige Entscheide der FINMA sowie die für die Weiterentwicklung der Praxis bedeutenden Urteile des Bundesverwaltungsgerichts und des Bundesgerichts einem breiten Kreis von interessierten Spezialisten bekannt zu machen.

Die Erwägungen der Entscheide und Urteile werden teilweise in gekürztem Wortlaut wiedergegeben. Diesen vorangestellt sind jeweils eine Regeste sowie der zusammengefasste Sachverhalt. Handelt es sich um von den Gerichten veröffentlichte Urteile, werden im FINMA-Bulletin ebenfalls deren Regesten übernommen, zugleich ist aber auch hier der Sachverhalt zusammengefasst.

Die im FINMA-Bulletin veröffentlichten Entscheide der FINMA sind grundsätzlich anonymisiert; Entscheide, welche die Auflösung oder die Eröffnung eines Konkurses einer Gesellschaft zum Gegenstand haben, werden nur so weit anonymisiert, als natürliche Personen involviert sind. Die Urteile der Gerichte schliesslich werden im FINMA-Bulletin entsprechend deren Veröffentlichung übernommen.

Das erste Bulletin widmet sich zentralen Themen, welche die FINMA in den letzten Jahren beschäftigt haben, z. B. dem Umgang mit Rechts- und Reputationsrisiken im grenzüberschreitenden Geschäft. Daneben setzt sich das Bulletin mit neuen Aufsichtsinstrumenten auseinander, die der FINMA mit dem FINMAG gegeben wurden, so z. B. der Feststellungsverfügung. Schliesslich finden auch für die aufsichtsrechtliche Tätigkeit der FINMA relevante Entscheide der Rechtsmittelinstanzen Eingang in diese Publikation.

Urs Zulauf  
General Counsel

Kathrin Tanner  
Leiterin Recht und Compliance

**Avant-propos**

L'Autorité fédérale de surveillance des marchés financiers FINMA a démarré son activité le 1er janvier 2009 et remplace depuis lors la Commission fédérale des banques (CFB), l'Office fédéral des assurances privées (OFAP) et l'Autorité de contrôle en matière de lutte contre le blanchiment d'argent (AdC LBA). A des fins de continuité, il ne conviendra pas de tout reconstruire sur de nouvelles bases suite à cette étape, mais au contraire de se baser sur ce qui a fait ses preuves et de poursuivre les actions judicieuses. Tel est le cas du Bulletin CFB, qui pendant des années a fait connaître la pratique de l'autorité de surveillance à un large public de spécialistes, mais a cessé de paraître avec le numéro 51/2008 : loin d'être définitivement abandonné, il renaît aujourd'hui pour devenir le Bulletin FINMA. Cette nouvelle formule répond à la volonté non seulement de publier les décisions importantes pour le secteur bancaire, mais aussi de donner un aperçu général de l'activité de surveillance menée conformément aux lois régissant les marchés financiers, sous l'égide de la loi sur la surveillance des marchés financiers (LFINMA). S'il a évolué graphiquement, le Bulletin FINMA reste largement fidèle, dans son contenu, au modèle du Bulletin CFB.

Le Bulletin FINMA vise à informer un large cercle de spécialistes sur les décisions importantes et entrées en force rendues par l'Autorité fédérale de surveillance des marchés financiers FINMA, ainsi que sur les arrêts du Tribunal administratif fédéral et du Tribunal fédéral susceptibles d'avoir un impact sur le développement de la pratique.

Dans certains cas, les considérants des décisions et arrêts sont reproduits sous une forme abrégée. Ils sont précédés d'un regeste ainsi que d'un résumé des faits. Lorsqu'il s'agit d'arrêts publiés par les tribunaux, le Bulletin FINMA reproduit les regestes de ces derniers, se permettant toutefois de résumer les faits.

Les décisions de la FINMA publiées dans son Bulletin sont en principe anonymisées ; celles ayant pour objet la dissolution d'une société ou l'ouverture d'une faillite ne sont anonymisées que dans la mesure où des personnes physiques sont impliquées. Enfin, les arrêts des tribunaux sont reproduits dans le Bulletin FINMA tels qu'ils ont été publiés.

Ce premier numéro est consacré à des thèmes majeurs sur lesquels la FINMA s'est penchée ces dernières années, comme la gestion des risques juridiques et des risques de réputation dans les opérations transfrontières. Il aborde aussi de nouveaux instruments de surveillance dont la LFINMA a doté la FINMA, notamment la décision en constatation. Enfin, les décisions rendues par les instances de recours pertinentes quant à l'activité de surveillance de la FINMA s'inscrivent tout naturellement dans cette publication.

Urs Zulauf                      Kathrin Tanner
General Counsel                 Cheffe Droit et compliance

# **Prefazione**

L'Autorità federale di vigilanza sui mercati finanziari FINMA ha iniziato la propria attività il 1° gennaio 2009 subentrando alla Commissione federale delle banche (CFB), all'Ufficio federale delle assicurazioni private (UFAP) e all'Autorità di controllo per la lotta contro il riciclaggio di denaro (AdC LRD). Per garantire una certa continuità col passato, si è voluto valorizzare e portare avanti ciò che di positivo e di sensato già esisteva. Così si è deciso che il bollettino della Commissione federale delle banche (CFB), uscito per l'ultima volta con il numero 51/2008 e con il quale nel corso degli anni si è fatta conoscere la prassi dell'Autorità di vigilanza a un vasto pubblico di specialisti, non scomparirà ma continuerà a esistere sotto una nuova veste: quella del bollettino della FINMA. L'intento non è solo quello di pubblicare le decisioni importanti per il settore bancario ma anche di offrire una panoramica dell'attività di vigilanza svolta conformemente alle leggi sui mercati finanziari facenti capo alla Legge sulla vigilanza dei mercati finanziari (LFINMA). Pur avendo cambiato veste, quindi, il bollettino della FINMA ricalca ampiamente lo schema di quello della CFB.

Il bollettino della FINMA ha lo scopo di portare a conoscenza di una vasta cerchia di specialisti interessati importanti decisioni passate in giudicato emesse dall'Autorità federale di vigilanza sui mercati finanziari FINMA, come pure le sentenze del Tribunale amministrativo federale e del Tribunale federale significative per l'ottimizzazione della prassi.

I considerandi delle decisioni e delle sentenze vengono in parte riportati in forma abbreviata e ogni volta sono preceduti da un regesto e dal riassunto dei fatti. Laddove si hanno sentenze pubblicate da un tribunale, il bollettino della FINMA ripropone anche i rispettivi regesti, ma riassume i fatti.

In linea di massima, le decisioni della FINMA pubblicate nel bollettino sono anonimizzate; quelle che hanno per oggetto lo scioglimento o la dichiarazione di fallimento di una società sono anonimizzate solo nella misura in cui riguardino persone fisiche. Per quanto concerne le sentenze dei tribunali, infine, la FINMA riprende nel proprio bollettino la forma di anonimizzazione adottata dal rispettivo tribunale nella propria pubblicazione.

Il primo numero è dedicato ai temi centrali di cui la FINMA si è occupata negli ultimi anni, come ad esempio la gestione dei rischi giuridici e di reputazione nelle operazioni transfrontaliere. Inoltre esso illustra i nuovi strumenti di vigilanza di cui la FINMA è stata dotata dalla LFINMA, come la decisione di accertamento. In questa pubblicazione, infine, viene dato spazio anche alle decisioni più rilevanti per l'attività di vigilanza della FINMA emananti dalle istanze di ricorso.

Urs Zulauf                    Kathrin Tanner
General Counsel               Responsabile Diritto e compliance

# 1 Gruppenweise Emissionshaustätigkeit

**URTEIL des Bundesgerichts 2C_276/2009 vom 22. September 2009 i.S. Steinhalden AG und Realcapital Invest AG (BGE 136 II 43)**

**Verhältnismässigkeit der aufsichtsrechtlichen Liquidation zweier Firmen, die im Rahmen einer Gruppe finanzmarktrechtlich bewilligungspflichtigen Aktivitäten nachgegangen sind (Art. 1 Abs. 2 und Art. 23ter Abs. 1 BankG [Fassung vor dem 1. Januar 2009]; Art. 3a Abs. 3 lit. a BankV; Art. 10 Abs. 1 und Art. 2 lit. d BEHG; Art. 3 Abs. 2 BEHV; Art. 31 und 37 Abs. 3 FINMAG).**

1. Verhältnismässigkeit der aufsichtsrechtlichen Liquidation zweier Firmen, die im Rahmen einer Gruppe finanzmarktrechtlich bewilligungspflichtigen Aktivitäten nachgegangen sind. Bestätigung der Rechtsprechung bezüglich der Aufsichtsbefugnisse der FINMA gegen Finanzintermediäre, die in Verletzung aufsichtsrechtlicher Bestimmungen als Gruppe arbeitsteilig tätig sind (E. 3 und 4.3).

2. Begriff des Emissionshauses (E. 4.1) und der unerlaubten gewerbsmässigen Entgegennahme von Publikumseinlagen (E. 4.2).

3. Eigenkapitalbezogene Selbstemissionen fallen nicht in den Aufsichtsbereich der EBK bzw. der FINMA, auch wenn ein beigezogener Intermediär anderweitig illegal als Emissionshaus auftritt (E. 4–6).

4. Verhältnismässigkeit der aufsichtsrechtlichen Liquidation einer Holdinggesellschaft, die Beziehungen zu einer bewilligungslos als Emissionshaus tätigen Gruppe unterhält und deren Tochtergesellschaften im Immobilienbereich einer eigenständigen Geschäftstätigkeit nachgehen (E. 7).

**Proportionnalité de la liquidation, ordonnée à titre de mesure de surveillance, de deux entreprises qui ont exercé dans le cadre d'un groupe des activités soumises à autorisation au regard de la législation sur les marchés financiers (art. 1 al. 2 et art. 23ter al. 1 LB [version antérieure au 1er janvier 2009] ; art. 3a al. 3 let. a OB; art. 10 al. 1 et art. 2 let. d LBVM; art. 3 al. 2 OBVM; art. 31 et 37 al. 3 LFINMA).**

1. Confirmation de la jurisprudence relative au devoir de surveillance de la FINMA à l'encontre des intermédiaires financiers qui, en violation des règles juridiques régissant leur surveillance, exercent leurs activités en tant que groupe (consid. 3 et 4.3).

2. Notion de maison d'émission (consid. 4.1) et d'acceptation à titre professionnel de dépôts du public non autorisés (consid. 4.2).

3. Les auto-émissions de capital propre ne sont pas soumises à la surveillance de la Commission fédérale des banques, respectivement de la FINMA, même si un intermédiaire financier qui y a participé agit ailleurs illégalement comme maison d'émission (consid. 4–6).

4. Proportionnalité de la liquidation, ordonnée à titre de mesure de surveillance, d'une société en holding qui entretient des rapports avec un groupe actif en tant que maison d'émission sans autorisation et dont les filiales ont une activité commerciale propre dans le domaine immobilier (consid. 7).

**Proporzionalità della liquidazione, ordinata a titolo di provvedi-
mento di vigilanza, di due ditte, le quali all'interno di un gruppo
hanno svolto delle attività sottoposte ad autorizzazione ai sensi
dalla legislazione sui mercati finanziari (art. 1 cpv. 2 e art. 23ter
cpv. 1 LBCR [versione in vigore prima del 1° gennaio 2009]; art. 3a
cpv. 3 lett. a OBCR; art. 10 cpv. 1 e art. 2 lett. d LBVM; art. 3 cpv. 2
OBVM; art. 31 e 37 cpv. 3 LFINMA).**

1. Conferma della giurisprudenza concernente il dovere di vigilanza della
   FINMA nei confronti degli intermediari finanziari che, in violazione del-
   le disposizioni legali in materia di vigilanza, esercitano le loro attività
   quale gruppo (consid. 3 e 4.3).

2. Nozioni di ditta d'emissione (consid. 4.1) e di accettazione non autoriz-
   zata di depositi del pubblico a titolo professionale (consid. 4.2).

3. Le auto emissioni di capitale proprio non sono sottoposte alla vigi-
   lanza della Commissione federale delle banche, rispettivamente della
   FINMA, anche se un intermediario finanziario a cui si è fatto ricorso
   esercita altrove illegalmente come ditta d'emissione (consid. 4–6).

4. Proporzionalità della liquidazione, ordinata a titolo di provvedimento
   di vigilanza, di una società holding che intrattiene dei rapporti con un
   gruppo attivo quale ditta d'emissione senza autorizzazione e le cui
   filiali hanno un'attività propria nel campo immobiliare (consid. 7).

**Zusammenfassung des Sachverhalts**

Ab Juli 2007 ermittelte die Eidgenössische Bankenkommission (EBK) wegen allfälliger Verletzungen finanzmarktrechtlicher Bestimmungen gegen die Steinhalden AG, die AFT Allgemeine Finanztreuhand AG, die IIC Interfinance Investment Co. Ltd., Panama, die UTG Communications International Inc., Delaware, sowie gegen die Realcapital Invest AG. Am 1. November 2007 stellte die EBK fest, dass neben anderen Gesellschaften auch die Steinhalden AG sowie die Realcapital Invest AG in Verletzung des Bankgesetzes (BankG; SR 952.0) bzw. des Börsengesetzes (BEHG; SR 954.1) gewerbsmässig Publikumseinlagen entgegengenommen hätten bzw. einer bewilligungspflichtigen Effektenhandelstätigkeit nachgegangen seien. A._____ und B._____ wurde verboten, unter jeglicher Bezeichnung selbst oder über Dritte Publikumseinlagen gewerbsmässig entgegenzunehmen, bewilligungspflichtige Bank- oder Effektenhandelstätigkeiten auszuüben oder hierfür in Inseraten, Prospekten, Rundschreiben, elektronischen oder anderen Medien zu werben.

Am 20. März 2009 hiess das Bundesverwaltungsgericht die von der Steinhalden AG, der AFT Allgemeine Finanztreuhand AG und der Realcapital Invest AG hiergegen eingereichte Beschwerde insofern teilweise gut, als es die Feststellung, die Gesellschaften hätten Publikumseinlagen entgegengenommen und so gegen das BankG verstossen, aufhob; im Übrigen wies es die Beschwerde ab, soweit darauf einzutreten war. Das Bundesverwaltungsgericht liess die Frage offen, ob die Aktivitäten der Steinhalden AG und der Realcapital Invest AG finanzmarktrechtlich relevant wären, würden sie für sich allein betrachtet. Da sie im Gruppenverband mit den anderen Gesellschaften gehandelt hätten, träfen sie die aufsichtsrechtlichen Konsequenzen, «selbst wenn [...] – isoliert betrachtet – nicht alle Tatbestandselemente erfüllt» seien oder «sie selbst überhaupt keine finanzmarktrechtlich relevanten Tätigkeiten» ausgeübt hätten. Die von der EBK angenommene Verletzung des BankG sei indessen nicht erstellt, da «ein und dieselbe Geldtransaktion

[...] nicht gleichzeitig eine Zahlung für die Zeichnung von Aktien und eine Publikumseinlage sein» könne.

Die Steinhalden AG und die Realcapital Invest AG gelangten am 30. April 2009 an das Bundesgericht.

## Aus den Erwägungen des Bundesgerichts

1.

1.1    Gegen Urteile des Bundesverwaltungsgerichts im Bereich der Finanzmarktaufsicht kann mit Beschwerde in öffentlich-rechtlichen Ange-legenheiten an das Bundesgericht gelangt werden (Art. 82 ff. BGG i.V.m. Art. 31 VGG; vgl. auch Art. 54 Abs. 1 des Bundesgesetzes vom 22. Juni 2007 über die Eidgenössische Finanzmarktaufsicht [FINMAG; SR 956.1]). Die Organe einer in Liquidation bzw. Konkurs versetzten Gesellschaft sind trotz Entzugs bzw. Dahinfallens ihrer Vertretungsbefugnis hierzu in deren Namen befugt (BGE 132 II 382 E. 1.1). Auf die vorliegende frist- (Art. 100 BGG) und grundsätzlich formgerecht eingereichte Eingabe (Art. 42 BGG) ist unter folgenden Vorbehalten einzutreten:

1.2    Das Urteil des Bundesverwaltungsgerichts wird nur noch durch die Steinhalden AG (in Konkurs) und die Realcapital Invest AG (in Liquidation) infrage gestellt. Die Unzulässigkeit der Aktivitäten der anderen Beteiligten bildet nicht mehr (unmittelbar) Verfahrensgegenstand. Ihnen gegenüber ist die Verfügung der EBK vom 1. November 2007 in Rechtskraft erwachsen, soweit das Bundesverwaltungsgericht sie bestätigt hat.

1.3    Nicht weiter einzugehen ist auf die verschiedenen Feststellungsan-träge der Beschwerdeführerinnen; da vorliegend ein Leistungsurteil ergehen kann, besteht kein schutzwürdiges Interesse an deren Beurteilung (BGE 126 II 300 E. 2c). Anfechtungsobjekt vor Bundesgericht bildet zudem nur der

Entscheid des Bundesverwaltungsgerichts, nicht auch die Verfügung der EBK (Devolutiveffekt; vgl. Art. 86 Abs. 1 lit. a BGG); diese gilt lediglich inhaltlich als mitangefochten (vgl. BGE 129 II 438 E. 1 S. 441; 125 II 29 E. 1c S. 33).

1.4

1.4.1   Das Bundesgericht legt seinem Urteil den Sachverhalt zugrunde, wie ihn die Vorinstanz festgestellt hat (Art. 105 Abs. 1 BGG). Es kann diesen berichtigen und ergänzen, wenn er offensichtlich unrichtig oder in Verletzung wesentlicher Verfahrensrechte festgestellt wurde (Art. 105 Abs. 2 BGG). Entsprechende Rügen sind rechtsgenüglich zu begründen (Art. 42 Abs. 2 und Art. 106 Abs. 2 BGG). Soweit die Beschwerdeführerinnen die Feststellung des Sachverhalts vorliegend rein appellatorisch beanstanden und die Beweiswürdigung ohne detaillierte Auseinandersetzung mit den Ausführungen im angefochtenen Entscheid infrage stellen, ist auf ihre Vorbringen nicht weiter einzugehen (vgl. BGE 133 II 249 E. 1.4 S. 254).

1.4.2   Die FINMA hat, im Rahmen ihrer Vernehmlassung, neue Unterlagen eingereicht, um ihren Standpunkt zu belegen, die Steinhalden AG sei entgegen deren Vorbringen – wie die anderen Gesellschaften – vorwiegend im Finanz- und nur untergeordnet im Immobilienbereich tätig gewesen. Neue Tatsachen und Beweismittel sind im bundesgerichtlichen Verfahren bloss zulässig, soweit der Entscheid der Vorinstanz hierzu Anlass gibt (Art. 99 Abs. 1 BGG). Die FINMA beruft sich in ihrer Vernehmlassung auf einen Untersuchungsbericht der Abteilung Strafsachen und Untersuchungen des Eidgenössischen Finanzdepartements vom 8. Oktober 2008, worin festgestellt wird, dass die Steinhalden AG «während Jahren zahlreiche Finanzdienstleistungen» erbracht habe und sich eine «eigentliche Trennung der Aktivitäten» zwischen ihr, der IIC Interfinance Investment Co. Ltd., Panama, und einer weiteren Gesellschaft «nicht bewerkstelligen» lasse. Dasselbe ergebe sich aus den von den liechtensteinischen Aufsichtsbehörden inzwischen amtshilferechtlich übermittelten Bankunterlagen.

1.4.3    Ob diese Aktenstücke – als bisher der FINMA in unverschuldeter Weise nicht bekannte echte Noven – hier zu berücksichtigen sind oder nicht (vgl. allenfalls pro: ULRICH MEYER, in: Basler Kommentar, Bundesgerichtsgesetz, 2009, N. 36, 40, 43 zu Art. 99 BGG; contra: BERNARD CORBOZ, in: Commentaire de la LTF, 2009, N. 15 ff. zu Art. 99 BGG; YVES DONZALLAZ, Loi sur le Tribunal fédéral, 2008, N. 4043; NICOLAS VON WERDT, in: Handkommentar Bundesgerichtsgesetz [BGG], 2007, N. 3 und 6 zu Art. 99 BGG; BGE 135 V 194 E. 2 u. 3) braucht nicht weiter geprüft zu werden, da der Schluss, die Steinhalden AG habe zur Gruppe um die AFT Allgemeine Finanztreuhand gehört, auch ohne deren Berücksichtigung kein Bundesrecht verletzt.


2.

Das Finanzmarktgesetz ist am 1. Januar 2009 in Kraft getreten. Die Eidgenössische Bankenkommission, das Bundesamt für Privatversicherung und die Kontrollstelle für die Bekämpfung der Geldwäscherei wurden auf dieses Datum hin in die «Eidgenössische Finanzmarktaufsicht (FINMA)» überführt (vgl. Art. 58 Abs. 1 FINMAG). Diese überwacht nunmehr als öffentlich-rechtliche Anstalt mit eigener Rechtspersönlichkeit den Finanzmarkt (Art.4 Abs. 1 FINMAG). Sie hat alle Verfahren der Eidgenössischen Bankenkommission übernommen, die bei Inkrafttreten des Finanzmarktgesetzes noch hängig waren (Art. 58 Abs. 3 FINMAG). Da es die Bankenkommission somit nicht mehr gibt, ist das vorliegende Verfahren mit der FINMA als deren Rechtsnachfolgerin abzuschliessen. Materiellrechtlich ist auf die Rechtslage abzustellen, wie sie dem Entscheid der EBK und des Bundesverwaltungsgerichts zugrunde lag, d. h. auf die Fassungen der Artikel des Banken- und Börsengesetzes, wie sie vor den mit dem Finanzmarktgesetz verbundenen Änderungen galten (vgl. die Urteile 2C_749/2008 vom 16. Juni 2009 E. 1 sowie 2C_74/2009 vom 22. Juni 2009 E. 1.2).

3.

3.1     Die Eidgenössische Bankenkommission (bzw. heute die FINMA) ist befugt, zur Beseitigung von Missständen und zur Wiederherstellung des ordnungsgemässen Zustands alle «notwendigen Verfügungen» zu treffen (vgl. Art. 23ter Abs. 1 BankG [Fassung vor dem 1. Januar 2009], Art. 31 FINMAG). Da sie allgemein über die Einhaltung der «gesetzlichen Vorschriften» zu wachen bzw. für die Wiederherstellung des ordnungsgemässen Zustands zu sorgen hat, ist ihre Aufsicht nicht auf die dem Gesetz unterstellten Betriebe beschränkt. Zu ihrem Aufgabenbereich gehören auch die Abklärung der finanzmarktrechtlichen Bewilligungspflicht und die Ermittlung von Finanzintermediären, die in Verletzung der gesetzlichen Bestimmungen bewilligungslos tätig sind (BGE 132 II 382 E. 4.1 mit Hinweisen). Sie ist deshalb berechtigt, die im Gesetz vorgesehenen Mittel auch gegenüber Instituten (oder Personen) einzusetzen, deren Unterstellungs- bzw. Bewilligungspflicht (noch) umstritten ist.

3.2     Geht eine Gesellschaft unbewilligt einer den Banken oder den bewilligten Effektenhändlern vorbehaltenen Tätigkeit nach, kann die EBK bzw. die FINMA sie im Rahmen der allgemeinen Verfassungs- und Verwaltungsgrundsätze (Willkürverbot, Rechtsgleichheits- und Verhältnismässigkeitsgebot, Treu und Glauben usw.) aufsichtsrechtlich liquidieren (BGE 131 II 306 E. 3.1.2; vgl. Art. 37 Abs. 3 FINMAG). Ihr Vorgehen soll dabei den Hauptzwecken der finanzmarktrechtlichen Gesetzgebung, dem Schutz der Gläubiger bzw. Anleger einerseits und der Lauterkeit des Kapitalmarkts andererseits, Rechnung tragen (BGE 2C_749/2008 vom 16. Juni 2009 E. 3.1). Erweist sich das betroffene Unternehmen als überschuldet oder dauernd zahlungsunfähig, ist über den unbewilligt auftretenden Finanzintermediär analog den Art. 33 ff. BankG (in der Fassung vom 3. Oktober 2003 [AS 2004 2767]) der Bankenkonkurs zu eröffnen und durchzuführen. Dabei braucht die Sanierungsfähigkeit (Art. 28 ff. BankG [in der Fassung vom 3. Oktober 2003]) in der Regel nicht mehr gesondert geprüft zu werden. Mit der nachträglichen Verweigerung der Erteilung der erforderlichen Bewilligung und der Anord-

nung der Liquidation ist eine Fortführung als unterstellter Betrieb ausge-
schlossen (BGE 132 II 382 E. 4.2 S. 388; 131 II 306 E. 4.1.3 S. 321).

3.3     Die finanzmarktrechtlichen Massnahmen müssen indessen – wie
jedes staatliche Handeln – verhältnismässig sein (vgl. zur Einsetzung eines
Beobachters: BGE 126 II 111 E. 5b/bb). Sie sollen mit anderen Worten nicht
über das hinausgehen, was zur Wiederherstellung des gesetzmässigen
Zustands erforderlich ist: Geht die Gesellschaft sowohl einer bewilligungs-
pflichtigen als auch einer finanzmarktrechtlich unbedenklichen Aktivität
nach, ist nur der bewilligungpflichtige Teil zu liquidieren, falls dies tech-
nisch möglich und die erlaubte Geschäftstätigkeit von eigenständiger Be-
deutung ist. Es dürfen keine buchhalterisch nicht abgrenzbaren finanziellen
Mittel, die in Verletzung finanzmarktrechtlicher Bestimmungen generiert
wurden, in die nicht bewilligungpflichtige Tätigkeit geflossen sein; zudem
muss – etwa aufgrund eines Wechsels in der Geschäftsleitung oder dem
Verwaltungsrat – davon ausgegangen werden können, dass künftig kein
relevantes Risiko mehr besteht, dass wiederum gesetzeswidrig bewilli-
gungspflichtige Aktivitäten entfaltet werden könnten (vgl. BGE 131 II 306
E. 3.3 S. 317; Urteil 2C_74/2009 vom 22. Juni 2009 E. 3.2.3).

4.

4.1     Effektenhändler gelten als Emissionshaus, wenn sie hauptsächlich
im Finanzbereich tätig sind und gewerbsmässig Effekten, welche von Dritt-
personen ausgegeben wurden, fest oder in Kommission übernehmen und
öffentlich auf dem Primärmarkt anbieten (Art. 3 Abs. 2 der Verordnung
vom 2. Dezember 1996 über die Börsen und den Effektenhandel [BEHV;
SR 954.11]). Die Tätigkeit ist bewilligungpflichtig (Art. 10 Abs. 1 i.V.m.
Art. 2 lit. d BEHG; vgl. auch EBK-RS 98/2 Effektenhändler, in: THÉVENOZ/
ZULAUF, BF 2007, N. 24 ff. zu 31A-21 sowie das Rundschreiben der FINMA
2008/5: Erläuterungen zum Begriff Effektenhändler, N. 24 ff., in: dieselben,
BF 2009, B-08.05; URS P. ROTH, in: Kommentar zum Bundesgesetz über

die Börsen und den Effektenhandel, 2000, N. 35 ff. zu Art. 2 lit. d BEHG). Als Primärmarkt wird der Markt bezeichnet, in dem Kapitalmarktpapiere (Aktien, Obligationen usw.) erstmals begeben (emittiert) werden; auf dem Sekundärmarkt werden die emittierten Kapitalmarktpapiere börslich oder ausserbörslich gehandelt (EMCH/RENZ/ARPAGAUS, Das Schweizerische Bankgeschäft, 6. Aufl., 2004, N. 1816). Effektenhändler gehen nur dann einer bewilligungspflichtigen Aktivität als Emissionshaus nach, wenn sie hauptsächlich im Finanzbereich tätig sind (Art. 2 Abs. 1 BEHV); ihre geschäftlichen Aktivitäten im Finanzbereich müssen gegenüber allfälligen anderen Zwecken (industrieller oder gewerblicher Natur) aufgrund der Würdigung aller Umstände deutlich überwiegen (EBK-RS 98/2 N. 7 ff.; PHILIPPE A. HUBER, in: Basler Kommentar, Börsengesetz, 2007, N. 27 zu Art. 2 lit. d BEHG). Gewerbsmässig handelt, wer das Effektenhandelsgeschäft wirtschaftlich selbständig und unabhängig betreibt. Seine Aktivität muss darauf ausgerichtet sein, regelmässige Erträge aus diesem zu erzielen (EBK-RS 98/2 N. 11 f.). Das Angebot ist öffentlich, wenn es sich an unbestimmt viele Personen richtet (d. h. insbesondere durch Inserate, Prospekte, Rundschreiben oder elektronische Medien verbreitet wird), nicht indessen, wenn damit ausschliesslich in- und ausländische Effektenhändler oder andere staatlich beaufsichtigte Unternehmen, Aktionäre oder Gesellschafter mit einer massgebenden Beteiligung am Schuldner und mit ihnen wirtschaftlich oder familiär verbundene Personen sowie institutionelle Anleger mit professioneller Tresorerie angesprochen werden (EBK-RS 98/2 N. 14 f.). Keine Tätigkeit als Emissionshaus übt aus, wer Effekten ohne öffentliches Angebot bei weniger als 20 Kunden platziert (EBK-RS 98/2 N. 28). Nicht unter die börsenrechtliche Bewilligungspflicht fällt – anders als der «Underwriter», d. h. das Mitglied eines Syndikats, das sich verpflichtet, Titel, die nicht platziert werden können, selber zu übernehmen (PHILIPPE A. HUBER, a. a. O., N. 41 zu Art. 2 lit. d BEHG) – der Emittent: Die Emission eigener Beteiligungspapiere unterliegt nicht dem Börsengesetz; ebenso wenig die bloss technische Festübernahme, die es einer Aktiengesellschaft erlaubt, eine Kapitalerhöhung (Kapitalerhöhungsbeschluss und Feststellung der

Liberierung) in einem Schritt durchzuführen: Die emittierten Aktien sind den Aktionären nach den Vorschriften des Aktienrechts anzubieten; dabei stehen regelmässig keine BEHG-relevanten Anlegerschutz- und Funktions-interessen auf dem Spiel (URS P. ROTH, a. a. O., N. 37 zu Art. 2 lit. d BEHG).

4.2     Natürlichen und juristischen Personen, die nicht dem Bankengesetz unterstehen, ist es untersagt, gewerbsmässig Publikumseinlagen entgegen-zunehmen. Der Bundesrat kann Ausnahmen vorsehen, sofern der Schutz der Einleger gewährleistet ist (Art. 1 Abs. 2 BankG [in der Fassung vom 18. März 1994]). Die Entgegennahme von Publikumseinlagen, das banken-mässige Passivgeschäft, besteht darin, dass ein Unternehmen gewerbsmäs-sig Verpflichtungen gegenüber Dritten eingeht, d. h. selber zum Rückzah-lungsschuldner der entsprechenden Leistung wird (BGE 132 II 382 E. 6.3.1 S. 391 mit Hinweisen; vgl. EMCH/RENZ/ARPAGAUS, a. a. O., N. 1227 ff.). Dabei gelten grundsätzlich alle Verbindlichkeiten als Einlagen (vgl. das EBK-Rundschreiben 96/4: Gewerbsmässige Entgegennahme von Publikumseinla-lagen durch Nichtbanken im Sinne des Bankengesetzes [EBK-RS 96/4], in: THÉVENOZ/ZULAUF, BF 2007, N. 10 zu 31A-15). Ausgenommen davon sind, unter gewissen, eng umschriebenen Voraussetzungen, fremde Mittel ohne Darlehens- oder Hinterlegungscharakter (Art. 3a Abs. 3 lit. a [in der Fas-sung vom 12. Dezember 1994] der Verordnung vom 17. Mai 1972 über die Banken und Sparkassen, BankV; SR 952.02), Anleihensobligationen (Art. 3a Abs. 3 lit. b BankV), Abwicklungskonti (Art. 3a Abs. 3 lit. c BankV), Gelder für Lebensversicherungen und die berufliche Vorsorge (Art. 3a Abs. 3 lit. d BankV) sowie Zahlungsmittel und Zahlungssysteme (N. 18[bis] EBK-RS 96/4; vgl. zum Ganzen: BGE 131 II 306 E. 3.2.1). Keine Publikumseinlagen bilden Einlagen von Banken oder anderen staatlich beaufsichtigten Unternehmen (Art. 3a Abs. 4 lit. a BankV), Aktionären oder Gesellschaftern mit einer qua-lifizierten Beteiligung am Schuldner (Art. 3a Abs. 4 lit. b BankV; vgl. hierzu KLEINER/SCHWOB, in: Kommentar zum Bundesgesetz über die Banken und Sparkassen, 2004, N. 38 zu Art. 1 BankG [Ausgabe April 2004]), von institu-tionellen Anlegern mit professioneller Tresorerie (Art. 3a Abs. 4 lit. c BankV),

von Einlegern bei Vereinen, Stiftungen und Genossenschaften, sofern diese «in keiner Weise im Finanzbereich tätig sind» (Art. 3a Abs. 4 lit. d BankV), sowie von Arbeitnehmern bei ihrem Arbeitgeber (Art. 3a Abs. 4 lit. e BankV). Gewerbsmässig im Sinne des Bankengesetzes handelt, wer dauernd mehr als 20 Publikumseinlagen hält (Art. 3a Abs. 2 BankV) oder in Inseraten, Prospekten, Rundschreiben oder elektronischen Medien für die gewerbsmässige Entgegennahme von Geldern wirbt (vgl. Art. 3 Abs. 1 BankV; BGE 132 II 382 E. 6.3.1 S. 391; 131 II 306 E. 3.2.1).

4.3

4.3.1    Wie das Bundesgericht in zwei jüngeren Entscheiden bestätigt hat, kann eine bewilligungpflichtige Aktivität als Effektenhändler bzw. eine bankengesetzlich unzulässige Entgegennahme von Publikumsgeldern auch bei einem arbeitsteiligen Vorgehen im Rahmen einer Gruppe vorliegen: Die Bewilligungspflicht und die finanzmarktrechtliche Aufsicht sollen nicht dadurch umgangen werden können, dass jedes einzelne Unternehmen bzw. die dahinter stehenden Personen für sich allein nicht alle Voraussetzungen für die Bewilligungspflicht erfüllen – etwa weniger als 20 Einlagen halten –, im Resultat gemeinsam aber dennoch eine bewilligungspflichtige Tätigkeit ausüben. Der Schutz des Marktes und der Anleger (vgl. Art. 5 FINMAG) rechtfertigt trotz formaljuristischer Trennung der Strukturen finanzmarktrechtlich eine einheitliche (wirtschaftliche) Betrachtungsweise, falls zwischen den einzelnen Personen und/oder Gesellschaften enge wirtschaftliche (finanzielle/geschäftliche), organisatorische oder personelle Verflechtungen bestehen und vernünftigerweise einzig eine Gesamtbetrachtung den faktischen Gegebenheiten und der Zielsetzung der Finanzmarktaufsicht gerecht wird. Ein gruppenweises Handeln kann insbesondere dann vorliegen, wenn die Beteiligten gegen aussen als Einheit auftreten bzw. aufgrund der Umstände (Verwischen der rechtlichen und buchhalterischen Grenzen zwischen den Beteiligten; faktisch gleicher Geschäftssitz; wirtschaftlich unbegründete, verschachtelte Beteiligungsverhältnisse; zwischengeschaltete Treuhandstrukturen) davon auszugehen ist, dass koordiniert – ausdrücklich oder

stillschweigend arbeitsteilig und zielgerichtet – eine gemeinsame Aktivität im aufsichtsrechtlichen Sinn ausgeübt wird (vgl. BGE 135 II 356 E. 3.2 mit Hinweisen auf die bisherige Rechtsprechung, bestätigt im Urteil 2C_74/2009 vom 22. Juni 2009 E. 2.2.2 und E. 3).

4.3.2   Was die Beschwerdeführerinnen gestützt auf ein privates Rechtsgutachten vom 27. April 2009 (Prof. R.) hiergegen einwenden, überzeugt nicht: Richtig ist, dass weder das Banken- noch das Börsengesetz ausdrücklich eine Regelung bezüglich der Liquidation von im Rahmen einer Gruppe tätigen Finanzintermediären enthält und die Auflösung einer juristischen Person einen schweren Eingriff in die Wirtschaftsfreiheit (vgl. Art. 27, Art 94 sowie Art. 95 Abs. 1 BV) und allenfalls in die Eigentumsgarantie (Art. 26 BV) bedeutet. Nach Art. 23[ter] Abs. 1 BankG bzw. Art. 35 Abs. 3 BEHG (AS 1997 78) trifft die Finanzmarktaufsichtsbehörde indessen die zur Beseitigung der von ihr festgestellten Missstände nötigen Verfügungen. Diese gesetzliche Grundlage deckt im Interesse der Anleger und des Finanzplatzes auch Anordnungen gegen Finanzintermediäre ab, die in Verletzung bzw. in Umgehung finanzmarktrechtlicher Bestimmungen bewilligungslos tätig sind, und erlaubt, ihnen gegenüber die für die überwachten Händler im Gesetz geregelten Sanktionen und Verwaltungsmassnahmen analog anzuwenden. Die erforderlichen Einschränkungen ergeben sich aus den jeweils zu berücksichtigenden verfassungs- und verwaltungsrechtlichen Grundsätzen, wie sie das Bundesgericht konkretisiert hat. Bei sämtlichen Massnahmen (Einsetzung eines Untersuchungsbeauftragten, Liquidation, Bankenkonkurs usw.) kommt dabei – wegen der Offenheit der Gesetzesgrundlage – dem Verhältnismässigkeitsprinzip eine besondere Bedeutung zu. Die Eingriffsvoraussetzungen von Art. 36 BV sind somit grundsätzlich erfüllt, ohne dass – wie dies die Beschwerdeführerinnen tun – auf den abweichenden Gruppenbegriff im Zusammenhang mit den börsenrechtlichen Meldepflichten (Art. 20 BEHG) oder der bankenrechtlichen Gruppenaufsicht (vgl. Art. 3c bzw. Art. 4[ter] BankG) zurückgegriffen werden müsste, zumal diese anderen Zwecken dienen als die gruppenmässige Erfassung von bewilligungslos tätigen Intermediären.

4.3.3   Der Gesetzgeber hat in Kenntnis der bundesgerichtlichen Praxis in Art. 31 FINMAG hieran festgehalten, nachdem bereits der Bundesrat in seiner Botschaft darauf hingewiesen hatte, dass die Neuformulierung den bisherigen Regelungen in den Finanzmarktgesetzen entspreche und die Pflicht der FINMA statuiere, bei Missständen für die Wiederherstellung des ordnungsgemässen Zustands zu sorgen, wobei sie den «Grundsatz der Verhältnismässigkeit» zu beachten habe (BBl 2006 2829 ff. Ziff. 2.3.2 [S. 2881]). Die FINMA entzieht nach Art. 37 FINMAG dem Beaufsichtigten die Bewilligung, wenn er die Voraussetzungen für die Tätigkeit nicht mehr erfüllt oder aufsichtsrechtliche Bestimmungen schwer verletzt, wobei sich die Folgen nach dem jeweiligen Finanzmarktgesetz richten. Diese gelten «analog, wenn eine Beaufsichtigte oder ein Beaufsichtigter tätig ist, ohne über eine Bewilligung, eine Anerkennung, eine Zulassung oder eine Registrierung zu verfügen» (Art. 37 Abs. 3 FINMAG; vgl. ZULAUF/WYSS/ROTH, Finanzmarktenforcement, 2008, S. 248 ff.). Die Regelung gebe – so der Bundesrat – die bisher vom Bundesgericht geschützte Praxis der EBK zur Liquidation illegaler Banken und Effektenhändlerinnen und -händler wieder, die fortgesetzt werden solle (BBl 2006 2829 ff. Ziff. 3.2 [S. 2885]). Das Erfassen von bewilligungslos tätigen Intermediären im Rahmen einer Gruppe aufgrund einer wirtschaftlichen (statt rein formellen) Betrachtungsweise mit den entsprechenden aufsichtsrechtlichen Konsequenzen richtet sich gegen den Rechtsmissbrauch (vgl. BGE 133 II 6 E. 3.2) und soll verhindern, dass Akteure, die in Umgehung der finanzmarktrechtlichen Auflagen handeln, besser gestellt werden, als wer sich gesetzeskonform der Aufsicht der staatlichen Behörden unterwirft.


5.

Das Bundesverwaltungsgericht hat das Verhalten der AFT Allgemeine Finanztreuhand AG (in Liquidation) – wie bereits die Bankenkommission – als öffentliches gewerbsmässiges Anbieten von Effekten bzw. Aktien eingestuft. Die Vorgehensweise sei immer dieselbe gewesen: Die Mitarbeiter bzw. die Organe der AFT hätten telefonisch und anschliessend persönlich potentielle

Investoren kontaktiert und überzeugt, nicht börsenkotierte Aktien unter anderem der Hematec Holding AG, der NicStic AG, der Libidfit AG sowie der Realcapital Invest AG zu erwerben. Den Investoren sei in Aussicht gestellt worden, die Aktien jeweils in wenigen Monaten zu einem Mehrfachen ihres Kaufpreises weiterveräussern zu können; teilweise wurde ihnen auch zugesichert, dass die AFT diese gegebenenfalls zurückkaufen bzw. weiterverkaufen könnte. Der in Aussicht gestellte Börsengang habe in der Folge nie stattgefunden; die angebotenen Aktien hätten sich vielmehr als Non-Valeur erwiesen; ein reeller Marktpreis habe nicht bestanden. Die Aktien seien unter den involvierten Gesellschaften nicht direkt bezahlt, sondern der Kaufpreis mit vorbestehenden Forderungen von fraglicher Werthaltigkeit verrechnet oder mittels verrechnungsmässiger Tatbestände im Rahmen von Kontokorrentverhältnissen beglichen worden, sodass kein direkter Mittelfluss zur Bezahlung der Papiere aktenmässig nachweisbar sei; teilweise seien die Aktien in diesem Rahmen aufgrund von unzulässigen Pfandverfallsabreden dem Publikum angeboten worden. Der AFT seien aus dieser Geschäftstätigkeit von diversen Privatpersonen Gelder im Umfang von mehreren Millionen Franken zugeflossen. Dieser Entscheid des Bundesverwaltungsgerichts ist der AFT gegenüber in Rechtskraft erwachsen und hier nicht mehr zu prüfen (vgl. E. 1.2). Ein ähnlicher Handel mit Titeln der Hematec Holding AG, der NicStic AG, der Libidfit AG lag im Übrigen dem Urteil BGE 135 II 356 zugrunde. Fraglich ist vorliegend indessen, ob und wieweit die Steinhalden AG bzw. die Realcapital Invest AG ihrerseits – allein oder als Gruppe verbunden mit der AFT und den weiteren involvierten Gesellschaften um diese bzw. um A._____ und B._____ herum – einer bewilligungspflichtigen Tätigkeit nachgegangen sind.

6.

6.1 Die Steinhalden AG ist am 12. August 1986 als Socimex Immobilien AG gegründet worden; ihr Name wurde am 11. September 1992 in den heutigen abgeändert. Einziges Mitglied des Verwaltungsrats ist A._____; ihm und seiner Frau gehören die 2'000 Namenaktien zu Fr. 100.--. Die Steinhalden

AG hält und betreibt ein Geschäftshaus von 5'000 m², das zum Zeitpunkt
der Eröffnung der aufsichtsrechtlichen Untersuchung an die Media Markt
(Schweiz) AG, einen Limousinenservice und die AFT Allgemeine Treuhand
AG vermietet war. Hieraus wurden teilweise – so der für das Bundesgericht
im vorliegenden Verfahren verbindlich festgestellte Sachverhalt (vgl. Art. 105
BGG, E. 1.4.1) – Erträge erwirtschaftet, die den Aufwand für die Hypo-
thekarzinsen «weit» überstiegen (E. 6.1 des angefochtenen Entscheids).
Unter diesen Umständen ist davon auszugehen, dass die Steinhalden AG
tatsächlich einer eigenen gewerblichen Geschäftstätigkeit nachgeht, wobei
die Verwaltungsaufgaben von den Aktionären A._____ und seiner Frau
wahrgenommen werden.

6.2   Auf dem Konto der Steinhalden AG sind zwischen dem 15. April
und dem 18. Juni 2004 Einzahlungen über mindestens Fr. 1,25 Mio. ein-
gegangen, welche laut Zahlungsvermerk den Kauf oder die Zeichnung von
Libidfit-Aktien betrafen. Die Steinhalden AG begründete dieses Geschäft
damit, dass sie 800'000 Libidfit-Aktien an die ICC verkauft habe, welche ihr
den Kaufpreis ratenweise überwies, bzw. dass sie diese mandatiert habe, die
Aktien aus ihrem Eigenbestand zu verkaufen. Der bei den Akten liegende
Vertrag sieht vor, dass die ICC die entsprechenden Aktien nicht öffentlich
und nur an wenige, qualifizierte Käufer veräussern dürfe, woran diese sich
in der Folge nicht gehalten hat. Mit der Vorinstanz ist davon auszugehen,
dass aufgrund der vorliegend zu berücksichtigenden Unterlagen nicht als
belegt gelten kann, dass die Steinhalden AG selber Libidfit-Wertpapiere auf
dem Primärmarkt im Rahmen einer hauptsächlichen Geschäftstätigkeit im
Finanzbereich angeboten hat und somit selber illegal als Emissionshaus tätig
geworden ist.

6.3
6.3.1   Das Bundesverwaltungsgericht durfte indessen die Steinhalden AG in
die Aktivitäten der Gruppe um die AFT miteinbeziehen und in diesem Rahmen
gegen sie aufsichtsrechtlich vorgehen: A._____ war sowohl bei der AFT

als auch bei der Steinhalden AG, der Realcapital Invest AG sowie der IIC und UTG zeichnungsberechtigt. B._____ war seinerseits sowohl Geschäftsführer der AFT wie der IIC. Nach Aussagen von A._____ sollen die Aktien der AFT vollumfänglich diesem gehören; B._____ seinerseits erklärte indessen, sie gehörten ihm und A._____ gemeinsam. Das umstrittene Konzept eines mit Aktien und Zertifikaten von Start-Up-Firmen handelnden Finanzintermediärs wurde über die von ihnen beherrschten Firmen realisiert, wobei diese durch die Verschiebungen der Aktien jeweils dazu dienten, trotz fragwürdiger Werthaltigkeit einzelner Papiere entsprechende Kurse stellen zu können. Die Steinhalden AG wurde von den gleichen Büroräumlichkeiten aus betrieben wie die Allgemeine Finanztreuhand AG und die UTG bzw. die IIC, wobei die gleichen Telefon- und Faxnummern verwendet wurden. Es konnten dort auch deren Geschäftsunterlagen sichergestellt werden. Die Steinhalden AG war Mitbegründerin der Allgemeinen Finanztreuhand AG; zwischen ihnen kam es zu wechselseitigen Zahlungen, für die keine nachvollziehbaren wirtschaftlichen Begründungen ersichtlich sind.

6.3.2 Der Schluss des Bundesverwaltungsgerichts bzw. des Untersuchungsbeauftragten, dass der Empfängerin offenbar jeweils kurzfristig Liquiditäten zur Verfügung gestellt werden sollten, um dem drohenden Konkurs zu entgehen bzw. um die Empfängergesellschaften «aufzublähen», um mehr Fremdgelder «anzulocken», ist aufgrund der Umstände und des Verhaltens der Betroffenen beweiswürdigungsrechtlich vertretbar: Die Organe der AFT und der Steinhalden AG versuchten wiederholt, die Ermittlungen zu erschweren bzw. den Zugang zu den verschiedenen Unterlagen ihrer Geschäftstätigkeit zu vereiteln (Verschweigen von Verschlüsselungskoden, Konten, Archivräumlichkeiten sowie widersprüchliche Angaben), was die Vorinstanzen bei ihrer Einschätzung mitberücksichtigen durften. Der Beitrag der Steinhalden AG floss in einer Art in das über A._____ und B._____ koordinierte Gruppenverhalten ein, welche sie – trotz bloss einmaligen Verkaufs von 800'000 Libidfit-Aktien – als Teil des (Gesamt-)Systems erscheinen lässt. Die Geschäfte der Steinhalden AG mit den

anderen Gruppenmitgliedern bildeten Teil der Pläne und Aktivitäten, über eine verschachtelte Struktur von unter sich wirtschaftlich verbundenen Gesellschaften Drittanlegern öffentlich auf dem Primärmarkt Effekten von zweifelhafter, teilweise vorgespiegelter Werthaltigkeit anzubieten (vgl. BGE 135 II 356 E. 4.3).

6.3.3   Die Aktivitäten der Steinhalden AG gingen über die Verwaltung einer einzelnen Immobilie hinaus; dabei handelte es sich um eine untergeordnete Tätigkeit, welche weder ihrem Einbezug in die bewilligungspflichtige Gruppe noch ihrer aufsichtsrechtlichen Liquidation entgegenstand (vgl. BGE 131 II 306 E. 3.3 S. 317). Der Einwand der Steinhalden AG, sie selber sei bei den Geschäften der anderen Gruppenmitglieder nicht gegen aussen aufgetreten und von den Anlegern deshalb – worauf es beim Gruppenbegriff ankomme (Urteile 2A.442/1999 vom 21. Februar 2000 E. 3b/dd und 2A.332/2006 vom 6. März 2007 E. 5.2.4) – auch nicht als Teil von deren Handeln wahrgenommen worden, überzeugt nicht: Ein aufsichtsrechtlich begründetes Schutzbedürfnis von Anlegern und Finanzplatz besteht nicht nur gegenüber nach aussen illegal in einem bewilligungspflichtigen Bereich auftretenden Finanzintermediären, sondern auch gegen Mitbeteiligte, die trotz ihrer Aktivität im Hintergrund als Teil des Systems gelten müssen, weil koordiniert und arbeitsteilig vorgegangen wird. Im Übrigen ist die Steinhalden AG tatsächlich nach aussen aufgetreten, wobei ihr Handeln als auswechselbarer Teil der Tätigkeit der Unternehmensgruppe wahrgenommen wurde. Dies ergibt sich etwa aus der Zivilklage eines Anlegers vom 24. April 2006, der im Sommer 2004 von der AFT Libidfit-Aktien für Fr. 30'000.-- und Hematec-Holding-Aktien für Fr. 40'000.-- erworben und im März 2005 ein neues Geschäft mit Hematec-Holding-Aktien (für Fr. 50'000.--) getätigt hatte. B._____ hat dabei unter anderem für die Steinhalden AG, die AFT Allgemeine Finanztreuhand AG, die IIC Interfinance Investments Ltd. und die IBC Group AG gehandelt, wobei nicht klar gewesen ist, mit wem das Geschäft eigentlich geschlossen wurde, da alle involvierten Firmen über die gleiche Adresse verfügten und sich jeweils vertraten.

7.

7.1    Heikler erscheint die Frage, ob auch die Realcapital Invest AG zur illegal als Emissionshaus tätigen Gruppe gerechnet werden durfte und ob deren aufsichtsrechtliche Liquidation gerechtfertigt war. Die Realcapital Invest AG wurde am 9. Dezember 2004 gegründet. Ihr heutiges Grundkapital beträgt Fr. 4'357'000.--; es ist eingeteilt in 407'000 Namenaktien (Stimmrechtsaktien) à Fr. 1.-- und 395'000 Inhaberaktien à Fr. 10.--. Die Gesellschaft soll 15 Aktionären gehören, die das entsprechende Kapital grösstenteils im Rahmen verschiedener Kapitalerhöhungen gezeichnet haben. Als Verwaltungsräte der Firma amtieren A._____, D._____ und E._____, wobei A._____ als Geschäftsführer über die Einzelzeichnungsberechtigung verfügt, während die beiden anderen Verwaltungsräte kollektiv zu zweien firmieren. Die Realcapital Invest AG ist als Immobilien-Holdinggesellschaft tätig; sie hält mit der Real Consulting AG (Aktienkapital von Fr. 500'000.--) und der Real Immobilien AG, beide in Zug, sowie der Tiffany's Immobilien AG in Sarnen (Aktienkapital von je Fr. 100'000.--) drei Tochtergesellschaften. Diese verwalten verschiedene Miethäuser und sind in Bauprojekten engagiert: Die Real Consulting AG verfügt über zwei Mehrfamilienhäuser (Investitionsvolumen von je ca. Fr. 2,7 Mio.). Die Real Immobilien AG hat 3 Mehrfamilienhäuser mit rund 32 Wohnungen von einem geschätzten Investitionsvolumen von Fr. 11 Mio. im Bau, die Tiffany's Immobilien AG deren 6 mit 50 Wohnungen und einem geplanten Investitionsvolumen von Fr. 20 Mio. Die Aktivitäten der Realcapital Invest AG liegen in der Kreditvergabe an ihre Tochtergesellschaften und dem Investment in Schuldbriefen; ihre Einnahmen erwirtschaftet sie aus den entsprechenden Zins- und Dividendenerträgen.

7.2    Unter diesen Umständen kann nicht gesagt werden, dass sie – wie im vorinstanzlichen Entscheid festgehalten wird – keiner ins Gewicht fallenden Geschäftstätigkeit nachgeht. Die entsprechende Sachverhaltsfeststellung hat als offensichtlich fehlerhaft zu gelten; die daraus gezogene rechtliche Qualifikation als unzutreffend (vgl. E. 1.4.1): Nicht jede Holdingstruktur, in

deren Rahmen Gelder beschafft und Tochtergesellschaften zur Verfügung gestellt werden, ist als solche unzulässig und hat als überwiegende Aktivität im Finanzbereich zu gelten. Eine reine Holding muss auch nicht notwendigerweise über eigene Geschäftsräume oder Arbeitnehmer verfügen. Bei der Einschätzung der Aktivitäten ist eine faire Gesamtsicht erforderlich. Die Realcapital Invest AG beschafft Gelder über Aktienerhöhungen, die dann in konkrete Immobilienprojekte fliessen. Diese scheinen wirtschaftlich nicht unrealistisch zu sein, werden sie doch über Hypothekarkredite auch von verschiedenen Banken massgeblich unterstützt. Die Ausgabe eigener Aktien ist weder eine Effektenhändlertätigkeit, noch stellt sie eine Entgegennahme von Publikumseinlagen dar. Die Aktienerhöhung bzw. deren Zeichnung und Liberierung richtet sich nach den Bestimmungen des Aktienrechts (Art. 650 ff. OR); deren Einhaltung bildet in der Regel nicht Gegenstand der Finanzmarktaufsicht. Mit dem Bundesverwaltungsgericht ist davon auszugehen, dass die Erteilung eines Platzierungsauftrags (hinsichtlich eigener Aktien) aufsichtsrechtlich nicht als illegal gelten kann, selbst wenn der Beauftragte – wie hier die AFT Allgemeine Finanztreuhand AG – seinerseits anderweitig als unbewilligtes Emissionshaus auftritt. Die Realcapital Invest AG hat selber nicht mit Aktien Dritter gehandelt, ihre Papiere wurden über die AFT zur Zeichnung angeboten, wobei eine kommissionsweise Festübernahme nicht erstellt ist. Zwar ist auf den Unterlagen von einem unwiderruflichen «Kauf» der Aktien die Rede, das entsprechende Papier war indessen jeweils als «Zeichnungsschein» überschrieben und trug den Zahlungsvermerk «Realcapital AK Erhöhung» sowie – zumindest teilweise – auch einen Abschnitt «Zeichnungsbedingungen». Der Vorwurf des öffentlichen Angebots und der Ausgabe von mehrjährigen Anleihen mit Verzinsung durch die Realcapital Invest AG ist – entgegen den Ausführungen der EBK in ihrer Verfügung vom 1. November 2007 – nicht erwiesen: Zwar finden sich entsprechende leere Unterlagen bei den Akten, doch ist aufgrund dieser der Einwand der Realcapital Invest AG nicht widerlegt, dass es sich bei den Dokumenten nur um interne Entwürfe und Modelle gehandelt habe, die noch zu prüfen gewesen seien. Es bestehen keine Hinweise dafür, dass

entsprechende Anleihen tatsächlich ausgegeben worden wären. Die Akti-
vitäten der Realcapital Invest AG waren damit, für sich selber betrachtet,
weder börsen- noch bankenrechtlich bewilligungspflichtig.

7.3

7.3.1    Was die EBK im vorinstanzlichen Verfahren hiergegen eingewendet
hat und von der FINMA im vorliegenden Verfahren teilweise wieder aufge-
nommen wird, überzeugt nicht: Richtig ist, dass der Realcapital Invest AG
Gelder von der AFT und der Steinhalden AG zugeflossen sind und sie selber
noch wenig Einnahmen generierte, dies ist indessen darauf zurückzuführen,
dass die einzelnen Immobilienprojekte ihrer Tochtergesellschaften noch im
Aufbau bzw. in Realisation begriffen waren. Eigenkapitalbezogene Emis-
sionen («Equity») fallen nicht notwendigerweise in den finanzmarktrecht-
lichen Aufsichtsbereich, zumal wenn sie in Selbstemission erfolgen (vgl. zu
den verschiedenen Begriffen: EMCH/RENZ/ARPAGAUS, a. a. O., N. 1843 ff.,
1854 ff.). Der Primärmarkt als Markt, in dem Kapitalmarktpapiere (Aktien,
Obligationen) erstmals begeben (emittiert) werden, ist finanzmarktrechtlich
nicht einheitlich geregelt, sondern nur bezüglich einzelner Berührungspunk-
te (unbewilligte Tätigkeit als Emissionshaus bzw. unerlaubte Entgegennahme
von Publikumsgeldern); im Übrigen gilt für ihn das Obligationenrecht (Pflicht
zur Erstellung eines Emissionsprospekts [Art. 652a bzw. Art. 1156 OR]; Pros-
pekthaftung [Art. 752 bzw. Art. 1156 OR]; vgl. EMCH/RENZ/ARPAGAUS,
a. a. O., N. 1820), dessen Durchsetzung zivilrechtlich (allenfalls strafrechtlich
[Betrug; ungetreue Geschäftsbesorgung]) zu erfolgen hat. Der finanzmarkt-
rechtliche Begriff der bewilligungslos als Gruppe handelnden Gesellschaften
darf – ohne eine Gesetzesanpassung – nicht so weit ausgedehnt werden,
dass diese Grenzen praktisch verwischt werden. Soweit die Bankenkommis-
sion darauf hinweist, dass nach Art. 3a Abs. 3 lit. b BankV Anleihensobli-
gationen und andere massenweise ausgegebenen Schuldverschreibungen
oder nicht verurkundete Rechte mit gleicher Funktion (Wertrechte) nur dann
bankenrechtlich nicht als Einlagen gälten, wenn die Gläubiger in einem dem
Art. 1156 i. V. m. Art. 652a OR entsprechenden Umfang informiert worden

seien, verkennt sie, dass die Realcapital Invest AG Aktien ausgegeben hat und keine fremdkapitalbezogenen Emissionen («Debt») zur Diskussion stehen (vgl. BAHAR/STUPP, in: Basler Kommentar Bankengesetz, 2005, N. 17–19 sowie N. 22 zu Art. 1 BankG).

7.3.2   Das Bundesverwaltungsgericht hat den aufsichtsrechtlichen Entscheid der EBK gegenüber der Realcapital AG mit der Begründung geschützt, sie gehöre ebenfalls zum Einflussbereich von A.＿＿＿＿＿ und zur als Emissionshaus illegal tätigen Gruppe um die AFT Allgemeine Finanztreuhand AG. Hierfür sprechen gewisse Indizien: Tatsächlich steht die Realcapital Invest AG faktisch ebenfalls unter der Leitung von A.＿＿＿＿＿ und wird sie von diesem von seinem Büro aus geführt, obwohl sie (pro forma) eine eigene Adresse in Sarnen hat; hierbei handelt es sich jedoch lediglich um einen «Briefkasten» bei einer anderen Gesellschaft (Domizilvertrag mit der BDO Visura). Die Steinhalden AG ist zudem an der Realcapital Invest AG beteiligt. Bei der an und für sich zulässigen Eigenkapitalbeschaffung wurde ähnlich wie bei den Aktivitäten der anderen Gesellschaften vorgegangen: In der Zeitspanne von April 2006 bis Mai 2007 sind bei der AFT 31 Einzahlungen mit dem Vermerk «Realcapital» bzw. «Realcapital AK Erhöhung» von mehr als 20 Privatpersonen über insgesamt Fr. 2'963'661.-- eingegangen. In derselben Zeitspanne gingen der «Realcapital Invest AG» indessen lediglich rund Fr. 905'438.-- zu. Die Geldflüsse erscheinen um so überraschender, als gleichzeitig Fr. 671'496.-- von der Realcapital Invest AG an die AFT zurückflossen und das neu gezeichnete Aktienkapital bei den letzten beiden Kapitalerhöhungen jeweils verrechnungsweise liberiert wurde. Zwar sind am 27. Oktober 2007 Fr. 1,4 Mio. auf das Kapitaleinzahlungs-Sperrkonto überwiesen worden, wovon Fr. 650'000.-- von der AFT stammten; doch kann nicht eruiert werden, woher die restlichen Gelder kommen, weil es die AFT unterlassen hat, die im Rahmen der Liberierung bezahlten Beträge, wie von ihr und der Realcapital Invest AG behauptet, unmittelbar «1:1» zu überstellen. Die Überweisung erfolgte allenfalls längere Zeit später gebündelt; dies war realistischerweise wohl nur möglich, weil A.＿＿＿＿＿ sowohl bei der

AFT wie bei der Realcapital Invest AG die Geschäftsführung besorgte und die eingehenden Mittel je nach den Bedürfnissen in der Gruppe verschieben konnte. Es sprechen somit in der Tat gewisse Gründe dafür, dass auch die Realcapital Invest AG im Rahmen der Gruppenaktivitäten tätig geworden sein könnte; es ist jedoch fraglich, ob sie tatsächlich einen namhaften Beitrag zur Umgehung der finanzmarktrechtlichen Regeln geleistet hat.

7.3.3   Die Problematik braucht nicht abschliessend vertieft zu werden, da die aufsichtsrechtliche Liquidation im November 2007 so oder anders unverhältnismässig war: Die Realcapital Invest AG war mit der Steinhalden AG über Darlehensverträge verbunden. Die verschiedenen Gelder der Zeichner der jeweiligen Aktien flossen der Realcapital Invest AG – wenn auch jeweils zeitlich verspätet – offenbar tatsächlich zu. Zwar war die Liquidation geeignet, das Funktionieren der Gruppe zu unterbinden, doch ging die Massnahme über das hierzu Erforderliche hinaus. Der Verdacht, die Gesellschaft könnte ähnlich verwendet werden, wie die anderen von A._____ aufgebauten Gesellschaften, war zwar nicht von der Hand zu weisen, wird durch die Akten aber nicht hinreichend erhärtet: Die Realcapital Invest AG wurde selber nicht für bewilligungspflichtige Aktivitäten verwendet; ob ihre Kapitalerhöhungen aktienrechtlich rechtens waren, bildet nicht Gegenstand der Finanzmarktaufsicht. Das Aktienkapital der Realcapital Invest AG ist breiter gestreut als jenes der Steinhalden AG; im Übrigen wird der Verwaltungsrat zwar von A._____ präsidiert, doch bestehen dort zwei zusätzliche Verwaltungsratssitze, die von Personen besetzt sind, die nach Lage der Akten zu den anderen Gesellschaften bzw. deren Aktivitäten in keiner unmittelbaren Beziehung stehen. Es kann nicht gesagt werden, dass zum Zeitpunkt des Entscheids der EBK die Anteile an den Tochtergesellschaften nicht werthaltig gewesen wären. Die verschiedenen Projekte schritten planmässig voran; erst das Eingreifen der EBK und die anschliessende Dauer des Rechtsmittelverfahrens stellten die Werthaltigkeit der Beteiligungen grundlegend infrage, sodass die Tochterunternehmen heute allenfalls überschuldet sind und mit ihnen die entsprechende Holding. Bei den Akten liegen Kurzgutachten von

unabhängigen Wirtschaftsprüfern, die zum Schluss gekommen sind, dass mit den nötigen bilanziellen und finanziellen Massnahmen und einer gegenseitigen Entflechtung der Gesellschaften ein Fortbestand unter Konzentration auf die bestehenden Immobiliengeschäfte möglich gewesen wäre; unter diesen Umständen ist zwar klar, dass der Realcapital Invest AG nicht nachträglich eine Effektenhändlerbewilligung erteilt werden konnte, doch hätte zumindest deren Weiterführungsmöglichkeit vertieft geprüft werden müssen, was weder die EBK noch die Vorinstanz hinreichend getan haben.

7.3.4   Mit der Beschwerdeführerin ist davon auszugehen, dass beim aufsichtsrechtlichen Entscheid in erster Linie die Interessen der Anleger zu wahren sind; es sollen Gesellschaften liquidiert werden, die vorwiegend von finanzmarktrechtlich illegalen Tätigkeiten leben und Gläubiger gefährden, nicht Gesellschaften, die (allenfalls) in punktueller Verkennung finanzmarktrechtlicher Pflichten eine legale Tätigkeit ausüben und denen nicht unzweifelhaft nachgewiesen werden kann, dass sie Teil eines grösseren Systems bilden. Die Realcapital Invest AG verfügt über ein Grundkapital von Fr. 4'375'000.--; die wichtigsten Aktiven sind ihre Beteiligungen an Tochtergesellschaften im Immobilienbereich. Die unmittelbare Liquidation stand in einem Missverhältnis zwischen den privaten Interessen der Aktionäre und Gläubiger an einem möglichst optimalen Werterhalt und jenem an der Anwendung der aufsichtsrechtlichen Bestimmungen, zumal höchstens ein (untergeordnetes) Fehlverhalten der betroffenen Gesellschaft im Rahmen einer bewilligungspflichtig tätigen Gruppe zur Diskussion stand und ihr selber als Emittentin von eigenen Aktien weder börsen- noch bankenrechtlich ein Vorwurf gemacht werden konnte. Zwar haben die AFT und die Steinhalden AG allenfalls durch Verrechnung liberierte Aktien der Realcapital Invest AG aus dem Eigenbestand verkauft und die für die Kapitalerhöhungen erhaltenen Zahlungen nicht 1:1 sofort weitergeleitet (Zwischenbericht vom 25. September 2007, S. 31), womit diese Gesellschaften als Emissionshaus tätig waren; dies lässt indessen nicht die Kapitalerhöhung der Realcapital Invest AG ihrerseits bereits als aufsichtsrechtlich relevant erscheinen. Die aufsichtsrechtlichen Ziele

ihr gegenüber hätten auch dadurch erreicht werden können, dass ihr eine angemessene Frist gesetzt worden wäre, unter Aufsicht des Untersuchungs-beauftragten bzw. der FINMA ihre Strukturen zu bereinigen, die Aktivität auf ihr Kerngeschäft bzw. dasjenige ihrer Tochtergesellschaften zu beschränken (Immobilienbau und -handel) und künftig nicht mehr mit ihren Partnern auf dem Primärmarkt in einer bewilligungspflichtigen Weise aktiv zu werden.

8.

8.1   Die Beschwerde ist deshalb gutzuheissen, soweit sie die aufsichts-rechtliche Liquidation der Realcapital Invest AG betrifft; der Entscheid des Bundesverwaltungsgerichts ist aufzuheben, soweit er die Verfügung der EBK bestätigt, dass die Realcapital Invest AG gewerbsmässig eine Effekten-handelstätigkeit ausgeübt und damit gegen das Börsengesetz verstossen habe, weshalb sie zu liquidieren sei. Das vorliegende Urteil bezieht sich auf sämtliche Ziffern der Verfügung vom 1. November 2007, welche auf die Realcapital Invest AG Bezug nehmen (Ziff. 1, 11, 13, 14, 18, 23, 24, 26); hiervon nicht berührt ist hingegen Ziff. 25 des Dispositivs, da aufgrund der Umstände die Einsetzung eines Untersuchungsbeauftragten auch bei ihr gerechtfertigt erschien (vgl. BGE 130 II 351 E. 2.2 S. 355 mit Hinweisen). Das Bundesverwaltungsgericht wird über die Kosten- und Entschädigungsfrage in seinem Verfahren neu zu befinden und die FINMA wird zu prüfen haben, welche Konsequenzen für die Realcapital Invest AG aus dem vorliegenden Entscheid zu ziehen sind (vgl. Art. 107 Abs. 2 letzter Satz BGG). Im Übrigen wird die Beschwerde abgewiesen.

8.2   Die unterliegende Steinhalden AG wird für das vorliegende Verfah-ren kostenpflichtig (Art. 66 BGG). Die Eidgenössische Finanzmarktaufsicht FINMA hat die obsiegende Realcapital Invest AG für das bundesgerichtliche Verfahren angemessen zu entschädigen (Art. 68 BGG).

Dispositiv

# 2      Beschwerdelegitimation der FINMA

**URTEIL des Bundesgerichts 2C_570/2009 vom 1. März 2010**

**Behördenbeschwerde (Art. 89 Abs. 2 Bst. d BGG, Art. 54 Abs. 2 FINMAG); Legitimation der FINMA; kein zusätzliches, aber ein zureichendes Interesse an der Beschwerde.**

1. Die FINMA ist nur dann legitimiert, ein sie betreffendes Urteil des Bundesverwaltungsgerichts beim Bundesgericht anzufechten, wenn sie mit Blick auf die einheitliche Anwendung des Bundesrechts in vergleichbaren Fällen ein zureichendes Interesse an der Beurteilung der aufgeworfenen Problematik hat (E. 1.1).

2. Die FINMA hat im konkreten Fall kein Interesse an einer materiellen Beurteilung, da auch nach der teilweisen Gutheissung der Beschwerde durch das Bundesverwaltungsgericht die Verfügung der FINMA im Ergebnis geschützt wurde. Mithin hätte auch die Gutheissung der Beschwerde der FINMA durch das Bundesgericht keine Konsequenzen auf die bereits rechtskräftig verfügte Konkurseröffnung (E. 1.2).

**Recours des autorités (art. 89 al. 2 let. d LTF, art. 54 al. 2 LFINMA) ; légitimité de la FINMA ; pas d'intérêt supplémentaire à recourir mais un intérêt suffisant.**

1. La FINMA ne peut légitimement recourir devant le Tribunal fédéral contre un arrêt du Tribunal administratif fédéral la concernant que si, au regard de l'application uniforme du droit fédéral dans des cas comparables, elle a un intérêt suffisant à ce que la problématique invoquée soit tranchée (consid. 1.1).

2. En l'espèce, la FINMA n'a pas d'intérêt à ce qu'un arrêt matériel soit rendu, dans la mesure où même après que le recours a été déclaré partiellement recevable par le Tribunal administratif fédéral, la décision de la FINMA a finalement été protégée. Par conséquent, l'admission du recours de la FINMA par le Tribunal fédéral n'aurait pas non plus d'incidence sur l'ouverture de la faillite qui a déjà fait l'objet d'une décision entrée en force (consid. 1.2).

**Ricorso delle autorità (art. 89 cpv. 2 lett. d LTF, art. 54 cpv. 2 LFINMA); diritto di ricorrere della FINMA; interesse sufficiente al ricorso e irrilevanza di interessi supplementari.**

1.  La FINMA è legittimata a impugnare presso il Tribunale federale una sentenza del Tribunale amministrativo federale che la riguarda solo se, in considerazione dell'applicazione unitaria del diritto federale in casi comparabili, ha un interesse sufficiente nella valutazione della problematica sollevata (consid. 1.1).

2.  Nel caso concreto, la FINMA non ha alcun interesse in una valutazione materiale perché, anche dopo il parziale accoglimento del ricorso da parte del Tribunale amministrativo federale, la sua decisione è stata tutelata nel risultato. Dunque, anche l'accoglimento del ricorso della FINMA da parte del Tribunale federale non avrebbe alcuna conseguenza sull'apertura del fallimento già passata in giudicato (consid. 1.2).

## Zusammenfassung des Sachverhalts

Die FINMA, resp. damals noch die EBK, stellte fest, dass die X._____-Gruppe kollektive Kapitalanlagen verwalte, aufbewahre, öffentlich anbiete und vertreibe, ohne über die notwendigen Bewilligungen zu verfügen, und damit gegen das KAG verstosse. Überdies nehme sie gewerbsmässig Publikumseinlagen entgegen, was dem BankG widerspreche. Gestützt hierauf wurde über die X._____ AG der Konkurs eröffnet.

Das Bundesverwaltungsgericht hiess die von der X._____ AG in Liquidation hiergegen eingereichte Beschwerde teilweise gut und stellte fest, dass diese als Teil der X._____-Gruppe nicht gewerbsmässig Publikumseinlagen entgegengenommen und damit gegen das Bankengesetz verstossen habe, und hob die angefochtene Verfügung diesbezüglich auf; im Übrigen wies es die Beschwerde ab.

Gegen den abschlägigen Teil des Urteils des Bundesverwaltungsgerichts gelangte die FINMA an das Bundesgericht.

## Aus den Erwägungen des Bundesgerichts

1.

1.1    Das Bundesgericht prüft seine Zuständigkeit bzw. die Zulässigkeit eines Rechtsmittels von Amtes wegen und mit freier Kognition (Art. 29 Abs. 1 BGG; BGE 133 II 249 E. 1.1). Immerhin hat der Beschwerdeführer seine Eingabe hinreichend zu begründen und in diesem Rahmen nötigenfalls auch darzulegen, dass und inwiefern er die gesetzlichen Legitimationsvoraussetzungen erfüllt (BGE 133 II 249 E. 1.1). Nach Art. 89 Abs. 2 lit. d BGG sind Personen, Organisationen und Behörden vor Bundesgericht beschwerdeberechtigt, denen ein anderes Bundesgesetz dieses Recht einräumt. Für die Bankenkommission war das bis zum 1. Januar 2009 gestützt auf Art. 24 Abs. 1 BankG (in der Fassung vom 1. Januar 2007) der Fall; die

Finanzmarktaufsicht verfügt heute nach Art. 54 Abs. 2 des Bundesgesetzes vom 22. Juni 2007 über die Eidgenössische Finanzmarktaufsicht (Finanzmarktaufsichtsgesetz, FINMAG; SR 956.1) über die gleiche Befugnis. Das Beschwerderecht der FINMA soll in deren Aufsichtsbereich den richtigen und rechtsgleichen Vollzug des Bundesverwaltungsrechts sicherstellen; sie hat diesbezüglich kein zusätzliches öffentliches Interesse an der Anfechtung des Entscheids des Bundesverwaltungsgerichts darzutun (vgl. BGE 129 II 1 E. 1.1 S. 4; 128 II 193 E. 1 S. 195 f., je mit Hinweisen). Immerhin muss sie ein mit Blick auf die einheitliche Anwendung des Bundesrechts in vergleichbaren Fällen zureichendes Interesse an der Beurteilung der aufgeworfenen Problematik haben. Dies ist praxisgemäss etwa dann der Fall, wenn dem Gericht eine neue Rechtsfrage unterbreitet oder eine konkret drohende und nicht anders abwendbare bundesrechtswidrige Rechtsentwicklung verhindert werden soll (BGE 134 II 201 E. 1.1 mit Hinweisen). Die Behördenbeschwerde darf nicht der Behandlung einer vom konkreten Fall losgelösten abstrakten Frage des objektiven Rechts dienen. Sie hat sich auf konkrete Probleme eines tatsächlich bestehenden Einzelfalls mit Auswirkungen über diesen hinaus zu beziehen und muss auch für ihn selber noch von einer gewissen Aktualität und (wenigstens potentiellen) Relevanz sein (vgl. BGE 135 II 338 E. 1.2.1 S. 342; 134 II 201 E. 1.1; zur EBK: Urteil 2C_171/2007 vom 19. Oktober 2007 E. 3.3).

1.2 Die Eidgenössische Finanzmarktaufsicht legt nicht dar, inwiefern sie im vorliegenden Zusammenhang über ein entsprechendes schutzwürdiges Interesse verfügen würde; ein solches ist auch nicht ersichtlich: Die Vorinstanz hat die Verfügung der EBK vom 20. Mai 2008 bezüglich der von dieser festgestellten Verletzung des Bankengesetzes aufgehoben. Im Resultat beeinflusste dies den konkreten Verfahrensausgang indessen nicht. Wie bereits das Bundesverwaltungsgericht festgestellt hat, kommen der teilweisen Gutheissung im konkreten Fall keine Auswirkungen auf den Hauptpunkt, die verfügte Konkurseröffnung, zu. Selbst wenn die Beschwerde gutgeheissen würde, änderte sich weder für die FINMA noch die Beschwer-

degegnerin irgendetwas am Ausgang des Aufsichtsverfahrens. Auch der Kostenpunkt der vorinstanzlichen Verfahren wird dadurch nicht betroffen. Zwar mag allenfalls ein gewisses öffentliches Interesse daran bestehen, dass sich das Bundesgericht dazu äussert, was beim umstrittenen Anlagemodell finanzmarktrechtlich als Fremd- und was als Eigenkapital zu gelten hat, doch wird es dies im Parallelverfahren bezüglich der X._____ & Co. VIII Sachwert-Beteiligung Kommanditgesellschaft zusammen mit der Unterstellungsfrage unter das Kollektivanlagengesetz so oder anders umfassend tun müssen (2C_571/2009). Die FINMA verfügt deshalb über kein schutzwürdiges Interesse daran, dass das Bundesgericht die von ihr aufgeworfene Frage der Anwendbarkeit des Bankengesetzes im vorliegenden Zusammenhang prüft, wo sie keinerlei Einfluss auf den Ausgang des Aufsichtsverfahrens hat. Auf ihre Beschwerde ist deshalb nicht einzutreten.

2.
Dem Verfahrensausgang entsprechend sind keine Kosten geschuldet (vgl. Art. 66 Abs. 3 BGG). Die FINMA muss die Beschwerdegegnerin für das bundesgerichtliche Verfahren angemessen entschädigen (Art. 68 Abs. 2 BGG).

Dispositiv

# 3     Décision en constatation d'infraction grave au droit de la surveillance

**DÉCISION de l'Autorité fédérale de surveillance des marchés financiers FINMA du 24 août 2009**

**Décision en constatation (art. 32 LFINMA); infraction grave au droit de la surveillance; organisation; garantie d'une activité irréprochable; blanchiment d'argent.**

1. S'il y a infraction grave au droit de la surveillance, la FINMA a la possibilité de rendre une décision en constatation ou de prendre d'autres mesures (Cm 53).

2. Les éléments appréciés par la FINMA, à savoir les événements concernant la banque A._____ SA et les carences concernant sa succursale de X._____, remplissent les conditions permettant de constater une infraction grave au droit de la surveillance (Cm 64 ss).

3. Compte tenu des irrégularités constatées, la FINMA aurait dans tous les cas pu prendre des mesures plus sévères, allant jusqu'au retrait de l'autorisation et à l'interdiction de continuer à exercer une activité à X._____. Au vu des circonstances, la décision en constatation est le moyen approprié (Cm 77).

**Feststellungsverfügung (Art. 32 FINMAG); schwere Verletzung von aufsichtsrechtlichen Bestimmungen; Organisation; Gewähr für eine einwandfreie Geschäftstätigkeit; Geldwäscherei.**

1. Die FINMA kann bei Vorliegen einer schweren Verletzung von aufsichtsrechtlichen Bestimmungen eine Feststellungsverfügung erlassen oder andere Massnahmen treffen (Rz. 53).

2. Die von der FINMA beurteilten Vorkommnisse um die Bank A._____ SA resp. die Mängel bei deren Zweigniederlassung in X._____ erfüllen die Voraussetzungen für die Feststellung einer schweren Verletzung von aufsichtsrechtlichen Bestimmungen (Rz. 64 ff.).

3. Aufgrund der bestehenden Missstände hätte die FINMA jedenfalls strengere Massnahmen, bis hin zum Bewilligungsentzug und einem Verbot, weiterhin in X._____ einer Geschäftstätigkeit nachzugehen, treffen können. Aufgrund der vorliegenden Umstände ist die Feststellungsverfügung das angemessene Mittel (Rz. 77).

**Decisione di accertamento (art. 32 LFINMA); grave violazione delle disposizioni legali in materia di vigilanza; organizzazione; garanzia di un'attività irreprensibile; riciclaggio di denaro.**

1. Di fronte a una grave violazione delle disposizioni legali in materia di vigilanza, la FINMA può avvalersi di diversi strumenti tra cui l'emanazione di una decisione di accertamento o adottare altre misure (m. 53).

2. Gli eventi giudicati dalla FINMA circa la banca A._____ SA, rispettivamente le irregolarità relative alla sua succursale a X._____, soddisfano i presupposti per l'accertamento di una grave violazione delle disposizioni legali in materia di vigilanza (m. 64 segg.).

3. A causa delle irregolarità esistenti, la FINMA avrebbe eventualmente potuto prendere misure più severe, come la revoca dell'autorizzazione o il divieto di esercizio di un'attività a X._____. La decisione di procedere a un accertamento è adeguata alle circostanze (m. 77).

## Résumé des faits

La banque A._____ SA, qui fait aujourd'hui partie du groupe B._____, a diverses succursales dont une se trouvant à X._____. L'activité de la succursale de X._____ a été suspendue dès avant le prononcé de la présente décision, cette succursale ayant été liquidée à fin septembre 2009. S._____ était directeur adjoint de la succursale de X._____ avant d'être suspendu de ses fonctions puis licencié avec effet immédiat à fin 2008. L'activité de la banque A._____ SA s'exerce dans une très large mesure auprès de particuliers fortunés étrangers, notamment dans le domaine de la gestion de fortune.

La FINMA a constaté pour l'essentiel de graves carences organisationnelles ainsi que des manquements à la législation sur le blanchiment d'argent. L'enquête a montré en particulier que le service Compliance de Y._____, compétent pour la succursale de X._____, avait enfreint presque toutes ses obligations. Il est apparu par ailleurs que la communication entre la succursale de X._____, la direction, dont le siège est à Z._____, et le service Compliance ne fonctionnait qu'avec des retards considérables – lorsqu'elle fonctionnait. Enfin, la question s'est posée de savoir si certaines personnes présentaient toutes les garanties d'une activité irréprochable.

## Extrait des considérants

1.      Dispositions légales applicables

1.1      Compétence de la FINMA, droit applicable et procédures

(52)      Au 1er janvier 2009, avec l'entrée en vigueur de la loi sur l'Autorité fédérale de surveillance des marchés financiers du 22 juin 2007 (loi sur la

surveillance des marchés financiers, LFINMA ; RS 956.1), l'Autorité fédérale de surveillance des marchés financiers FINMA a remplacé la CFB. Dès cette date, la FINMA reprend les procédures en cours devant la CFB et la LFINMA leur est applicable (art. 58 al. 3 LFINMA). Les faits à l'origine de la présente décision se sont déroulés avant l'entrée en vigueur de la LFINMA. Par conséquent, c'est l'ancienne ordonnance de la CFB sur le blanchiment d'argent dans le domaine bancaire qui s'applique, soit l'ordonnance de la Commission fédérale des banques en matière de lutte contre le blanchiment d'argent (OBA-CFB), et non pas l'ordonnance de l'Autorité fédérale de surveillance des marchés financiers sur la prévention du blanchiment d'argent et du financement du terrorisme dans le domaine des banques, des négociants en valeurs mobilières et des placements collectifs (OBA-FINMA 1), qui reprend ladite ordonnance au 1er janvier 2009 (OBA-CFB jusqu'au 31 décembre 2008 ; OBA-FINMA 1 dès le 1er janvier 2009 ; RS 955.022). De même, lorsque, pour les besoins de la présente procédure, la loi fédérale du 8 novembre 1934 sur les banques et les caisses d'épargne (LB ; 952.0) dans sa teneur avant le 1er janvier 2009 doit être citée, l'abréviation « aLB » (pour ancienne LB) sera utilisée ci-après. Lorsqu'il n'est pas nécessaire de faire référence à la LB dans sa teneur avant le 1er janvier 2009 puisque la disposition concernée n'a pas été modifiée par l'introduction de la LFINMA, l'abréviation LB sera conservée. Les autres articles de lois cités ont conservé la même teneur avant et après l'entrée en vigueur de la LFINMA.

(53)    La FINMA exerce la surveillance conformément aux lois sur les marchés financiers, notamment à la loi sur les banques, à l'ordonnance du 17 mai 1972 sur les banques et les caisses d'épargne (OB ; 952.02), à la loi fédérale du 10 octobre 1997 concernant la lutte contre le blanchiment d'argent et le financement du terrorisme dans le secteur financier (LBA ; RS 955.0) et à l'ordonnance sur le blanchiment d'argent applicable dans le domaine bancaire. Elle prend les décisions nécessaires à l'application de la loi et veille au respect des prescriptions légales (art. 6 al. 1 LFINMA). Lorsqu'un assujetti enfreint la LFINMA ou une autre loi sur les marchés financiers ou si d'autres

irrégularités sont constatées, la FINMA veille au rétablissement de l'ordre légal (art. 31 LFINMA), usant pour ce faire des moyens de surveillance à sa disposition. Ces instruments sont énoncés au chapitre 3 de la LFINMA, où sont entre autres énumérés l'audit (section 1, art. 24 ss LFINMA) et les autres moyens de surveillance (section 2, art. 29 ss LFINMA), tels la décision en constatation (art. 32 LFINMA), l'interdiction d'exercer (art. 33 LFINMA), la publication de la décision (art. 34 LFINMA), la confiscation (art. 35 LFINMA), la nomination de chargé d'enquête (art. 36 LFINMA) et le retrait d'autorisation d'exercer (art. 37 LFINMA). Dans le cadre de ces mesures, la FINMA jouit d'un large pouvoir d'appréciation (arrêt du Tribunal fédéral 2A.65/2002 du 22 mai 2002, consid. 3.2 in fine et ATF 126 II 111, consid. 3b).

(54)    La présente décision traite notamment du défaut de contrôle d'une succursale par sa maison-mère et de violations de règles de la législation sur le blanchiment d'argent telles que le devoir de prodiguer une formation suivie au personnel dans ce domaine, du devoir de transmettre les documents requis par les autorités pénales dans un délai raisonnable, ou encore du devoir de publier les directives internes dans ce domaine.

(55)    L'exploitation d'une banque nécessite une autorisation préalable de la FINMA, conformément à l'art. 3 LB. L'art. 3 al. 2 LB fixe les conditions de cette autorisation, conditions qui doivent être respectées en permanence.

1.2    Garantie d'une activité irréprochable

(56)    Aux termes de l'art. 3 al. 2 lit. c LB, les personnes chargées d'administrer et de gérer la banque doivent jouir d'une bonne réputation et présenter toutes les garanties d'une activité irréprochable. Ces personnes doivent non seulement être professionnellement compétentes, mais encore se comporter de manière adéquate dans les affaires (cf. Bulletin CFB

23, p. 25). Par comportement adéquat, il faut comprendre en premier lieu le respect de l'ordre juridique, c'est-à-dire des lois et des ordonnances, des directives et de la pratique de l'autorité de surveillance ainsi que des usages de la profession et des directives internes. Cela implique de s'assurer de la véracité de ses déclarations, de sorte à ne pas mettre en péril la crédibilité de l'établissement. Ce qui est valable pour les personnes chargées d'administrer et de gérer la banque s'applique aussi à cette dernière. En sa qualité d'entreprise, elle doit également respecter la condition de la garantie d'une activité irréprochable (cf. Bulletin CFB 41, p. 20).

### 1.3    Organisation

(57)    Aux termes de l'art. 3 al. 2 lit. a LB, la banque doit également disposer d'une organisation appropriée à son activité. Selon l'art. 9 al. 2 OB, la banque doit notamment mettre en place une organisation interne idoine permettant de déterminer, limiter et contrôler ses risques, y compris les risques juridiques et les risques susceptibles de ternir sa réputation. Les buts visés par cette norme sont de plusieurs ordres : il s'agit naturellement de protéger les créanciers, de se prémunir contre la réalisation de risques systémiques, mais également d'éviter la survenance d'événements propres à mettre en danger la réputation de l'établissement financier concerné ainsi que celle de la place financière suisse.

(58)    Une bonne organisation implique que les employés de la banque soient régulièrement informés et aient une connaissance pointue de leurs propres obligations contractuelles, des processus internes et des responsabilités des différents postes de la hiérarchie. Les employés doivent notamment être en mesure de reconnaître toute situation qui pourrait ternir la réputation de la banque. Ils veillent à informer leurs supérieurs hiérarchiques de même que leur Compliance de manière complète et honnête sur tout événement représentant un risque juridique ou réputationnel pour la banque.

1.4     Devoir de communication des directives internes en matière de lutte contre le blanchiment, de former le personnel et d'effectuer des contrôles réguliers

(59)     Selon l'art. 8 LBA, les intermédiaires financiers prennent dans leur domaine les mesures nécessaires pour empêcher le blanchiment d'argent et le financement du terrorisme. Ils veillent notamment à ce que leur personnel reçoive une formation suffisante et à ce que des contrôles soient effectués. Cet article est mis en œuvre dans l'ordonnance précisant l'application de la LBA par les art. 10 et 11 OBA-CFB, aux termes desquels l'intermédiaire financier émet des directives internes en matière de lutte contre le blanchiment d'argent et les communique aux conseillers à la clientèle ainsi qu'à tous les collaborateurs concernés. D'autre part, ce dernier veille à ce que le conseiller à la clientèle ainsi que tous les autres collaborateurs concernés reçoivent une formation régulière qui couvre les aspects essentiels pour eux de la lutte contre le blanchiment d'argent.

1.5     Devoir de production des documents sur demande des autorités

(60)     Selon l'art. 7 LBA, repris en partie par l'art. 23 OBA-CFB, l'intermédiaire financier doit conserver les documents relatifs aux transactions effectuées ainsi qu'aux clarifications requises en vertu de la présente loi de manière à pouvoir satisfaire, dans un délai raisonnable, aux éventuelles demandes d'informations ou de séquestre présentées par les autorités de poursuite pénales.

1.6     Devoirs de clarification au sens de la législation sur le blanchiment d'argent

(61)     Selon l'art. 6 LBA, l'intermédiaire financier est tenu d'identifier l'objet et le but de la relation d'affaires souhaitée par le cocontractant. L'étendue des informations à collecter est fonction du risque que représente le cocon-

tractant. L'intermédiaire financier doit clarifier l'arrière-plan économique et le but d'une transaction ou d'une relation d'affaires notamment lorsque la transaction ou la relation d'affaires paraissent inhabituelles, sauf si leur légalité est manifeste.

1.7    Renouvellement des vérifications de l'identité des titulaires ou ayants droit économiques des relations bancaires

(62)    Conformément à l'art. 5 LBA, lorsque, au cours de la relation d'affaires, des doutes surviennent quant à l'identité du cocontractant ou de l'ayant droit économique, la vérification d'identité ou l'identification prévue aux art. 3 et 4 LBA doivent être renouvelées.

1.8    Respect de la Convention relative à l'obligation de diligence des banques

(63)    Reconnue par la Circ.-CFB 04/2 Normes d'autorégulation reconnues comme standards minimaux (cf. cm 1 en relation avec annexe, I.14), la Convention relative à l'obligation de diligence des banques de l'Association suisse des banquiers (CDB 03) en vigueur au moment des faits litigieux devait être respectée par les banques. Selon l'art. 6 CDB 03, la banque doit répéter les procédures prévues aux articles 2, ch. 9-24, et articles 3 et 4, ch. 25-45 CDB, relatives notamment à la vérification de l'identité du cocontractant et à l'identification de l'ayant droit économique, lorsque, dans le courant des relations d'affaires, un doute survient au sujet de l'exactitude des indications données sur l'identité du cocontractant.

2.    Manquements de la banque A._____ SA

(64)    Dans le cadre de la présente affaire, S._____ a gravement violé de nombreuses dispositions du droit prudentiel. La banque s'évertue toute-

fois à marteler qu'elle n'est qu'une victime du comportement frauduleux de son responsable de X._____. Elle tente ainsi de rejeter sa responsabilité sur S._____. S'il est vrai que l'animus delinquendi d'un individu qui est décidé à passer à l'acte est difficile à déjouer, la banque n'en conserve pas moins une responsabilité du point de vue de la surveillance. Elle doit assumer, en tant qu'institut, les actes de ses employés en cas de défaut de surveillance. Elle dispose en effet d'une autorisation octroyée par la CFB, devenue FINMA, qu'elle doit respecter. Pour ce faire, elle doit mener une surveillance adéquate de l'ensemble de ses établissements et collaborateurs en Suisse.

2.1    Comportement inadéquat de la banque et déficiences dans l'organisation

(65)    Le comportement de S._____ eu égard à la longue durée des faits en cause (de 2002 à 2008), à la violation grave de dispositions essentielles concernant la bonne tenue et la gestion des comptes et au traitement des transactions de caisse est inadmissible. Celui-ci a fait preuve d'une véritable structure dans sa volonté d'agir délictueusement. Compte tenu de la longue durée et de la gravité des faits, la banque doit se laisser imputer les faits en question.

(66)    T._____, quant à lui, a gravement violé ses devoirs de management et de diligence. Compte tenu de ces éléments, il est d'ailleurs difficilement compréhensible qu'il soit toujours suspendu par la banque. Plus saisissant encore constitue le fait qu'il continue à effectuer des missions pour le compte de la banque.

(67)    Etant donnée la longue durée des activités et la complicité des collaborateurs de X._____ et du Chief Compliance Officer, il est d'autant plus critiquable que la banque ait failli à ce point à surveiller de manière adéquate la succursale, et ce d'autant plus que l'audit interne a pointé des problèmes à X._____ à plusieurs reprises.

(68)    Cette affaire illustre un véritable problème de culture au sein de la
banque. En effet, tant les collaborateurs de la succursale de X._____,
que le Chief Compliance Officer qui connaissait l'existence des coffres-forts
dont des individus visés par les ordres de perquisition du Procureur étaient
titulaires, ont souligné, en se taisant, une absence de communication élo-
quente au sein de la banque. Le fait même que la Direction n'ait pas été
informée de la procédure pénale en cours par les employés de la succursale
de X._____ mais par la police de X._____, et ce fin novembre 2008
alors que celle-ci avait été entamée début septembre 2008, ne constitue
pas un argument en faveur de la banque, mais souligne plutôt le manque
de communication récurrent au sein de la banque. De plus, bien que les
collaborateurs de la succursale de X._____ aient été informés tant de
la procédure pénale en cours à l'encontre de leur responsable S._____
que du fait que le service de Compliance n'en avait pas connaissance, ceux-
ci n'ont toutefois pas fait part de ces informations au Compliance ou à un
autre service de la banque, démontrant par là également le problème de
culture au sein de la banque.

2.2    Violations des obligations découlant de la législation sur le blanchi-
ment d'argent et de la CDB 03

(69)    En premier lieu, la banque a transmis la documentation exigée par
le Procureur de X._____ avec retard, près de deux mois s'étant écoulés
entre la prise de connaissance de l'ordre de perquisition du 8 octobre 2008
et la transmission des derniers documents ayant trait à cet ordre début
décembre 2008. D'autre part, la documentation était lacunaire dans la me-
sure où elle faisait l'impasse sur l'existence de coffres-forts ouverts pour le
compte d'individus visés par les ordres de perquisition.

(70)    Par ailleurs, la formation du personnel, lorsqu'elle existait, a été
qualifiée tant de mauvaise qualité que lacunaire, ce à plusieurs reprises.
En outre, la succursale de X._____ a souffert d'une absence totale

de contrôle du Compliance Y._____ durant de nombreuses années. D'autre part, contrairement aux exigences légales, la banque a failli à pu-blier une directive importante sur les opérations de caisse, qui n'apparais-sait ainsi nulle part dans la documentation interne de la banque, comme l'atteste U._____ dans ses déclarations au Procureur de X._____. Quant aux clarifications légalement requises, celles-ci se sont révélées de piètre qualité, lorsqu'elles ne faisaient pas défaut.

(71)    A plusieurs reprises, la banque n'a eu aucune réaction en présence de doutes quant à l'exactitude du formulaire A relatif aux ayants droit éco-nomiques, manquant ainsi à son obligation de renouveler les vérifications imposées par la législation sur le blanchiment d'argent. Ce comportement pourrait en outre contrevenir à l'art. 6 CDB 03, point qu'il appartient à la Commission de surveillance de la CDB de trancher.

3.    Conclusions

(72)    Les différentes irrégularités décrites ci-dessus démontrent que la banque ne disposait à l'évidence pas d'une organisation suffisante pour lui permettre de découvrir les événements qui se sont déroulés à X._____, de même que pour lui permettre de retrouver et transmettre rapidement les documents requis par le Procureur de X._____. Par les nombreuses violations décrites ci-dessus, la banque a manqué à son devoir selon l'art. 3 al. 2 lit. a LB et 9 al. 2 OB de mettre en place une organisation adéquate permettant de déterminer et contrôler ses risques, y compris les risques juri-diques et ceux susceptibles de ternir sa réputation. Elle a en outre violé des obligations de diligence résultant des art. 5 à 8 LBA, de même que des art. 10, 11 et 23 OBA-CFB, soit ses obligations de renouveler les vérifications des identités du titulaire d'une relation bancaire, respectivement de son ayant droit économique, de clarification en cas de soupçon, son devoir de publica-tion des directives internes en matière de blanchiment d'argent, de former

son personnel à cet égard et d'effectuer des contrôles réguliers, et enfin son devoir de produire les documents requis par les autorités sans retard.

(73)    Ces irrégularités ne sont pas compatibles avec le comportement adéquat attendu d'une banque et des personnes chargées de l'adminis-trer et de la gérer au sens de l'art. 3 al. 2 lit. c LB. Outre la violation de l'ordre juridique qui en découle, de telles irrégularités ne permettent pas à la banque de s'assurer de la véracité de ses déclarations, de sorte à ne pas mettre en péril sa crédibilité.


4.    Mesures

(74)    Depuis le début de la présente procédure, des changements impor-tants sont intervenus au sein de A._____ SA, eu égard au changement d'actionnariat et à l'intégration de A._____ SA au sein du groupe B._____. Eu égard à ces changements notables qui vont mener à une structure de management différente au sein de la banque, il serait dispro-portionné d'ordonner le retrait de l'autorisation bancaire au siège principal de la banque.

(75)    Toutefois, dans la mesure où le groupe B._____, ayant une ré-putation sérieuse, s'apprête à fusionner avec A._____ SA, la FINMA a décidé de faire preuve de clémence à l'égard de A._____ SA, dans la certitude que la fonction Compliance de la banque en ressortira plus renforcée.

(76)    En vertu de l'art. 32 LFINMA, si la procédure révèle que l'assujetti a gravement enfreint le droit de la surveillance et qu'aucune mesure de rétablissement de l'ordre légal ne doit être prise, la FINMA peut rendre une décision en constatation.

(77)     En l'espèce, les faits sont d'une telle gravité qu'ils nécessitent impéra-
tivement la prise d'une décision. La FINMA ne peut en aucun cas suspendre
la procédure eu égard à la gravité des violations en cause. Dans la mesure
où la banque procèdera d'elle-même à la liquidation de la succursale de
X._____, la FINMA ne doit pas se déterminer sur les mesures qu'elle
aurait prises dans d'autres circonstances et qui auraient pu aller jusqu'au
retrait d'autorisation et à l'interdiction faite à la banque de continuer à exer-
cer des activités à X._____. D'autre part, la banque s'est pliée d'elle-
même ou va bientôt se calquer sur les recommandations effectuées par la
société C._____, de sorte que les violations et mauvaises applications
de la législation en matière de blanchiment d'argent ont été réparées, ou à
tout le moins vont l'être.

(78)     Dans la mesure où les faits évoqués dans la présente procédure sont
en outre constitutifs de violations à la CDB 03, la FINMA les dénoncera à la
Commission de surveillance relative à l'obligation de diligence des banques.
(…)

Dispositif

# 4    Differenzierte Anfechtbarkeit von superprovisorischen Verfügungen

**URTEIL des Bundesverwaltungsgerichts B-7038/2009
vom 20. November 2009**

**Anfechtbarkeit von superprovisorischen Verfügungen vor dem Bundesverwaltungsgericht.**

Die superprovisorische Einsetzung eines Untersuchungsbeauftragten und die damit einhergehende Einschränkung in der Geschäftstätigkeit der Betroffenen bewirken in der Regel keinen nicht wieder gutzumachenden Nachteil, sofern die FINMA nach Eingang der Einwände der Betroffenen über die allfällige Bestätigung der superprovisorisch verfügten Massnahmen entscheidet (E. 1.5, E. 1.6 und E. 1.10).

**Possibilité de recourir contre des décisions superprovisoires devant le Tribunal administratif fédéral.**

La nomination superprovisoire d'un chargé d'enquête et la limitation corrélative de l'activité des établissements concernés n'entraînent généralement pas un désavantage irréversible, pour autant que la FINMA se prononce, après réception des objections des établissements concernés, sur l'éventuelle confirmation des mesures décidées à titre superprovisoire (consid. 1.5, consid. 1.6 et consid. 1.10).

**Impugnabilità di decisioni superprovvisionali presso il Tribunale amministrativo federale.**

Di norma, la nomina superprovvisionale di un incaricato dell'inchiesta e la conseguente limitazione dell'attività degli interessati non comportano danno irreparabile, purché la FINMA, dopo aver ricevuto le obiezioni degli interessati, prenda una decisione in merito a un'eventuale conferma delle misure decise a titolo superprovvisionale (consid. 1.5, consid. 1.6 e consid. 1.10).

## Zusammenfassung des Sachverhalts

Im Kontext einer Untersuchung der Eidgenössischen Finanzmarktaufsicht FINMA gegen die D._____, die E._____, die F._____, die G._____, die H._____, die J._____ sowie gegen K._____ wegen Verdachts auf unerlaubte Entgegennahme von Publikumseinlagen ergaben sich nach Auffassung der Untersuchungsbeauftragten konkrete Anhaltspunkte für enge personelle Verflechtungen und ein arbeitsteiliges Zusammenwirken zwischen den untersuchten Gesellschaften bzw. Personen und dem A._____ (Beschwerdeführer 1), der B._____ (Beschwerdeführerin 2), der C._____ (Beschwerdeführerin 3), der L._____, der M._____ und der N._____.

Mit superprovisorischer Verfügung vom 11. November 2009 ordnete die FINMA vorsorgliche Massnahmen an und setzte beim A._____, der B._____, der C._____ sowie bei der L._____, der M._____ und der N._____ die gleichen Untersuchungsbeauftragten für eine Untersuchung ein. Die FINMA untersagte den Organen der Verfügungsadressaten jegliche Rechtshandlungen ohne Zustimmung der Untersuchungsbeauftragten und insbesondere die Entgegennahme von Publikumseinlagen oder die Werbung dafür. Sie verpflichtete die Verfügungsadressaten, den Untersuchungsbeauftragten sämtliche Informationen und Unterlagen zu den Geschäftsaktivitäten zur Verfügung zu stellen und Zugang zu den Räumlichkeiten zu verschaffen. Weiter wies die FINMA die zuständigen Handelsregisterämter an, die Ermächtigung der Untersuchungsbeauftragten, allein für die Verfügungsadressaten zu handeln, und das Verbot, gegenüber den Organen der Verfügungsadressaten ohne Zustimmung der Untersuchungsbeauftragten Rechtshandlungen vorzunehmen, einzutragen und die sich daraus ergebenden Änderungen nachzutragen. Die FINMA sperrte weiter sämtliche Konten und Depots, die auf die Verfügungsadressaten lauten oder an denen sie wirtschaftlich berechtigt sind, und räumte den Untersuchungsbeauftragten die Verfügungsberechtigung darüber ein. Schliesslich wurden die Kosten der Untersuchungsbeauftragten den Ver-

fügungsadressaten solidarisch auferlegt, die Untersuchungsbeauftragten wurden zudem ermächtigt, von den Verfügungsadressaten einen Kosten-vorschuss zu verlangen.

Mit Beschwerde vom 12. November 2009 beantragen der A._____, die B._____ und die C._____ beim Bundesverwaltungsgericht die kostenfällige Aufhebung dieser superprovisorischen Verfügung.

**Aus den Erwägungen des Bundesverwaltungsgerichts**

1.

1.1    Das Bundesverwaltungsgericht beurteilt gemäss Art. 31 des Verwal-tungsgerichtsgesetzes vom 17. Juni 2005 (VGG, SR 173.32) Beschwerden gegen Verfügungen nach Art. 5 des Bundesgesetzes über das Verwaltungs-verfahren vom 20. Dezember 1968 (VwVG, SR 172.021). Die zur Beurteilung stehende Sache fällt nicht unter die Ausnahmebestimmungen des Art. 32 VGG, und die FINMA ist eine Vorinstanz im Sinne von Art. 33 Bst. e VGG, gegen deren Verfügungen die Beschwerde an das Bundesverwaltungs-gericht zulässig ist.

1.2    Die Beschwerde richtet sich gegen die selbständig eröffnete superprovisorische Zwischenverfügung der FINMA vom 11. November 2009. Auch selbständig eröffnete Zwischenverfügungen gelten als an-fechtbare Verfügungen gemäss Art. 5 Abs. 2 i. V. m. Art. 46 Abs. 1 VwVG, wenn sie einen nicht wieder gutzumachenden Nachteil bewirken können (Art. 46 Abs. 1 Bst. a VwVG) oder wenn die Gutheissung der Beschwerde sofort einen Endentscheid herbeiführen und damit einen bedeutenden Mehraufwand an Zeit oder Kosten für ein weitläufiges Beweisverfahren ersparen würde (Art. 46 Abs. 1 Bst. B VwVG). Die angefochtene super-provisorische Verfügung ist im Kontext eines Untersuchungsverfahrens der Vorinstanz zu sehen. Gegenstand dieses Verfahrens ist die Frage, ob die

Beschwerdeführer eine nach den Finanzmarktaufsichtsgesetzen unterstellungspflichtige Tätigkeit ausüben oder nicht. Gegenstand der angefochtenen superprovisorischen Zwischenverfügung ist vorab die Einsetzung von zwei Untersuchungsbeauftragten und der Entzug der Verfügungsberechtigung der bisherigen Organe der Beschwerdeführer während der Dauer des Untersuchungsverfahrens. Eine Gutheissung der vorliegenden Beschwerde wäre daher nicht geeignet, sofort einen Endentscheid im Untersuchungsverfahren herbeizuführen (vgl. Art. 46 Abs. 1 Bst. b VwVG). Die Beschwerde gegen die angefochtene superprovisorische Zwischenverfügung ist daher nur zulässig, wenn diese einen nicht wieder gutzumachenden Nachteil im Sinne von Art. 46 Abs. 1 Bst. A VwVG bewirken kann. Diese Frage ist daher in der Folge zu prüfen.

1.3    Das besondere Rechtsschutzinteresse, das die sofortige Anfechtbarkeit einer Zwischenverfügung begründet, liegt im Nachteil, der entstünde, wenn die Anfechtung der Zwischenverfügung erst zusammen mit der Beschwerde gegen den Endentscheid zugelassen wäre (vgl. PIERRE TSCHANNEN/ULRICH ZIMMERLI/MARKUS MÜLLER, Allgemeines Verwaltungsrecht, 3. Auflage, Bern 2009, § 28 N. 84; FELIX UHLMANN/SIMONE WÄLLE-BÄR, in: Praxiskommentar VwVG, Waldmann/Weissenberger [Hrsg.], Zürich 2009, Art. 46 N 4 ff.). Bei superprovisorischen Massnahmen liegt das besondere Rechtsschutzinteresse somit im Nachteil, der entstünde, wenn die Anfechtung der Zwischenverfügung erst zusammen mit der Beschwerde gegen eine sie bestätigende provisorische Massnahme oder gegen den Endentscheid zugelassen würde. Der Nachteil im Sinne von Art. 46 Abs. 1 Bst. a VwVG kann sowohl rechtlicher als auch tatsächlicher Natur sein. Das schutzwürdige Interesse kann namentlich wirtschaftlich begründet sein, der Prozessökonomie oder der Rechtssicherheit entspringen, sofern es den Beschwerdeführern bei der Anfechtung nicht lediglich darum geht, eine Verlängerung oder Verteuerung des Verfahrens zu verhindern (Urteil des Bundesverwaltungsgerichts B-1100/2007 vom 6. Dezember 2007 E. 2.2.1).

1.4	In der Folge ist daher zu prüfen, welches die relevanten Kriterien sind, damit in einem konkreten Fall davon auszugehen ist, dass eine superprovisorische Verfügung der Vorinstanz für die Betroffenen einen nicht wieder gutzumachenden Nachteil bewirken kann. Dazu ist vorab die Entwicklung der Praxis der Vorinstanz und deren Bewertung in der bundesgerichtlichen Rechtsprechung – bzw., soweit vorhanden, in der Rechtsprechung des Bundesverwaltungsgerichts – darzustellen.

1.4.1	Das Bundesgericht kam in mehreren Urteilen zum Schluss, dass die Einsetzung eines Untersuchungsbeauftragten und der Entzug der Verfügungsberechtigung der eigenen Organe durch die Vorinstanz für den Zeitraum von mehreren Monaten bis zum rechtskräftigen Abschluss der Untersuchung einen nicht wieder gutzumachenden Nachteil für die Betroffenen darstellen kann (vgl. Urteil des Bundesgerichts 2A.509/1999 vom 24. März 2000 E. 1b, BGE 126 II 111 nicht veröffentlichte E. 1b, Urteil des Bundesgerichts 2A.179/2001 vom 31. Mai 2001 E. 1b). Das Bundesverwaltungsgericht folgte dieser Auffassung in den bisherigen beiden Urteilen zu dieser Fragestellung (vgl. Urteile des Bundesverwaltungsgerichts B-2627/2009 vom 27. Mai 2009 und B-4935/2009 vom 31. August 2009).

1.4.2	Die Eidgenössische Bankenkommission, die Rechtsvorgängerin der Vorinstanz, hatte offenbar gemäss ihrer früheren Praxis in Fällen, in denen konkreter Verdacht auf eine unterstellungspflichtige Tätigkeit bestand und Gefahr im Verzug war, superprovisorisch, d. h. ohne Gewährung des rechtlichen Gehörs, einen Beobachter eingesetzt und in die Geschäftstätigkeit eingegriffen, beispielsweise durch eine Kontensperre oder die Einschränkung der Handlungsbefähigung der Organe der untersuchten Gesellschaft. Das Bundesgericht entschied daraufhin, dass es nicht angängig sei, wenn die Vorinstanz es bis zum Endentscheid im Untersuchungsverfahren bei dieser superprovisorischen Verfügung belasse. Nach Art. 30 Abs. 1 VwVG habe die Behörde die Parteien anzuhören, bevor sie verfüge. Hiervon könne sie lediglich absehen bei Zwischenverfügungen, die nicht selbständig

durch Beschwerde anfechtbar seien (Art. 30 Abs. 2 Bst. a VwVG), falls
eine Einsprachemöglichkeit bestehe (Art. 30 Abs. 2 Bst. b VwVG), wenn
dem Begehren der Parteien voll entsprochen werde (Art. 30 Abs. 2 Bst. c
VwVG), bei Vollstreckungsverfügungen (Art. 30 Abs. 2 Bst. D VwVG) sowie
bei anderen Verfügungen in einem erstinstanzlichen Verfahren, soweit Ge-
fahr im Verzug sei, die Parteien gegen die Verfügung Beschwerde führen
könnten und ihnen keine andere Bestimmung des Bundesrechts einen An-
spruch auf vorgängige Anhörung einräume (Art. 30 Abs. 2 Bst. e VwVG).
Art. 30 Abs. 2 Bst. e VwVG ermögliche den Verzicht auf eine vorgängige
Anhörung nur, wenn kumulativ einerseits Gefahr im Verzug sei und an-
dererseits gegen die Verfügung ein verwaltungsinterner Beschwerdeweg
mit voller Überprüfungsbefugnis offen stehe; die Verwaltungsgerichtsbe-
schwerde genüge für den Verzicht auf eine Anhörung grundsätzlich nicht.
Könne keine Rechtsmittelinstanz mit voller Kognition angerufen werden,
so sei bei Gefahr im Verzug die vorgesehene Massnahme superprovisorisch
anzuordnen und unmittelbar anschliessend das rechtliche Gehör zu gewäh-
ren, worauf die superprovisorische Anordnung allenfalls als vorsorgliche
Massnahme aufrechterhalten werden könne. Dieser Entscheid sei dann im
Rahmen von aArt. 45 Abs. 2 Bst. G VwVG (heute Art. 46 Abs. 1 VwVG) vor
Bundesgericht wiederum mit Verwaltungsgerichtsbeschwerde anfechtbar
(BGE 126 II 111 E. 6b).

1.4.3    In der Folge änderte die Vorinstanz bzw. ihre Rechtsvorgängerin
ihre Praxis und wies in ihren superprovisorischen Verfügungen jeweils
darauf hin, dass sie dazu bereit sei, nach der Gewährung des rechtlichen
Gehörs eine anfechtbare Verfügung über die allenfalls bestätigten vorsorg-
lichen Massnahmen zu erlassen, sofern die Betroffenen dies verlangten.
Das Bundesgericht bestätigte diese neue Praxis in mehreren Entscheiden als
korrekt und stellte fest, erst diese Bestätigung als vorsorgliche Massnahme
stelle einen Zwischenentscheid dar, der einen nicht wieder gutzumachen-
den Nachteil zur Folge habe und deshalb beim Bundesgericht angefochten
werden könne (vgl. Urteil des Bundesgerichts 2A.65/2002 E. 2.2.2, Urteil

des Bundesgerichts 2A.179/2001 vom 31. Mai 2001 E. 1b/aa, BGE 132 II
382 E. 1.2.1). Es sei auch zulässig, wenn die Vorinstanz darauf verzichte, von
sich aus eine solche anfechtbare Verfügung über die allenfalls bestätigten
vorsorglichen Massnahmen zu erlassen, sofern sie die Betroffenen in der
Rechtsmittelbelehrung der superprovisorischen Verfügung darauf hinweise,
dass sie dazu bereit sei. Wer die Einsetzung eines Beobachters oder Unter-
suchungsbeauftragen für die Dauer des Unterstellungsverfahrens nicht in
Frage stellen wolle, habe ein Interesse daran, dass kein unnötiger Aufwand
betrieben werde (vgl. Urteil des Bundesgerichts 2A.65/2002 E. 2.2.2). Es sei
daher Sache der Betroffenen, sich um den Erlass einer derartigen selbstän-
dig anfechtbaren Verfügung zu bemühen, nötigenfalls mit einer Rechtsver-
weigerungsbeschwerde.

1.5      Im Kontext dieser neueren Praxis der Vorinstanz ist die Frage, ob
bereits eine superprovisorische Zwischenverfügung einen nicht wieder
gutzumachenden Nachteil bewirken kann, somit nicht mehr mit Blick auf
die ganze voraussichtliche Dauer des Untersuchungsverfahrens zu beant-
worten. Massgeblich ist vielmehr die voraussichtliche Zeitspanne, bis die
Vorinstanz nach Eingang der Einwände der Betroffenen über die allfällige
Bestätigung ihrer superprovisorisch verfügten Massnahmen entschieden
haben wird. In einem vergleichbaren Fall aus einem anderen Rechtsgebiet,
in dem zwar ein ungleich geringerer Eingriff in Frage stand als im vorlie-
genden Fall, der aber ansonsten von der verfahrensrechtlichen Problematik
her eine ähnliche Fragestellung aufwies, führte das Bundesgericht aus, es
sei klar, dass die superprovisorische Verfügung nur bis zur Gewährung des
rechtlichen Gehörs gelte und die Behörde «unmittelbar danach» über die
allfällige Bestätigung dieser superprovisorisch angeordneten Massnahmen
entscheiden werde. Als allfälliger Nachteil komme daher lediglich die-
se kurzfristige Beeinträchtigung der Betroffenen in Frage (vgl. das Urteil
2A.438/2004 vom 1. Dezember 2004 E. 1.3.2).

1.6 Die Frage, ob eine superprovisorische Zwischenverfügung, in der die Vorinstanz einen Untersuchungsbeauftragten eingesetzt und die Geschäftsführungsbefugnis der Organe der Betroffenen entzogen hat, geeignet ist, einen nicht wieder gutzumachenden Nachteil zu bewirken und daher separat anfechtbar ist, wurde vom Bundesgericht seit der Praxisänderung der Vorinstanz zwar stets verneint. Die Frage kann indessen nicht generell beantwortet werden; massgeblich sind vielmehr die jeweiligen Umstände des konkreten Einzelfalles. In erster Linie dürfte diesbezüglich entscheidend sein, ob bzw. innert welcher Frist die Vorinstanz im konkreten Einzelfall nach der Gewährung des rechtlichen Gehörs über die Bestätigung, Modifizierung oder Aufhebung der superprovisorisch verfügten Massnahmen verfügen sollte, und ob konkrete Anhaltspunkte dafür bestehen, dass sie dies nicht zeitgerecht tun wird oder gar bereits im Verzug ist.

1.7 Über die Bestätigung von superprovisorisch verfügten Massnahmen ist «unmittelbar» nach der Gewährung des rechtlichen Gehörs bzw. nach Eingang der Einwände der Betroffenen zu verfügen (vgl. das Urteil 2A.438/2004 vom 1. Dezember 2004 E. 1.3.2). Wie schnell «unmittelbar» ist, kann nicht generell gesagt werden. Massgeblich sind die konkreten Umstände des Einzelfalles. Je nach Schwere des Eingriffes und Relevanz des Zeitablaufs ist ein Entscheid mehr oder weniger rasch zu fällen. Im Allgemeinen wird die Behörde sich bis zum Entscheid einige Tage oder auch mehr Zeit nehmen können. In besonderen Fällen sind bedeutend kürzere oder auch längere Entscheidfristen zu verlangen. Entscheidend ist letztlich, wie viel Zeit objektiv erforderlich ist, um in einer summarischen Würdigung und aufgrund der bereits vorhandenen oder rasch greifbaren Beweismittel zu entscheiden, ob die objektiven Anhaltspunkte auch angesichts der von den Betroffenen dagegen vorgebrachten Einwände die superprovisorisch verfügten Massnahmen als angemessen erscheinen lassen oder ob letztere aufzuheben oder durch mildere zu ersetzen sind.

1.8     Darin allein, dass die Beschwerdeführer ihre Einwände zuerst bei der Vorinstanz vorbringen müssen und erst die dadurch erwirkte Verfügung – falls noch erforderlich – beim Bundesverwaltungsgericht anfechten können, kann kein nicht wieder gutzumachender Nachteil gesehen werden. Im Zeitpunkt des Beschwerdeeingangs verfügt das Bundesverwaltungsgericht nämlich weder über die Vorakten noch über eine Vernehmlassung der Vorinstanz. Gerade im Kontext der Eröffnung eines Untersuchungsverfahrens steht der Vorinstanz nach ständiger Praxis des Bundesgerichts und des Bundesverwaltungsgerichts aber ein «technisches Ermessen» zu bezüglich der Frage, ob und welche Massnahmen sie ergreift (vgl. BGE 132 II 382 E. 4.1, BGE 131 II 306 E. 3.1.2, BGE 130 II 351 E. 2.2, BGE 126 II 111 E. 3b, Urteil des Bundesverwaltungsgerichts B-4935/2009 vom 31. August 2009 E. 2.4). Selbst wenn das Bundesverwaltungsgericht auf eine Beschwerde gegen eine superprovisorische Zwischenverfügung eintreten würde, müsste es daher zwingend zuerst einen Schriftenwechsel durchführen und die Vernehmlassung und die Vorakten der Vorinstanz einholen, bevor es über die Beschwerde entscheiden könnte. Ob unter Berücksichtigung dieser unumgänglichen Verfahrensnotwendigkeiten überhaupt angenommen werden kann, die Beschwerdeführer könnten mit einer direkten Anrufung des Bundesverwaltungsgerichts einen relevanten Zeitgewinn erzielen, erscheint daher als zweifelhaft. Sofern keine Anhaltspunkte vorliegen, dass die Vorinstanz ihre Verfügung nicht zeitgerecht erlassen wird, dürfte daher in aller Regel davon auszugehen sein, dass die Notwendigkeit, zuerst eine Verfügung der Vorinstanz zu verlangen, keinen nicht wieder gutzumachenden Nachteil bewirkt.

1.9     Zu berücksichtigen ist ferner, dass die Vorinstanz in Fällen der vorliegenden Art ihre superprovisorische Verfügung jeweils sofort vollzieht und den Übergang der Verfügungsberechtigung von den Organen der Gesellschaft auf den Untersuchungsbeauftragten unverzüglich ins Handelsregister eintragen lässt. Selbst wenn auf die Beschwerde gegen die superprovisorische Verfügung eingetreten und diese gutgeheissen würde, würde

der Vollzug der Verfügung daher nicht aufgehalten, sondern nur mehr rück-
gängig gemacht werden. Als möglicher Nachteil in Betracht fällt daher nur
eine allfällige, wie dargelegt höchstens geringfügige Verzögerung in dieser
nachträglichen Korrektur.

1.10    Insgesamt ergibt sich somit, dass zwar jeder konkrete Fall einzeln zu
prüfen, mit dem Bundesgericht aber davon auszugehen ist, dass die super-
provisorische Einsetzung eines Untersuchungsbeauftragten und die damit
einhergehende Einschränkung in der Geschäftstätigkeit der Betroffenen in
der Regel keinen nicht wieder gutzumachenden Nachteil beinhaltet, sofern
davon ausgegangen werden kann, dass die Vorinstanz gebührend rasch
nach Eingang der Einwände der Betroffenen über die allfällige Bestätigung
der superprovisorisch verfügten Massnahmen entscheiden wird.

1.11    Wie das Bundesverwaltungsgericht kürzlich in zwei Urteilen (Ur-
teile des Bundesverwaltungsgerichts B-2627/2009 vom 27. Mai 2009 und
B-4935/2009 vom 31. August 2009) ausgeführt hat, hat sich die Rechtslage
seit Anfang 2007 insofern geändert, als mit der Revision der Bundesrechts-
pflege das Bundesverwaltungsgericht als erste Rechtsmittelinstanz gegen
Verfügungen der Vorinstanz geschaffen wurde. Im Gegensatz zum Bun-
desgericht verfügt das Bundesverwaltungsgericht über volle Kognition, d. h.
es kann eine angefochtene Verfügung nicht nur auf eine unrichtige Sach-
verhaltsfeststellung und auf Rechtsfehler, sondern auch auf ihre Angemes-
senheit überprüfen (vgl. Art. 49 VwVG). Insofern ist eine Heilung allfälliger
Gehörsverletzungen durch die Vorinstanz im Beschwerdeverfahren vor dem
Bundesverwaltungsgericht nunmehr grundsätzlich in allen Fällen möglich.

1.12    Nach der Rechtsprechung kann eine – nicht besonders schwer-
wiegende – Verletzung des rechtlichen Gehörs ausnahmsweise als geheilt
gelten, wenn die betroffene Person die Möglichkeit erhält, sich vor einer Be-
schwerdeinstanz zu äussern, die sowohl den Sachverhalt wie die Rechtslage
frei überprüfen kann (BGE 127 V 431 E. 3d/aa). Von einer Rückweisung der

Sache an die Verwaltung ist selbst bei einer schwerwiegenden Verletzung des rechtlichen Gehörs dann abzusehen, wenn und soweit die Rückweisung zu einem formalistischen Leerlauf und damit zu unnötigen Verzögerungen führen würde, die mit dem (der Anhörung gleichgestellten) Interesse der betroffenen Partei an einer beförderlichen Beurteilung der Sache nicht zu vereinbaren wären (BGE 133 I 201 E. 2.2, BGE 132 V 387 E. 5.1, mit Hinweisen). In den beiden zitierten Urteilen des Bundesverwaltungsgerichts hatte die Vorinstanz bereits im Rahmen ihrer Vernehmlassung zu den Einwänden der Beschwerdeführer Stellung genommen und ausgeführt, dass sie an den superprovisorisch verfügten Massnahmen festhalten wolle. Eine Rückweisung nach dieser Vernehmlassung wäre daher prozessualer Leerlauf gewesen; es war offensichtlich, wie die Vorinstanz verfügt hätte, wenn die Sache an sie zurückgewiesen worden wäre, damit sie die bisher erst superprovisorisch verfügten Massnahmen als vorsorgliche Massnahmen bestätige oder modifiziere. Das Vorliegen eines nicht wieder gutzumachenden Nachteils war bei dieser Sachlage zu bejahen.

1.13     Nach ständiger Rechtsprechung des Bundesgerichts – nicht nur in finanzmarktrechtlichen Verfahren – und der herrschenden Lehre sollen Gehörsverletzungen durch die Beschwerdeinstanz indessen – wie erwähnt – nur ausnahmsweise und nicht systematisch geheilt werden, auch wenn die Beschwerdeinstanz über volle Kognition verfügt (vgl. BGE 124 V 180 E. 4, BGE 124 II 132 E. 2c, je mit Hinweisen). Nur so kann vermieden werden, dass systematisch im erstinstanzlichen Verfahren der Anspruch auf rechtliches Gehör missachtet wird und die Rechtsmittelinstanz sich allenfalls mit neuen Einwänden beschäftigen muss, die das erstinstanzliche Verfahren zu beeinflussen bzw. zu verkürzen oder zu beenden geeignet gewesen wären. Die Wahrung der Verfahrensrechte der Betroffenen ist diesbezüglich von zentraler Bedeutung. Eine nachträgliche Heilung eines entsprechenden Mangels kommt daher nur ausnahmsweise in Frage; die erstinstanzliche Behörde darf nicht darauf vertrauen, dass von ihr missachtete Verfahrensrechte systematisch nachträglich geheilt würden. Ansonsten würden

die gerade für das erstinstanzliche Verfahren vorgesehenen prozessualen Garantien ihren Sinn verlieren (BGE 126 II 111 E. 6b).

1.14    Wie dargelegt, ist die Vorinstanz seit ihrer durch das Bundesgericht veranlassten Praxisänderung durchaus bereit, den durch eine superprovisorische Verfügung Betroffenen das rechtliche Gehör zu gewähren. Insofern kann von einer Verletzung oder Missachtung des Anspruchs auf rechtliches Gehör nicht gesprochen werden. Würde das Bundesverwaltungsgericht in derartigen Beschwerdeverfahren gegen superprovisorische Verfügungen aber nun regelmässig einen vollständigen Schriftenwechsel durchführen und die Vorinstanz zur Vernehmlassung und zum Einreichen ihrer Vorakten auffordern, so würde dies zu einer systematischen Verlagerung des erstmaligen rechtlichen Gehörs in das Rechtsmittelverfahren führen. Dies wäre aber nach dem Gesagten weder zulässig noch erwünscht. Von der Möglichkeit, das vor der Vorinstanz noch nicht gewährte Gehör vor dem Bundesverwaltungsgericht nachzuholen, ist daher nicht als Regelfall, sondern nur ausnahmsweise Gebrauch zu machen, insbesondere etwa, wenn eigentliche Rechtsverweigerungs- oder Rechtsverzögerungsrügen vorgebracht werden, weil die Vorinstanz ihre Verfügung über die allfällige Bestätigung der superprovisorisch verfügten Massnahmen nicht gebührend rasch erlassen sollte.

1.15    Im vorliegenden Fall hat die Vorinstanz die Beschwerdeführer eingeladen, allfällige Einwände gegen die superprovisorisch verfügten Massnahmen bis zum 24. November 2009 vorzubringen, damit sie anschliessend über die Bestätigung der Massnahmen entscheide. Wie dieser Entscheid ausfallen wird, ist daher noch nicht bekannt, da die Vorinstanz noch keine Kenntnis von den Einwänden der Beschwerdeführer hat und dazu auch noch keine Stellung nehmen konnte. Es sind auch keinerlei Anhaltspunkte dargetan oder ersichtlich dafür, dass die Vorinstanz diese Verfügung nicht – der Dringlichkeit der Sache angemessen – unverzüglich nach Eingang der Einwände der Beschwerdeführer erlassen würde. Insofern steht im vorlie-

genden Fall noch nicht fest, ob der den Beschwerdeführern entstandene
Nachteil nicht bereits durch eine entsprechende Verfügung der Vorinstanz
behoben würde. Auch kann nicht gesagt werden, dass den Beschwerde-
führern insofern ein nicht wieder gutzumachender Nachteil erwächst, als
sie zuerst bei der Vorinstanz ihre Einwände vorbringen und erst die dadurch
erwirkte Verfügung – falls noch erforderlich – beim Bundesverwaltungsge-
richt anfechten können.

1.16    Nach dem Gesagten erweist sich die angefochtene superpro-
visorische Zwischenverfügung als nicht selbständig anfechtbar. Auf die
Beschwerde ist daher nicht einzutreten. Die Beschwerdeschrift ist an die
Vorinstanz zu überweisen, damit sie die darin vorgebrachten Einwände
der Beschwerdeführer prüfe und unverzüglich über die Bestätigung oder
Nichtbestätigung ihrer bisher erst superprovisorisch verfügten Massnahmen
entscheide.

2.
Bei diesem Verfahrensausgang gelten die Beschwerdeführer zwar als un-
terliegend, weshalb ihnen an sich die Kosten des Verfahrens aufzuerlegen
wären. Verfahrenskosten können indessen ausnahmsweise erlassen werden
(vgl. Art. 63 Abs. 1 VwVG, Art. 1 ff. und 6 des Reglements vom 21. Februar
2008 über die Kosten und Entschädigungen vor dem Bundesverwaltungs-
gericht [VGKE, SR 173.320.2]). Da das vorliegende Urteil eine Präzisierung
der bisherigen Rechtsprechung des Bundesverwaltungsgerichts beinhaltet,
ist von der Auferlegung von Verfahrenskosten abzusehen.
(…)

Dispositiv

# 5 Rechts- und Reputationsrisiken bei der Umsetzung des Qualified Intermediary Agreement

**VERFÜGUNG der Eidgenössischen Bankenkommission**
**vom 21. Dezember 2008**

**Grenzüberschreitendes Geschäft mit Privatkunden in den USA; unzureichende Organisation durch mangelhaftes Risikomanagement, Gewähr für eine einwandfreie Geschäftstätigkeit (Art. 3 Abs. 2 Bst. c BankG).**

1. Verstoss gegen das Gewährs- und Organisationserfordernis des Bankengesetzes.

2. Ungenügende Erfassung, Begrenzung und Überwachung der mit dem grenzüberschreitenden Geschäft mit US-Privatkunden verbundenen Rechtsrisiken.

**Opérations transfrontières avec des clients privés aux Etats-Unis ; organisation insuffisante du fait d'une gestion des risques présentant des lacunes ; garantie d'une activité irréprochable (art. 3 al. 2 let. c LB).**

1. Infraction aux obligations de garantie et d'organisation de la loi sur les banques.

2. Détermination, limitation et surveillance insuffisantes des risques juridiques liés aux opérations transfrontières avec des clients privés aux Etats-Unis.

**Operazioni transfrontaliere con clienti privati negli Stati Uniti d'America; organizzazione carente a causa di un'insufficiente gestione dei rischi; garanzia di un'attività irreprensibile (art. 3 cpv. 2 lett. c LBCR).**

1. Violazione del requisito d'irreprensibilità e di organizzazione adeguata secondo la Legge sulle banche.

2. Carenze nel rilevamento, nella limitazione e nel controllo dei rischi giuridici legati alle operazioni transfrontaliere con clienti privati statunitensi.

**Zusammenfassung des Sachverhalts**

Hauptgegenstand des Verfahrens in Sachen A._____ AG war die Frage, ob die A._____ AG die mit der Umsetzung des Qualified Intermediary Agreement (QIA) und mit den amerikanischen aufsichtsrechtlichen Beschränkungen des grenzüberschreitenden Geschäftsverkehrs mit US-Personen (SEC-Restriktionen) verbundenen Rechts- und Reputationsrisiken angemessen erfasst, begrenzt und überwacht hat.

Die EBK stellte in ihrer Verfügung fest, dass die A._____ AG gegen das Gewährs- und Organisationserfordernis des Bankengesetzes verstossen hat. Einzelne Mitarbeiter der A._____ AG hatten in einer beschränkten Zahl von Fällen entgegen den Bestimmungen des QIA für US-Steuerzwecke erstellte Kundendokumente als zureichend erachtet, von denen sie wussten oder hätten wissen müssen, dass sie den US-Steuerstatus des Kunden nicht zutreffend wiedergeben. Zudem missachteten sie über eine längere Zeit hinweg die SEC-Restriktionen, welche für grenzüberschreitende Finanzdienstleistungen an US-Investoren eine Bewilligungspflicht vorsehen. Die A._____ AG setzte sich dadurch massiven Rechts- und Reputationsrisiken aus, die sich in von verschiedenen US-Behörden ausgelösten Verfahren realisierten.

Die EBK stellte im Rahmen ihrer Untersuchung hingegen keine nachlässige Umsetzung des QIA durch die A._____ AG fest. Ebenso wenig kam die EBK zum Schluss, die oberste Geschäftsleitung der A._____ AG hätte von den zuvor erwähnten Betrugsmanövern von US-Kunden zum Nachteil der US-Steuerbehörden und der weisungswidrigen Verletzung von SEC-Restriktionen durch einzelne Mitarbeiter gewusst. Die EBK verbot jedoch der A._____ AG in ihrer Verfügung, das grenzüberschreitende Private Banking mit Personen mit Wohnsitz oder Domizil in den USA weiter zu betreiben. Sie verpflichtete die A_____ AG, die der grenzüberschreitenden Dienstleistungserbringung inhärenten Rechts- und Reputationsrisiken angemessen zu erfassen, zu begrenzen und zu überwachen, und ordnete eine Kontrolle der Umsetzung dieser Anordnungen an.

1.      Parteistellung

(51)    Einzige Verfahrenspartei im Sinne von Artikel 6 des Verwaltungs-
verfahrensgesetzes (VwVG; SR 172.021) ist vorliegend die A._____
AG. Ziel der Untersuchungshandlungen der EBK war es, mittels Verfügung
festzustellen, ob die Bank die Bewilligungsvoraussetzungen oder andere
gesetzliche Vorschriften verletzt hat. Nicht Verfahrensgegenstand war
dagegen, in welchem Ausmass den involvierten Organen X._____,
Y._____ oder Z._____ eine Verantwortung am Vorgefallenen zu-
kommt. Gleichwohl erlaubt das Untersuchungsergebnis die eine oder ande-
re Aussage dazu, selbst wenn diesen Personen formell keine Parteistellung
zukommt.

2.      Bewilligungspflicht und Bewilligungsvoraussetzungen

(52)    Bewilligungspflicht: Der Betrieb einer Bank bedarf nach Art. 3 des
Bankengesetzes (BankG; SR 952.0) einer Bewilligung der Bankenkommis-
sion. Art. 3 Abs. 2 BankG umschreibt die dauernd einzuhaltenden Bewil-
ligungsvoraussetzungen zum Geschäftsbetrieb als Bank. Soweit eine Bank
auch den gewerbsmässigen Effektenhandel betreibt, bedarf sie zusätzlich
einer Bewilligung als Effektenhändler im Sinn von Art. 10 des Börsengeset-
zes (BEHG; SR 954.1). Ist die Bank Teil einer oder an der Spitze einer von der
Schweiz aus geleiteten Finanzgruppe (Art. 3c und 3d Abs. 1 BankG), sind
zudem die Anforderungen gemäss Art. 3e ff. BankG zu beachten.

(53)    Organisationserfordernis: Zu den dauernd einzuhaltenden Bewilli-
gungsvoraussetzungen gehört nach Art. 3 Abs. 2 Bst. a BankG, dass die
Bank über eine ihrer Geschäftstätigkeit entsprechende Verwaltungsorgani-
sation verfügt. Eine der Gruppenaufsicht der EBK unterstellte Finanzgruppe

muss zudem so organisiert sein, dass sie insbesondere alle wesentlichen Risiken erfassen, begrenzen und überwachen kann (Art. 3f Abs. 2 BankG). Gleiches gilt für Effektenhändler nach Massgabe von Art. 10 Abs. 2 Bst. a BEHG. Zu einer angemessenen Organisation gehört unter anderem ein gut ausgebautes Weisungswesen mit klaren Aufgaben-, Kompetenz- und Verhaltensregeln. Die Bank hat dafür zu sorgen, dass die von ihr erlassenen Weisungen und Richtlinien umgesetzt und dauernd befolgt werden. Schliesslich ist eine Bank von der Bedeutung und Grösse der A._____ AG verpflichtet, die EBK unverzüglich über wichtige Vorkommnisse bei der Bank zu orientieren, welche (zu Recht oder zu Unrecht) das Potenzial haben, das Vertrauen der Aufsichtsbehörden oder der Öffentlichkeit in die Bank zu gefährden. Dazu gehören insbesondere auch Informationen über potenzielle Risiken der Bank im In- und Ausland.

(54)    Gewährserfordernis: Gemäss Art. 3 Abs. 2 Bst. c BankG haben die mit der Verwaltung und Geschäftsführung der Bank und gemäss Art. 3f Abs. 1 BankG die mit der Geschäftsführung einerseits und der Oberleitung, Aufsicht und Kontrolle der Finanzgruppe anderseits betrauten Personen einen guten Ruf zu geniessen und Gewähr für eine einwandfreie Geschäftstätigkeit zu bieten (Gewährsträger). Sie müssen fachlich kompetent sein, sich im Geschäftsverkehr korrekt verhalten und charakterlich geeignet sein, das Bankgeschäft zu betreiben. Das Gewährserfordernis gemäss Art. 10 Abs. 2 Bst. d BEHG für die verantwortlichen Mitarbeiter eines Effektenhändlers ist deckungsgleich mit demjenigen nach Bankengesetz. Was für die einzelnen Organe, massgeblichen Beteiligten oder verantwortlichen Mitarbeitenden gilt, hat auch für die Bank seine Gültigkeit: Sie muss als Unternehmung die Bewilligungsvoraussetzung der einwandfreien Geschäftstätigkeit ebenfalls erfüllen (Verfügung der EBK vom 30. August 2000 in EBK-Bulletin 41/2000, S. 15 ff., insbes. 20, und Verfügung der EBK vom 25. Juni 2002 gegen die A._____ AG, Erw. 1).

(55)     Grundsätze der inneren Organisation: Zu den dauernd einzuhalten-
den Bewilligungsvoraussetzungen gehört nach Art. 3 Abs. 2 Bst. a BankG,
dass die Bank in ihren Statuten, Gesellschaftsverträgen und Reglementen
den Geschäftskreis genau umschreibt und über eine ihrer Geschäftstätigkeit
entsprechende Verwaltungsorganisation verfügt. Umgekehrt müssen die
Aktivitäten der Bank ihrer Organisation und ihren Ressourcen entsprechen.
Für Effektenhändler ergibt sich das Organisationserfordernis aus Art. 10
Abs. 2 Bst. a BEHG. Das Aufsichtsrecht verlangt ausserdem eine funktionel-
le und personelle Trennung der strategischen Aufsicht und Leitung (Verwal-
tungsrat) von der operationellen Führung (Geschäftsleitung) (Art. 3 Abs. 2
Bst. a BankG i. V. m. Art. 8 Verordnung über die Banken und Sparkassen/
Bankenverordnung/BankV, SR 952.02; ferner Winzeler Christoph, Basler
Kommentar zum Bankengesetz, Hrsg. Watter/Vogt/Bauer/Winzeler, Basel
2005, N 8 zu Art. 3). Die Befugnisse von Verwaltungsrat und Geschäfts-
leitung sind so abzugrenzen, dass eine sachgemässe Überwachung der
Geschäftsführung durch den Verwaltungsrat gewährleistet ist (vgl. Art. 3
Abs. 2 Bst. a BankG). Im Übrigen müssen die Funktionen Handel, Vermö-
gensverwaltung und Abwicklung wirksam getrennt sein (Art. 9 Abs. 1
BankV und Art. 19 Abs. 1 Verordnung über die Börsen und den Effekten-
handel/Börsenverordnung/BEHV, SR 954.11).

(56)     Risikomanagement: Zu einer angemessenen inneren Organisation
gehört, dass ein Institut den sachgerechten Umgang mit Risiken sicherstellt.
Die Grundzüge des Risikomanagements sowie die Zuständigkeiten und
das Verfahren für die Bewilligung risikobehafteter Geschäfte sind in einem
Reglement oder in internen Richtlinien zu regeln. Markt-, Kredit-, Ausfall-,
Abwicklungs-, Liquiditäts- und Imagerisiken sowie operationelle und recht-
liche Risiken müssen erfasst, begrenzt und überwacht werden (Art. 9 Abs. 2
BankV; Art. 19 Abs. 3 i. V. m. Art. 26 Abs. 1 BEHV).

(57)    Interne Kontrolle: Die Bank und der Effektenhändler haben weiter für ein wirksames internes Kontrollsystem zu sorgen. Sie bestellen insbesondere eine von der Geschäftsleitung unabhängige interne Revision (Inspektorat) (Art. 9 Abs. 4 BankV und Art. 20 Abs. 1 BEHV). Bis zum 31. Dezember 2006 waren die Anforderungen an das interne Kontrollsystem in zwei Erlassen konkretisiert: einerseits im EBK-RS 95/1 «Interne Revision» sowie andererseits in den «Richtlinien zur internen Kontrolle» der Schweizerischen Bankiervereinigung vom Juni 2002 («Richtlinien zur internen Kontrolle»), welche von der EBK als aufsichtsrechtlicher Mindeststandard anerkannt waren (vgl. EBK-RS 96/3 «Revisionsbericht», Anhang I: Selbstregulierung; abgelöst per 21. April 2004 durch das EBK-RS 04/2 «Selbstregulierung als Mindeststandard»). Diese beiden Regularien wurden per 1. Januar 2007 durch das EBK-RS 06/6 «Überwachung und interne Kontrolle» abgelöst, dessen Anforderungen vollumfänglich bis zum 1. Januar 2008 umzusetzen sind. Für die Beurteilung der zur Diskussion stehenden Sachverhalte sind zu einem bedeutenden Teil die beiden erstgenannten Regelwerke massgebend.

(58)    Elemente eines wirksamen internen Kontrollsystems: Unter dem Begriff internes Kontrollsystem oder interne Kontrolle werden alle vom Verwaltungsrat, der Geschäftsleitung und den übrigen Führungsverantwortlichen angeordneten Vorgänge, Methoden und Massnahmen verstanden, die dazu dienen, einen ordnungsgemässen Ablauf des betrieblichen Geschehens sicherzustellen. Darunter sind nicht nur eigentliche Kontrollaktivitäten, sondern auch solche der Steuerung und Planung zu verstehen. Unter anderem dient das interne Kontrollsystem der Einhaltung gesetzlicher und anderer Vorschriften (s. sogleich Rz. (59) unten), der Verhinderung, Verminderung und Aufdeckung von Fehlern und Unregelmässigkeiten, dem Schutz des Geschäftsvermögens, der Sicherstellung der Zuverlässigkeit und Vollständigkeit der Buchführung, der zeitgerechten und verlässlichen finanziellen Berichterstattung, der Erreichung der geschäftspolitischen Ziele sowie der wirksamen und effizienten Geschäftsführung (vgl. Richtlinien zur internen Kontrolle 2002).

(59)    Compliance: Banken und Effektenhändler haben durch geeignete Vorkehrungen und Kontrollen auf die Einhaltung der Gesetze und übrigen Vorschriften hinzuwirken (Compliance). Dazu gehört insbesondere ein zweckmässiges internes Weisungswesen mit klaren Aufgaben-, Kompetenz- und Verhaltensregeln. Die Leitungsorgane und die übrigen mit Compliance-Aufgaben betrauten Personen haben dafür zu sorgen, dass die von ihnen erlassenen Weisungen und Richtlinien umgesetzt und von sämtlichen Mitarbeitern dauernd befolgt werden. Dies gilt umso mehr bei grösseren Instituten und Gruppen. Die Anforderungen an Compliance (sowohl im Sinne der Normeinhaltung als auch der Funktion) sind direkter Ausfluss des Organisationserfordernisses gemäss Art. 3 Abs. 2 lit. a BankG und sind heute in den Rz. 97 ff. des EBK-RS 06/6 «Überwachung und interne Kontrolle» konkretisiert, galten aber gestützt auf das Organisationserfordernis bereits früher sinngemäss.

(60)    Verwaltungsrat: Der Verwaltungsrat hat unübertragbare und unentziehbare Aufgaben (vgl. Art. Art. 716a Abs. 1 OR). Mitunter zu den Kernaufgaben des Verwaltungsrates gehören die Oberleitung der Gesellschaft und die Erteilung der nötigen Weisungen, die Festlegung der Organisation, die Ausgestaltung des Rechnungswesens, der Finanzkontrolle und der Finanzplanung, die Ernennung und Abberufung der mit der Geschäftsführung und Vertretung betrauten Personen, die Oberaufsicht über die mit der Geschäftsführung betrauten Personen, namentlich im Hinblick auf die Befolgung der Gesetze, Statuten, Reglemente und Weisungen. Zu seinen Aufsichtsinstrumenten gehört in erster Linie die interne Revision (Inspektorat). Schliesslich gehört zu den Pflichten des Verwaltungsrates auch die Schaffung und Aufrechterhaltung einer geeigneten internen Kontrolle (vgl. Richtlinien zur internen Kontrolle 2002, Art. 9 Abs. 4 BankV und Art. 20 Abs. 1 BEHV; vgl. Rz. (57) oben).

(61)    Geschäftsleitung: Der Geschäftsleitung obliegt die operationelle Führung des Bankbetriebs, das heisst, sie ist für die Umsetzung der vom Verwaltungsrat festgelegten Strategien und Geschäftsgrundsätze verant-

wortlich. Die Geschäftsleitung hat ferner gewisse Kontrollaufgaben wahrzunehmen. Sie gewährleistet die Umsetzung und Einhaltung sämtlicher Gesetze, Statuten, Reglemente und Weisungen etc. Bei dieser Aufgabe wird sie durch die Funktion Compliance unterstützt (vgl. Rz. (59) oben). Sie sorgt weiter im Rahmen der internen Kontrolle für die Aufrechterhaltung und Dokumentation einer Organisationsstruktur, welche die Verantwortlichkeiten, Kompetenzen und Informationsflüsse eindeutig festhält. Sie entwickelt geeignete Prozesse für den Umgang mit Risiken und überwacht den quantitativ und qualitativ optimalen Ressourceneinsatz im Bereich der internen Kontrolle (vgl. Richtlinien zur internen Kontrolle 2002).

### 3.    Massnahmenkompetenz der EBK

(62)    Wiederherstellung des ordnungsgemässen Zustands: Die Bankenkommission trifft die zum Vollzug des Gesetzes notwendigen Verfügungen und überwacht die Einhaltung der gesetzlichen Vorschriften (Art. 23bis Abs. 1 BankG). Erhält die EBK von Verletzungen des Gesetzes oder von sonstigen Missständen Kenntnis, erlässt sie die zur Herstellung des ordnungsgemässen Zustandes und zur Beseitigung der Missstände notwendigen Verfügungen (Art. 23ter Abs. 1 BankG). Bei der Anordnung von Massnahmen steht der EBK im Rahmen ihres gesetzlichen Auftrages ein weiter – weitgehend technischer – Ermessensspielraum zu (vgl. BGE 131 II 306, BGE 126 II 111, Erw. 3b und Urteil des Bundesgerichts 2A.91/2005 vom 9. Februar 2005 [nur veröffentlicht im EBK-Bulletin 49 S. 36 ff.] sowie Urteil des Bundesverwaltungsgerichts B-3708/2007 E.3.3 vom 4. März 2007).

(63)    Allgemeine Massnahmenkompetenz: Bei den Ermächtigungen im Sinn der Art. 23bis Abs. 1 und 23ter Abs. 1 BankG handelt es sich um eine allgemeine Kompetenz, diejenigen Massnahmen präventiv zu ergreifen, die sicherstellen sollen, dass ein Institut die gesetzlichen Anforderungen erfüllt und die Gläubiger geschützt werden. Die Massnahmenkompetenz ist in

einigen Bereichen weiter konkretisiert. So kann die EBK gemäss Art. 23[septies] Abs. 1 BankG zur Durchsetzung des Bankengesetzes direkte Prüfungen bei ausländischen Niederlassungen von Banken, für deren konsolidierte Aufsicht sie im Rahmen der Herkunftskontrolle verantwortlich ist, selber vornehmen oder durch Revisionsstellen vornehmen lassen. Aus den oben erwähnten Grundlagen ergibt sich, dass die EBK, wenn dies dem Zweck der Aufsicht förderlich ist, auch selbst direkte Prüfungen bei unterstellten Banken in der Schweiz vornehmen kann (vgl. ebenfalls Erw. 6 der Verfügung der EBK vom 25. Juni 2002 gegen die A._____ AG i. S. […]).

(64)   Keine Sanktionen: Anders als viele Bankenaufsichtsbehörden im Ausland, darunter die New York FED, kann die EBK nach geltendem Recht keine Vermögenssanktionen gegen Banken und deren Mitarbeiter verhängen, die aufsichtsrechtliche Bestimmungen in schwerwiegender Weise verletzt haben (vgl. den Entscheid des Bundesgerichts vom 2. Februar 2000 i. S. Credit Suisse Group und Credit Suisse First Boston (Biber Holding AG), EBK-Bulletin 40/2000, S. 37 ff., insbes. E. 9, den auf der Website publizierten «EBK-Sanktionenbericht» vom Mai 2003, sowie Urs Zulauf/ David Wyss/Daniel Roth, Finanzmarktenforcement, Bern 2008, S. 25 ff.). Dies gilt sowohl für die Verhängung von Bussen als auch für die Einziehung unrechtmässig erzielter Gewinne.

4.   Verletzung der Bewilligungsvoraussetzungen durch die A._____ AG

(65)   Die A._____ AG muss für die Handlungen ihrer Mitarbeiter einstehen: Sämtliche nachfolgenden Feststellungen betreffend Verletzungen aufsichtsrechtlicher Bestimmungen beziehen sich allesamt auf die A._____ AG als Bewilligungsträgerin, selbst wenn einzelne Handlungen einzelnen Mitarbeitenden, insbesondere den Kundenberatern und Kadern des NAM[1]-Geschäfts sowie deren direkten Vorgesetzten klar zuge-

[1]  NAM = Nordamerika

ordnet werden können. Die A._____ AG muss sich deren Handlungen zurechnen lassen, war und ist sie doch als bewilligtes Institut gehalten, mittels geeigneter interner Kontrollmechanismen Compliance mit den auf die Bank anwendbaren Vorschriften sicherzustellen und die mit einer Non-Compliance verbundenen Rechts- und Reputationsrisiken zu erfassen, zu begrenzen und zu überwachen.

## 4.1   Unvollständige Einhaltung der Verpflichtungen gemäss dem QIA

(66)   Verletzung des Gewährs- und Organisationserfordernisses: Im Rahmen der Umsetzung ihrer Verpflichtungen aus dem QIA verstiess die A._____ AG gegen das Gewährs- und Organisationserfordernis des Bankengesetzes, weil sie zwar in beschränktem Ausmass, aber doch in einigen Fällen und über eine lange Zeitperiode nicht beherrschbare Rechts- und Reputationsrisiken einging. Dabei unterliess es das Management des NAM-Business, das oberste Management der A._____ AG rechtzeitig und umfassend zu informieren, sodass keine informierten Entscheide gefällt werden konnten. Schwerwiegend sind insbesondere diejenigen bestimm-baren Einzelfälle, in denen die Bank über ihre Kundenberater eine aktive Rolle bei der (steuerlichen) Beratung von US-Kunden übernommen hat und ihnen auch Hilfestellungen geleistet hat, was unter dem Gesichtspunkt der aktiven Teilnahme an einem möglichen Steuerdelikt der US-Personen zumindest höchst problematisch und unter dem Aspekt des Risikomanage-ments und der zu Recht strengen Compliance-Politik der Bank inakzeptabel ist (…).

(67)   Duldung und bewusste Förderung durch das mittlere Management: Verantwortlich für die konkreten Abweichungen vom Ziel der vollständigen Umsetzung des QIA waren die Kundenberater bzw. auch Bankkader mit direktem Kundenkontakt. Das Vorgehen der Kundenberater war von den direkten Vorgesetzten und den für das NAM-Geschäft verantwortlichen Management-Ebenen gefördert, teilweise erwartet und teilweise zumindest

geduldet worden. Zudem waren dazu auch Spezialisten, vorab von Financial Planning, involviert und es wurde in diesem Bereich auch externer Rat beigezogen.

(68)   Fehlende unabhängige Kontrollen der Kundenberater: Den Kundenberatern wurde betreffend Abklärung des US-Steuerstatus eine grosse Verantwortung überbunden. Dies barg auch ein Missbrauchspotenzial in sich. Zwar hatte die Bank die Kundenberater betreffend Kategorisierung der Kundenbeziehungen geschult, doch unterliess sie es in der Folge, durch stichprobenartige, tiefgehende unabhängige Kontrollen sicherzustellen, dass die Kundenberater nur dort die Erklärungen ihrer Kunden gelten liessen, wo das berechtigt war. Auch nach Meinung der Bank hätten unabhängige Kontrollen in einer beschränkten Anzahl von Fällen mögliche Verletzungen des QIA durch die Bank vermieden.

(69)   Nichterfüllung von «1099-Reporting»-Pflichten bei W-9[2]-Kunden: 2002 ging die Bank sicherheitshalber von einer Anwendbarkeit der «Deemed Sales Rules» aus und passte daher ihr Geschäftsmodell an. Hinsichtlich ihrer W-9-Kundschaft nahm sie aber bewusst in Kauf, ihren «1099-Reporting»-Pflichten bei Transaktionen von W-9-Kunden mit Non-US-Wertschriften nicht nachzukommen, weil sie dazu technisch nicht in der Lage gewesen sei. Auf Anfrage stellte die Bank den Kunden Erträgnisaufstellungen zur Verfügung. Die Bank beurteilte den Verstoss als «Underreporting» und beurteilte die Konsequenzen eines allfälligen Verfahrens des IRS deswegen als nicht gravierend. Die Bank stellt sich heute – auch gestützt auf U.S. Counsel – auf den Standpunkt, die steuerlichen «Deemed Sales Rules» fänden unter dem QIA keine Anwendung. Diese Frage ist nach US-Steuerrecht offenbar umstritten.

[2]   US-Bürger, die ein Konto bei einer ausländischen Bank haben, legen ihre Identität mittels Formular W-9 gegenüber der US-Steuerbehörde offen.

4.2     Domizilgesellschaften im Private Banking und die «Switches»

(70)     Zulässigkeit des Einsatzes von Domizilgesellschaften: Die Verwendung von Strukturen wie Domizilgesellschaften, Trusts und Stiftungen im Rahmen einer Private-Banking-Kundenbeziehung entspricht einem Kundenbedürfnis und ist rechtlich ohne Weiteres zulässig. Ist nicht eine natürliche Person, ein Verein, eine gemeinnützige Stiftung, eine operativ tätige Personen- oder Handelsgesellschaft Kunde einer Bank, sondern eine nicht operativ tätige Sitz- oder Domizilgesellschaft, so muss die Bank sicherstellen, dass sie den oder die daran wirtschaftlich Berechtigte(n) nach Massgabe der anwendbaren Bestimmungen der Geldwäschereibekämpfung ordentlich identifiziert und die Herkunft der Gelder abklärt. Prinzipiell muss sich die Bank nicht um den Steuerstatus der Domizilgesellschaft und des daran wirtschaftlich Berechtigten kümmern. Immerhin muss die Bank aber in Anwendung der erforderlichen Sorgfalt ausschliessen können, dass die eingebrachten Gelder nicht aus einem Verbrechen herrühren (Art. 305[bis] Ziff. 1 des Strafgesetzbuches; StGB; SR 311.0) oder mit deren Annahme für die Bank nicht anderweitig unkalkulierbare Rechts- und Reputationsrisiken verbunden sind. Schliesslich dürfen Banken in Anwendung von Art. 8 der Vereinbarung über die Sorgfaltspflicht der Banken (VSB) Täuschungsmanövern ihrer Kunden gegenüber Behörden im Inland und Ausland, insbesondere gegenüber Steuerbehörden, durch unvollständige oder auf andere Weise irreführende Bescheinigungen keinen Vorschub leisten.

(71)     Problematische Konstellationen: Aufsichtsrechtlich problematisch sind Fallkonstellationen, in denen eine Bank bzw. deren Kundenberater den Kunden nicht strikte an externe Berater verweisen, sondern selbst intensiv beratend tätig sind oder in einer Weise Handlungen vornehmen, mit denen sie sich selbst in die Nähe eines Beitrags zu einem Steuerdelikt nach Massgabe ausländischen oder auch schweizerischen Rechts rücken. Noch problematischer sind Fälle, in denen eine Bank gegenüber einer in- oder ausländischen Steuerbehörde, wie etwa mit Unterzeichnung des QIA gegenüber dem IRS, direkt Pflichten übernommen hat und diese in der Folge missachtet.

(72)     Domizilgesellschaften und QIA: Aus dem zwischen dem IRS und der A._____ AG als QI abgeschlossenen Vertragswerk QIA, das für wesentliche Auslegungsfragen auf das US-Steuerrecht verweist und den QI für Anwendungsfragen vollumfänglich amerikanischem Recht unterstellt, geht die klare Erwartung des IRS hervor, dass der QI als vertrauenswürdiger Partner bei Täuschungsmanövern von Kunden bei der Ausfüllung der relevanten Formulare für die QI-Kundendokumentation nicht nur keinen Unterstützungsbeitrag leistet, sondern solche Machenschaften auch nicht stillschweigend duldet. Entsprechend sieht das QIA im Zusammenspiel mit dem U.S. Tax Code ausdrücklich vor, dass ein QI dann auf eine QI-Kundendokumentation nicht abstellen darf, wenn er weiss, dass die Angaben nicht der Wahrheit entsprechen. Gleichzeitig ist festzuhalten, dass weder unter dem QIA noch nach amerikanischem Steuerrecht der Einsatz von Offshore-Strukturen verboten ist. Überdies war dem IRS im Zeitpunkt der Verhandlungen über die Ausgestaltung des QI-Systems, u. a. mit der SBVg, bewusst, dass im Private Banking Offshore-Strukturen eine bedeutende Rolle spielen. Dass der IRS von der Zulässigkeit des Einsatzes von Offshore-Strukturen ausging, zeigt sich insbesondere daran, dass er für diese Haltung heute in der US-Politik kritisiert wird.

(73)     Verletzungen vertraglicher Pflichten: Vorliegend hat die A._____ AG durch einige wenige Kundenberater und mit dem Wissen weniger direkter Vorgesetzter bei einer überblick- und bestimmbaren Anzahl von Fällen in unter dem Standard des QIA unzulässiger Art und Weise ihre Kunden aktiv unterstützt und/oder zumindest in unzulässiger Art und Weise ein Auge zugedrückt und wider besseres Wissen eine unzutreffende Erklärung betreffend den US-Steuerstatus einer Offshore-Struktur in die QI-Dokumentation des Kunden aufgenommen. Damit hat die A._____ AG freiwillig gegenüber dem amerikanischen IRS eingegangene vertragliche Verpflichtungen verletzt, was seinerseits ein grober Verstoss sowohl gegen das Gewährserfordernis ist als auch unter dem Gesichtspunkt des Risikomanagements und der Risikokontrolle unzulässig war. Ob die betreffenden Kundenberater

damit ein Delikt im Sinne des amerikanischen Steuerrechts selbst begangen oder zu einem Delikt einer US-Person einen aktiven und strafbaren Beitrag geleistet haben, kann und muss an dieser Stelle nicht beurteilt werden.

4.3 Partielle Nichtbeachtung der SEC-Restriktionen

(74)    Inkaufnahme potenzieller Non-Compliance mit den SEC-Restriktionen: Bereits spätestens im Jahr 1999 wurde innerhalb der Bank darauf hingewiesen, dass gängige Praktiken im Cross-Border-Private-Banking-Geschäft in die USA bedeutende Non-Compliance-Risiken betreffend SEC-Restriktionen beinhalteten. Ein ernsthafter Versuch, dieses Geschäft in «Compliance» zu bringen, fand (erst) 2002 mit dem Entscheid statt, für das Non-W-9-Geschäft das «Revised Business Model» einzuführen. Indessen wurde dieser Entscheid nicht konsequent umgesetzt. Insbesondere wurde die Einhaltung des Revised Business Model vom NAM-Management nicht durchgesetzt und wurden keine periodischen unabhängigen Kontrollen durchgeführt.

(75)    Länderpapier USA (2004) – geschult, aber nicht kontrolliert: In einer Anstrengung, das Personal weiter zu sensibilisieren, erarbeitete die Bank unter Beizug externer Berater ein «Länderpapier USA». Die Kundenberater wurden über den Inhalt des Papiers geschult, doch händigte man es ihnen vorerst nicht aus. Erst später wurde es im Intranet – ohne Begleitinformation – aufgeschaltet. Weder das direkt verantwortliche Management noch das übergeordnete Management verlangte und kontrollierte in der Folge dessen lückenlose Einhaltung. Als das Länderpapier ohne weiteren Kommentar im Intranet platziert wurde, entstand bei einzelnen Kundenberatern nach ihren Angaben gegenüber der EBK offenbar der Eindruck, primär wolle sich die Bank decken, treibe im Übrigen aber das Cross-Border-Geschäft weiter voran. So jedenfalls stellten dies einzelne Kundenberater im Herbst 2008 gegenüber der EBK dar.

• Reisetätigkeit: Auszüge aus dem IT-System zur Kundengeschichte belegen, dass sich einzelne Kundenberater anlässlich ihrer Reisen nicht immer an die SEC-Restriktionen hielten. So kam es vor, dass Kundenberater über Investitionsmöglichkeiten sprachen, potenzielle Kunden trafen, sich mit Kunden mit einem externen Berater zwecks Erörterung der steuerlichen Massnahmen unterhielten oder ihre Kunden anhielten, einen Vermögensverwaltungsvertrag zu unterzeichnen etc.

• Telefonische Kontakte: Einige Kundenberater nahmen von gewissen Kunden (weiterhin) telefonische Aufträge betreffend den Kauf oder Verkauf von US- und Non-US-Wertschriften entgegen.

• Postversand in die USA: Entgegen den Instruktionen verschickten einige Kundenberater bei einzelnen Geschäftsbeziehungen, vereinzelt auch trotz «banklagernd» Instruktionen, (weiterhin) Konto-/Depotauszüge und Bestätigungen über Wertschriftentransaktionen in die USA.

(76) Enforcement «light» des Länderpapiers USA (2004): Noch vor der Untersuchung des «E._____ Whistleblowing» überprüfte das NAM-Management mögliche Formen der Durchsetzung des Länderpapiers USA (2004) und von Durchsetzungskontrollen (Projekt «Globus»). Die in Frage kommenden Massnahmen wurden dabei nach Massgabe ihrer Auswirkungen auf das NAM-Geschäft kategorisiert und beurteilt. Es bestand ein Konsens innerhalb der Bank, diejenigen Massnahmen durchzusetzen, deren Auswirkungen auf das Geschäft als zwar spürbar beurteilt wurden, nicht aber diejenigen, die das Geschäft zum Stagnieren, wenn nicht gar zum Erliegen gebracht hätten. Die Entscheidträger gingen bei der Diskussion allerdings nicht von einem unrechtmässigen Zustand, sondern davon aus, dass die bestehende Compliance grundsätzlich konform mit den US-Regulierungen war, jedoch verstärkt werden sollte.

(77)    Verzögerung des Länderpapiers USA (2007): Nach Abschluss der Untersuchung zum «E._____ Whistleblowing» im Sommer 2006 bestand innerhalb des Managements Konsens darüber, dass das Länderpapier USA (2004) überarbeitet werden musste und dass die Einhaltung der Vorgaben des Länderpapiers (neu) durch eine unabhängige Stelle zu überprüfen war. Zwar schritt die Überarbeitung des Papiers zügig voran, sodass erste Entwürfe bereits im Oktober 2006 vorlagen und die Mitarbeiter des NAM-Geschäfts über den Inhalt erneut geschult wurden. Dennoch trat das Papier erst im Sommer 2007 in Kraft. Seitens des Managements des NAM-Geschäfts war auch zum Ausdruck gebracht worden, dass man auf Zeit spielen solle, da die Auswirkungen des überarbeiteten Länderpapiers USA das Geschäft stark treffen würden.

(78)    Zu wenig Führung bei der Durchsetzung der Compliance: Verantwortlich für die Einhaltung der US-Vorschriften sowie die Erarbeitung entsprechender interner Weisungen (wie etwa des Länderpapiers USA) war das Management des NAM-Geschäfts. Es wurde in beratender Weise oder auch bei der Ausarbeitung konkreter Weisungen unterstützt von Spezialisten von Group Tax, von Financial Planning and Wealth Management, Legal und Compliance sowie externen U.S. Legal Counsel. Ergebnisse waren etwa die «Guidelines for implementation of the Revised Business Model» sowie die «Deemed Sales FAQs»). Weder die obersten Linienverantwortlichen noch die entsprechenden Stabsfunktionen von GWM&BB[3] bezüglich Risikoerfassung und Risikobegrenzung im Cross-Border-Geschäft in die USA übernahmen eine aktive Führungsrolle und brachten ihren Untergebenen unmissverständlich zum Ausdruck, dass die im Länderpapier USA beschriebenen Verhaltensweisen ausnahmslos zu befolgen sind. Entsprechend fehlte es auch an wirksamen, von der Front unabhängigen Einhaltekontrollen. Bezeichnend ist, dass es bis zur Besprechung der Ergebnisse der «E._____ Whistleblowing»-Untersuchung dauerte, bis der für Gruppenbelange zuständige Group General Counsel F._____ mit den Exponenten von GWM&BB D._____, G._____ und H._____

[3] Global Wealth Management & Business Banking

weitergehende Massnahmen zur Verbesserung der Compliance vereinbarte. Auch danach lag aber die Initiative für die Einhaltung der Vorgaben des Länderpapiers USA weiterhin vorab beim NAM-Geschäft, bei I._____, C._____ bzw. J._____ und D._____ sowie einzelnen Spezialisten von Legal und Compliance. Die als Folge der E._____-Untersuchung vorgesehene Überprüfung durch Group Internal Audit (GIA) nach Inkrafttreten des Länderpapiers USA (2007) wurde dann von den Ereignissen überholt.

(79)   Einschätzung nach Schweizer Aufsichtsrecht: Indem die A._____ AG Verletzungen der SEC-Restriktionen bzw. interner Weisungen dazu durch Kundenberater tolerierte, ging sie unkalkulierbare Rechts- und Reputationsrisiken ein und verstiess damit sowohl gegen das Gewährs- als auch gegen das Organisationserfordernis des Bankengesetzes.

4.4   Verantwortung auf Managementstufe

(80)   Erhöhte Risiken bei gleichzeitigem Onshore- und Offshore-Business: Innerhalb der Bank wurde nach dem Kauf von (…) darauf hingewiesen, dass sich daraus erhöhte Reputationsrisiken aus dem gleichzeitigen Betreiben des Onshore- und Offshore-Geschäfts ergäben. Die A._____ AG reagierte grundsätzlich mit zwei Massnahmen auf diese Herausforderung: (a) der Verabschiedung des «Revised Business Model» für das Non-W-9-Geschäft im Jahre 2002 und (b) der Gründung der (…) für das W-9-Geschäft, welche allerdings erst 2005 operativ tätig wurde. Die angestrebte Compliance war aber in beiden Fällen nicht durch unabhängige und griffige Kontrollinstrumente sichergestellt. Dies führte im Ergebnis dazu, dass die Bank teilweise während Jahren – auf dem Weg zur Umsetzung dieser Massnahmen – nicht «compliant» war und damit bewusst hohe Rechts- und Reputationsrisiken einging, die sie nicht beherrschte.

(81)   Grosses Engagement betreffend QI-Compliance: Zwischen 2001 und 2002 unternahm die Bank enorme Anstrengungen, um sicherzustellen,

dass die Bank ihren Verpflichtungen aus dem QIA voll und ganz nachkam. In Bezug auf die QI-Dokumentation der Kundenbeziehungen, die eine grundlegende Anforderung unter dem QIA war, stellte H._____ in seiner Eigenschaft als damaliger CEO von (…) an die Adresse des QI Coordination Committee unmissverständlich klar: «Non-compliance is not an option.» Mit Blick auf den bevorstehenden QI-Audit und die bankengesetzliche Prüfung machte auch G._____ anlässlich des PBI Business Committee Meeting vom 7. August 2002 klar, es werde «Zero Tolerance» für Non-Compliance geben.

(82) W-9-Kunden und Compliance vor dem 1. Januar 2005: Anfang 2002 prüfte die Bank im Zusammenhang mit der Neuausrichtung des US-Offshore-Geschäfts auch die Optionen für das W-9-Geschäft. Die Bank kam zum Schluss, dass das für die Non-W-9-Kunden vorgesehene neue limitierte Dienstleistungsangebot des Revised Business Model für W-9-Kunden nicht genügend attraktiv sei. Man ging davon aus, dass diese Kunden ein aktiveres Dienstleistungsangebot erwarteten. Langfristig konnte dies nach Einschätzung der Bank nur über die Bildung eines bei der SEC registrierten Finanzintermediärs angeboten werden, was zur Gründung der (…) führte. Vor der Aufnahme der Geschäftstätigkeit der (…) am 1. Januar 2005 waren die SEC-Restriktionen im W-9-Geschäft nicht lückenlos eingehalten worden.

(83) Falsche Anreize – zu späte Korrektur: Indem das Management von K._____ ab 2004 ein neues Anreizsystem einführte, bei dem das Kriterium «Net New Money» ein alles überragendes Gewicht erhielt, fühlten sich einzelne Kundenberater vorab des Non-W-9-Geschäfts nach ihren Angaben gegenüber der EBK offenbar unter zusätzlichen Druck gesetzt. Zwar änderte das Management im Jahr 2007 die Vorgaben, das ändert aber nichts daran, dass die Anreize in den Jahren 2004 bis Anfang 2007, zusammen mit der fehlenden Einhaltekontrolle, offenbar einen Anreiz für einzelne Kundenberater schuf, auch in den USA aktiv neue Kunden zu gewinnen, was ohne Verletzung des Länderpapiers USA bzw. die SEC-Restriktionen schwierig war.

(84)    Lange aufgeschobener Entscheid über die Zukunft des Non-W-9-Geschäfts: Das direkt verantwortliche Management des US-Offshore-Geschäfts führte erstmals im Herbst 2001 Diskussionen über die Zukunft des Geschäfts mit Non-W-9-Kunden. Nachdem im Management bereits im Jahr 2002 strategische und auch konkrete Überlegungen zur Zukunft des Non-W-9-Geschäfts angestellt worden waren – und ein Verkauf verworfen worden war –, nahmen die Verantwortlichen das Thema im Jahr 2006 wieder auf. Sie fühlten sich in ihrer Einschätzung aufgrund der Untersuchung zum «E._____ Whistleblowing» zwar bestärkt, doch wurde nicht entschieden und rasch nach einer langfristigen Lösung gesucht. Vorab wurde eine Verstärkung des Compliance-Umfelds angeordnet, das mit Inkrafttreten des Länderpapiers USA (2007) ab Mitte 2007 griff. Hinsichtlich der strategischen Zukunft des Geschäfts blieb bis zum Ausstiegsbeschluss vom August 2007 über eine recht lange Zeit entscheidendes Thema, auf welche Art das Geschäft abzustossen (Management-Buy-out, Verkauf an Dritte, Preisvorstellungen) und wie das zu kommunizieren sei.

(85)    Beachtung von ausländischen Vorschriften und Risikomanagement: Insgesamt hatte die Bank im Zeitraum von 2000 bis 2007 wiederholt Veranlassung, sich eingehend mit den Themen QIA und SEC-Restriktionen bzw. mit den Rahmenbedingungen für das US-Offshore-Geschäft zu befassen. Dabei liess vorab das Management des betroffenen Geschäftsbereichs – D._____ und B._____ sowie dessen Nachfolger C._____ – den unbedingten Willen vermissen, sich den US-regulatorischen Vorgaben ohne Wenn und Aber anzupassen. Insbesondere was die Beachtung der SEC-Restriktionen anging, trugen C._____ und danach auch I._____ eine grosse persönliche Verantwortung. Das Beachten ausländischer Rechtsvorschriften folgt zwar nicht direkt aus dem Schweizer Aufsichtsrecht. Auch ist anzuerkennen, dass die anwendbaren Bestimmungen des US-Rechts dem Schweizer Aufsichtsrecht teilweise fremd sind. Angesichts der sehr grossen Exposition der A._____ AG in den USA war aber das konsequente Beachten des US-Rechts aus Sicht des Risikomanagements ein absolutes

Erfordernis. Diese Ansicht wurde auch vom obersten Management klar vertreten.

(86)    Im Rückblick ungenügende Risikoeinschätzung durch die Bank: Die mit dem grenzüberschreitenden US-Geschäft verbundenen Risiken hat die Bank zumindest teilweise zwar erkannt, aber rückblickend nicht richtig eingeschätzt. Indem intern bekannte oder leicht erahnbare Verstösse gegen US-Recht (z.B. Kommunikation unter Verwendung von «U.S. Jurisdictional Means» oder Nichteinhalten der Reportingpflichten für W-9-Kunden) nicht geahndet bzw. ein während längerer Zeit nicht im Einklang mit den anzuwendenden Bestimmungen andauernder Zustand nicht beseitigt wurde, setzten die dafür verantwortlichen Führungspersonen ein verhängnisvolles Zeichen. Der Effekt wurde (vom obersten Management unbeabsichtigt) dadurch verstärkt, dass aufgrund der speziellen Ausgestaltung der Anreizstrukturen innerhalb des Geschäftsbereichs K._____ die für das US-Cross-Border-Geschäft zuständigen Kundenberater im NAM-Geschäft unter zusätzlichen Druck gesetzt wurden, Neugeld zu akquirieren.

(87)    Gravierendes Kulturproblem: Allein schon der Umstand, dass die Vornahme von «Upgrades» von Strukturen (vgl. oben Rz. (66)) innerhalb der A._____ AG im Zeitraum von 2002 ernsthaft diskutiert wurde, ohne dass – von wem auch immer – dagegen dezidiert und wirksam eingeschritten worden wäre, belegt ein ernsthaftes Kulturproblem, zumindest in Teilen einer Bank, die sich in ihren offiziellen Verlautbarungen einer absoluten Compliance verschrieben hat. Gleiches gilt für den Umgang mit dem Länderpapier USA bzw. den ihm vorangegangenen «Deemed Sales Guidelines» durch die Front bis mindestens Ende 2006, wobei noch zu diesem Zeitpunkt der kraft seiner Managementfunktion für Einhaltung der Restriktionen des Länderpapiers USA eigentlich zuständige C._____ sich in einem internen E-Mail-Austausch darüber ausliess, dass die Verabschiedung des revidierten Länderpapiers USA so lange wie möglich hinauszuzögern sei. Die heutige Erkenntnis der Bank, das Länderpapier hätte

nicht als «Papier», als «softe» Handlungsanweisung, sondern als «harte» Policy verabschiedet sein müssen, weist ebenfalls dahin, dass es zumindest im NAM-Geschäft nicht gelang, bei den Private Bankern den dringend benötigen Wandel im Rollenverständnis zu bewirken. Hier hat es das oberste Management und haben es die Linienverantwortlichen auf Stufe des mittleren und übrigen Kaders sowie die beigezogenen Stabsstellen versäumt, mittels sicht- und spürbarer Leadership und begleitender griffiger Kontrollinstrumente den notwendigen Wandel nicht nur rhetorisch einzufordern, sondern auch praktisch rigoros durchzusetzen.

4.5     Keine Anzeichen auf Straftaten von Organen

(88)     Die Untersuchung der EBK erbrachte keine Hinweise auf Straftaten nach Schweizer oder auch amerikanischem Recht der Organe G._____, H._____ und F._____. Insofern, als sich das amerikanische DoJ auf dieselben Akten stützt wie die EBK, ist nicht nachvollziehbar, weshalb es zu einer Anklageerhebung gegen G._____ kam und in der gegen ihn gerichteten Anklage in erkennbarer Weise auch H._____ und F._____ als – nicht angeklagte – Mitverschwörer erwähnt wurden. In diesem Zusammenhang ist erwähnenswert, dass sich die Anklage des DoJ gegen G._____ wesentlich auf zwei Aussagen stützt: diejenige des seinerseits wegen Straftaten in den USA angeklagten E._____, der sich im Streit von der A._____ AG getrennt hatte, und diejenige von D._____, der zwischen Mai und Oktober 2008 in den USA als «Material Witness» festgehalten worden war und für die festgestellten Fälle von Non-Compliance eine grosse persönliche Führungsverantwortung trägt.

5.      Massnahmen der EBK

(89)    Keine Massnahmen gegenüber Gewährsträgern: Die festgestell-
ten schweren Mängel sind Handlungen einzelner Mitarbeitender weit
unterhalb der Schwelle der Gewährsträger zuzuordnen, von denen
die obersten Leitungsorgane nichts gewusst haben. Die Untersuchung
der EBK hat keine Anhaltspunkte dafür gegeben, dass den Organen
F._____, H._____ oder auch G._____ ein genügend star-
ker Vorwurf zu machen wäre, der es rechtfertigen würde, eine gegen
sie persönlich gerichtete formelle Rüge oder auch strengere aufsichts-
rechtliche Massnahmen zu erlassen. Die Gewähr von G._____,
H._____ und F._____ ist nicht in Frage gestellt.

(90)    Feststellung gegenüber der Bank: Die Schwere der festgestellten
Mängel im Risikomanagement und bei der Risikokontrolle erfordern in-
dessen, dass dieser Umstand förmlich festgestellt wird. Im Sinne ihrer
Gesamtverantwortung für das Unternehmen sind die Gewährsträger für
die innerhalb der A._____ AG festgestellten Mängel verantwortlich.

(91)    Verbot des Non-W-9-Geschäfts: Auch wenn die A._____ AG
bereits von sich aus erklärt hat, diese Geschäftstätigkeit einzustellen,
ist ihr formell zu verbieten, weiterhin das Non-W-9-Geschäft mit US-
Personen zu betreiben. Die Bank hat alles in ihrer Macht Stehende zu
tun, um diese Kundenbeziehungen so rasch wie möglich aufzulösen.

(92)    Aufbau eines Cross-Border-Risikomanagement- und Risikokont-
rollsystems: Die Bank ist schliesslich zu verpflichten, geeignete Massnah-
men zum Management und zur Kontrolle der mit einer ausgedehnten
Cross-Border-Geschäftstätigkeit in zahlreiche Länder verbundenen
Rechts- und Reputationsrisiken aufzubauen und anschliessend die Wirk-
samkeit dieser Massnahmen überprüfen zu lassen. Die A._____
AG wird in diesem Zusammenhang auch Vor-Ort-Kontrollen durch die

Rechtsnachfolgerin der EBK, die Eidg. Finanzmarktaufsicht (FINMA), dulden müssen.

(…)

Dispositiv

# 6     Rechts- und Reputationsrisiken im grenzüberschreitenden Geschäft

**VERFÜGUNG der Eidgenössischen Finanzmarktaufsicht FINMA vom 11. Januar 2010**

**Grenzüberschreitendes Geschäft; Organisation; Gewähr für eine einwandfreie Geschäftstätigkeit (Art. 3 Abs. 2 Bst. a und c BankG); Eingehen und Management von Rechts- und Reputationsrisiken bei der Erbringung von grenzüberschreitenden Dienstleistungen; tatsachenwidrige Bescheinigung von Bartransaktionen im Ausland; angemessene Verwaltungsorganisation.**

1. Die Verletzung ausländischen Aufsichtsrechts oder anderer ausländischer Normen durch beaufsichtigte Banken kann beträchtliche Rechts- und Reputationsrisiken bergen, weshalb diese durch geeignete Massnahmen zu minimieren sind. Dazu gehören insbesondere Weisungen über die in den Zielländern erlaubte Geschäftstätigkeit. Das Personal ist entsprechend zu schulen. Vergütungsmodelle sind so auszugestalten, dass sie eine gute Compliance nicht bestrafen, sondern fördern. Die Einhaltung solcher Weisungen ist auf sinnvolle Weise zu kontrollieren. Wenn nötig, ist das Geschäftsmodell anzupassen und auf die Tätigkeit in bestimmten Märkten zu verzichten (Rz. 43).

2. Mit dem Erfordernis der Gewähr einer einwandfreien Geschäftstätigkeit ist ebenfalls unvereinbar, dass eine Bank unrichtige oder unvollständige Bescheinigungen ausstellt, zumal Bankbescheinigungen im Geschäftsverkehr ein erhöhtes Vertrauen entgegengebracht wird (Rz. 44).

3. Die Bank muss über eine ihrer Geschäftstätigkeit entsprechende Verwaltungsorganisation verfügen (Art. 3 Abs. 2 Bst. a BankG). Dazu gehört, dass die Bank im Stande ist, relevante Risiken zu erfassen, zu begrenzen und zu überwachen. Zu diesen Risiken zählen insbesondere die Rechts- und Reputationsrisiken gemäss Art. 9 Abs. 2 BankV (Rz. 45–52).

**Opérations transfrontières ; organisation ; garantie d'une activité irréprochable (art. 3 al. 2 let. a et c LB) ; prise de risques juridiques et de réputation lors de la fourniture de prestations de services transfrontières et gestion de ces risques ; attestation mensongère de transactions en espèces à l'étranger ; organisation administrative appropriée.**

1. La violation d'un droit de la surveillance étranger ou d'autres normes étrangères par des banques assujetties peut comporter des risques juridiques et de réputation considérables, qu'il convient de réduire par des mesures appropriées. Comptent parmi ces mesures, notamment, des directives concernant les activités autorisées dans les pays cibles. Le personnel doit être formé en conséquence. Les modèles de rémunération doivent être structurés de manière à encourager, et non à pénaliser, une bonne compliance. Le respect de ces directives doit faire l'objet de contrôles judicieux. Au besoin, il convient d'adapter le modèle d'affaires et de renoncer à exercer l'activité sur certains marchés (Cm 43).

2. Est également incompatible avec l'obligation de présenter la garantie d'une activité irréprochable le fait, pour une banque, d'établir des attestations erronées ou incomplètes, d'autant plus que l'on accorde une confiance accrue aux attestations bancaires dans la vie des affaires (Cm 44).

3. La banque doit disposer d'une organisation administrative correspondant à son activité (art. 3 al. 2 let. a LB). Dans ce cadre, elle doit être en mesure de déterminer, de limiter et de contrôler les risques pertinents. Comptent parmi ces risques, notamment, les risques juridiques et risques de réputation au sens de l'art. 9 al. 2 OB (Cm 45–52).

**Operazioni transfrontaliere; organizzazione; garanzia di un'attività irreprensibile (art. 3 cpv. 2 lett. a e c LBCR); assunzione e gestione dei rischi giuridici e di reputazione nell'ambito della fornitura di servizi transfrontalieri; attestazione contraria ai fatti nell'ambito di transazioni in contanti all'estero; organizzazione amministrativa adeguata.**

1. La violazione del diritto prudenziale estero o di altre norme estere da parte di banche sottoposte a vigilanza può comportare notevoli rischi giuridici e di reputazione che vanno ridotti con misure adeguate. Di queste misure fanno parte, in particolare, le istruzioni concernenti l'attività consentita nei Paesi in cui si opera. Il personale deve essere adeguatamente istruito in merito. I modelli di remunerazione devono essere impostati in modo tale da non penalizzare bensì da favorire una buona compliance. Occorre vigilare con ragionevolezza sul rispetto di tali istruzioni. Se necessario, si deve adeguare il modello commerciale e rinunciare all'attività su determinati mercati (m. 43).

2. Il fatto che una banca rilasci attestazioni inesatte o incomplete è incompatibile con il requisito della garanzia di un'attività irreprensibile, tanto più che nelle operazioni commerciali le attestazioni bancarie godono di ampia fiducia (m. 44).

3. La banca deve disporre di un'organizzazione proporzionata all'importanza dei propri affari (art. 3 cpv. 2 lett. a LBCR). Tra le altre cose, essa deve essere in grado di rilevare, limitare e sorvegliare i rischi rilevanti. Tra questi ultimi vi sono, in particolare, i rischi giuridici e di reputazione ai sensi dell'art. 9 cpv. 2 OBCR (m. 45–52).

**Zusammenfassung des Sachverhalts**

Mit Schreiben vom 3. November 2004 richtete sich die Schweizerische Bankiervereinigung (SBVg) an ihre Mitglieder, darunter auch die C._____ AG, um diese in Bezug auf die Risiken in der grenzüberschreitenden Dienstleistungserbringung zu sensibilisieren. Sie machte die Mitgliedbanken darauf aufmerksam, dass verschiedene gängige Praktiken gegen ausländisches Recht verstossen könnten. Als Beispiel für solche Praktiken nannte sie den Bargeldtransport für Kunden ins und Bargeldauszahlungen an Kunden im Ausland, die Benutzung von Nostro-Konten bei Drittbanken im Ausland für Ein- und Auszahlungen von bzw. an Kunden und die Akquisition von ausländischen Kunden im Ausland, beispielsweise über Vermittler. Weiter wies die SBVg unter anderem auf das Bewilligungserfordernis für die Erbringung von Bank- und Finanzdienstleistungen gemäss den neuen Richtlinien der deutschen Bundesanstalt für Finanzdienstleistungsaufsicht (BaFin) hin.

Die Depotwerte bei der C._____ AG per Ende Dezember 2008 gehörten zu 94% ausländischen Kunden. Rund 80% dieser Depot- und Einlage-Kunden stammten aus Deutschland. Die Ausrichtung auf ausländische, insbesondere deutsche Kunden ist eine Strategie der B._____ Gen. gewesen, die mit der Gründung der C._____ AG einen Offshore-Standort in der Schweiz, d. h. ausserhalb der Europäischen Union (EU), habe schaffen wollen.

Die Abklärungen ergaben, dass Vermittler im Namen und für Rechnung von Kunden Order zum Kauf bzw. Verkauf von Vermögensanlagen erteilten, teilweise sogar ohne über die nötigen Vollmachten zu verfügen. Die Vermittlertätigkeit beschränkte sich nicht nur auf die reine Beratung, sondern erstreckte sich zumindest teilweise auch auf Handlungen zwecks Verwaltung des Kundenvermögens. Es erfolgten daneben tatsachenwidrige Bescheinigungen von Bartransaktionen im Ausland, indem diese jeweils so verbucht wurden, als hätte der Kunde selber die Transaktion in den Räumlichkeiten der C._____ AG vorgenommen. Die Bank hat schliesslich auch nicht dokumentiert, ob die deutschen Vermittler über eine

Erlaubnis der BaFin verfügten. Die Erlaubnispflicht für die C._____ AG selbst ist gemäss einem Gutachten insbesondere dann gegeben, wenn die C._____ AG als ausländisches Unternehmen – auch ohne physische Präsenz in Deutschland – beabsichtigt, sich in Deutschland zielgerichtet an den Markt zu wenden. Dies könne beispielsweise durch den Aufbau und die Nutzung einer Vertriebsorganisation über deutsche freie Mitarbeiter, welche der Bank neue deutsche Kunden bringen, geschehen. Folgende Indizien können für das Bestehen einer Vertriebsorganisation sprechen: eine grosse Zahl von Vermittlern, die exklusive Vermittlung an ein ausländisches (nicht in Deutschland domiziliertes) Unternehmen sowie regelmässig hohe Provisionen.

**Aus den Erwägungen**

1.      Zuständigkeit und Massnahmenkompetenz der FINMA

(36)      Gemäss Art. 6 Abs. 1 FINMAG übt die FINMA die Aufsicht nach den Finanzmarktgesetzen und nach dem FINMAG aus. Zu den Finanzmarktgesetzen gehört unter anderem das Bankengesetz (Art. 1 Abs. 1 Bst. d FINMAG).

(37)      Verletzt ein Beaufsichtigter die Bestimmungen des FINMAG oder eines der Finanzmarktgesetze oder bestehen sonstige Missstände, so sorgt die FINMA für die Wiederherstellung des ordnungsgemässen Zustandes (Art. 31 FINMAG). Zu den ihr zur Verfügung stehenden Aufsichtsinstrumenten gehören insbesondere die Feststellungsverfügung (Art. 32 FINMAG), das Berufsverbot (Art. 33 FINMAG), die Veröffentlichung der aufsichtsrechtlichen Verfügung (Art. 34 FINMAG), die Einziehung (Art. 35 FINMAG), die Einsetzung eines Untersuchungsbeauftragten (Art. 36 FINMAG) sowie der Entzug der Bewilligung (Art. 37 FINMAG).

(38)    Im Rahmen ihrer Verfügungskompetenz hat die FINMA diejenigen Massnahmen zu wählen, welche sie für angemessen hält, um den Gesetzeszweck zu erreichen (BGE 130 II 351 E. 2.1; EBK-Bulletin 47 S. 49). Die Frage, wie die FINMA ihre Aufsichtsfunktion im Einzelnen wahrnimmt, ist weitgehend ihrem «technischen Ermessen» überlassen (Urteil des Bundesgerichts 2C.749/2008 vom 16. Juni 2009 E. 3.1; EBK-Bulletin 37 S. 49 f.).

(39)    In der Wahl der geeigneten Massnahme hat die FINMA das Verhältnismässigkeitsprinzip zu wahren und die Massnahmen zu wählen, die am wenigsten in die Rechte der Betroffenen eingreifen, ihren Zweck, die Wiederherstellung des ordnungsgemässen Zustandes, jedoch trotzdem erreichen. Nach Art. 5 FINMAG bezweckt die Finanzmarktaufsicht den Schutz der Gläubigerinnen und Gläubiger, der Anlegerinnen und Anleger, der Versicherten sowie den Schutz der Funktionsfähigkeit der Finanzmärkte. Sie trägt damit zur Stärkung des Ansehens und der Wettbewerbsfähigkeit des Finanzplatzes Schweiz bei.

## 2.    Gesetzliche Vorgaben im Bankenbereich

(40)    Gemäss Art. 3 BankG bedarf eine Bank zur Aufnahme der Geschäftstätigkeit einer Bewilligung der FINMA. Art. 3 Abs. 2 BankG legt die Bedingungen für die Erteilung einer Bewilligung fest. Diese müssen von der Bank jederzeit erfüllt werden.

### 2.1    Gewähr einer einwandfreien Geschäftstätigkeit

#### 2.1.1   Allgemein

(41)    Zu den dauernd einzuhaltenden Bewilligungsvoraussetzungen gehört unter anderem, dass die mit der Verwaltung und Geschäftsführung der Bank betrauten Personen einen guten Ruf geniessen und Gewähr für

eine einwandfreie Geschäftstätigkeit bieten (Art. 3 Abs. 2 Bst. c BankG). Die mit der «Verwaltung und Geschäftsführung betrauten Personen» müssen nicht nur fachlich kompetent sein, sondern sie müssen sich auch im Geschäftsverkehr korrekt verhalten. Unter korrektem Verhalten im Geschäftsverkehr ist in erster Linie die Beachtung der Rechtsordnung, d. h. der Gesetze und der Verordnungen, der internen Vorschriften und der Standesregeln zu verstehen. Eine Verletzung der Rechtsordnung ist indessen für die Verneinung der Gewähr nicht zwingend erforderlich. Es genügt, wenn das beanstandete Verhalten «in krasser Weise dem Verhalten, wie es von einem redlichen Bankier erwartet werden muss», widerspricht (EBK-Bulletin 23, S. 25 und 27). Dazu gehört, dass die Bank sich und ihre Mitarbeiter nicht unnötigen Rechts- und Reputationsrisiken aussetzt.

(42)   Was für die Gewährsträger gilt, hat auch für die Bank als Unternehmen seine Gültigkeit, d. h. die Bank muss als Unternehmen die Bewilligungsvoraussetzung der einwandfreien Geschäftstätigkeit ebenfalls erfüllen (EBK-Bulletin 41, S. 20).

2.1.2   Eingehen von Rechts- und Reputationsrisiken bei der Erbringung von grenzüberschreitenden Dienstleistungen

(43)   Die Überprüfung der Einhaltung des ausländischen Aufsichtsrechts durch eine beaufsichtigte Bank gehört grundsätzlich nicht zu den Aufgaben der FINMA. Dies gilt insbesondere für ausländische Aufsichtsnormen, welche von den schweizerischen erheblich abweichen, indem sie beispielsweise grenzüberschreitende Dienstleistungen viel einschränkenderen Bedingungen unterstellen als das schweizerische Aufsichtsrecht. Die Verletzung ausländischen Aufsichtsrechts oder anderer ausländischer Normen durch beaufsichtigte Banken kann aber beträchtliche Rechts- und Reputationsrisiken bergen. Die Vorschriften des Bankengesetzes betreffend das Erfordernis des adäquaten Risikomanagements, der angemessenen Organisation sowie der Gewähr für einwandfreie Geschäftstätigkeit verlangen daher, dass in

der grenzüberschreitenden Dienstleistungserbringung Beaufsichtigte das anwendbare ausländische Aufsichtsrecht regelmässig abklären und die damit verbundenen Risiken erfassen, begrenzen und kontrollieren. Sie sind durch geeignete Massnahmen zu minimieren. Dazu gehören insbesondere Weisungen über die in den Zielländern erlaubte Geschäftätigkeit. Das Personal ist entsprechend zu schulen. Vergütungsmodelle sind so auszugestalten, dass sie eine gute Compliance nicht bestrafen, sondern fördern (FINMA-RS 10/01 «Vergütungssysteme», Rz. 36). Die Einhaltung solcher Weisungen ist auf sinnvolle Weise zu kontrollieren. Wenn nötig ist das Geschäftsmodell anzupassen und auf die Tätigkeit in bestimmten Märkten zu verzichten.

### 2.1.3 Tatsachenwidrige Bescheinigung von Bartransaktionen im Ausland

(44)    Mit dem Erfordernis der Gewähr einer einwandfreien Geschäftstätigkeit ist ebenfalls unvereinbar, dass eine Bank unrichtige oder unvollständige Bescheinigungen ausstellt (EBK-Bulletin 23, S. 21; EBK-Bulletin 15, S. 15; BGE 111 Ib 126), zumal Bankbescheinigungen im Geschäftsverkehr ein erhöhtes Vertrauen entgegengebracht wird (BGE 102 IV 191 E. 3). Im Sinne von Art. 8 der Vereinbarung über die Standesregeln zur Sorgfaltspflicht der Banken (VSB), welche von der Eidg. Bankenkommission als Mindeststandard festgelegt worden ist (Anhang zum EBK-RS 04/2 «Selbstregulierung als Mindeststandard» [jetzt: FINMA-RS 08/10]), ist es den Banken untersagt, Täuschungsmanövern ihrer Vertragspartner gegenüber Behörden des In- und Auslandes, insbesondere gegenüber Steuerbehörden, durch unvollständige oder auf andere Weise irreführende Bescheinigungen Vorschub zu leisten. Gemäss Rz. 54 VSB 08 fallen unter dieses Verbot insbesondere routinemässig erstellte Belege, zu denen namentlich auch Gutschrifts- und Belastungsanzeigen gerechnet werden.

### 2.2 Angemessene Verwaltungsorganisation

(45)    Die Bank muss über eine ihrer Geschäftstätigkeit entsprechende Verwaltungsorganisation verfügen (Art. 3 Abs. 2 Bst. a BankG). Dazu gehört, dass die Bank im Stande ist, relevante Risiken zu erfassen, zu begrenzen und zu überwachen. Zu diesen Risiken zählen insbesondere die Rechts- und Reputationsrisiken (Imagerisiken und rechtliche Risiken gemäss Art. 9 Abs. 2 der Bankenverordnung [BankV, SR 952.02]). Die Praxis betreffend Überwachung und Kontrolle von Risiken wurde von der EBK in einem Rundschreiben konkretisiert (EBK-RS 06/6 «Überwachung und interne Kontrolle»). Dieses wurde in das grundsätzlich inhaltsgleiche FINMA-RS 08/24 «Überwachung und interne Kontrolle Banken» überführt, welches am 1. Januar 2009 in Kraft trat. Gemäss Rz. 130 EBK-RS 06/6 mussten die Institute die hier relevanten Vorschriften des Rundschreibens bis spätestens am 1. Januar 2008 erfüllen. Der Prüfbericht von C._____ AG bezieht sich auf die Periode vom 1. Oktober 2007 bis zum 30. September 2008. Damit fällt die Prüfperiode zum weitaus grössten Teil in den Zeitraum, in welchem die Vorschriften des Rundschreibens bereits von der C._____ AG hätten umgesetzt werden müssen.

(46)    Die Verantwortung für die Erfassung, Begrenzung und Überwachung von Risiken wird durch Verwaltungsrat und Geschäftsleitung geteilt. Der Verwaltungsrat wird dabei insbesondere durch die interne Revision unterstützt. Der Geschäftsleitung steht mit Bezug auf Compliance-Risiken die Compliance-Funktion zur Seite.

(47)    Das Rundschreiben sieht vor, dass der Verwaltungsrat die Verantwortung für die Reglementierung, Einrichtung, Aufrechterhaltung, Überwachung und regelmässige Überprüfung einer angemessenen internen Kontrolle, welche der Grösse, der Komplexität, der Struktur und dem Risikoprofil des Instituts angepasst ist, trägt. Durch die aus einer systematischen Risikoanalyse abgeleitete interne Kontrolle und deren Überwachung stellt

der Verwaltungsrat sicher, dass alle wesentlichen Risiken im Institut erfasst, begrenzt und überwacht werden (Rz. 9 und 10 EBK-RS 06/6).

(48)    Der Verwaltungsrat richtet eine interne Revision ein, welche ihm oder dem Audit Committee direkt unterstellt ist (Rz. 15 EBK-RS 06/6). Die interne Revision liefert wichtige Entscheidungsgrundlagen für die Beurteilung, ob das Institut über ein dem Risikoprofil des Instituts angemessenes und wirksames internes Kontrollsystem verfügt. Die interne Revision führt jährlich eine umfassende Risikobeurteilung des Instituts durch. Ausgehend von dieser Risikobeurteilung legt die interne Revision schwergewichtig die Prüfziele für die nächste Prüfperiode fest. Im Weiteren stellt die interne Revision sicher, dass sämtliche risikorelevanten Geschäftsaktivitäten im Rahmen einer Mehrjahresplanung einer Prüfung durch sie selbst oder die Prüfgesellschaft unterliegen. Die interne Revision informiert den Verwaltungsrat oder den zuständigen Ausschuss und die Geschäftsleitung schriftlich über die Risikobeurteilung und die Prüfziele und lässt die Prüfziele und die Prüfplanung durch den Verwaltungsrat oder den zuständigen Ausschuss genehmigen (Rz. 69–73 EBK-RS 06/6).

(49)    Die Geschäftsleitung setzt die Vorgaben des Verwaltungsrats bezüglich Einrichtung, Aufrechterhaltung und regelmässiger Überprüfung der internen Kontrolle um. Die Geschäftsleitung entwickelt geeignete Prozesse für die Identifikation, Messung, Bewertung, Beurteilung und Kontrolle der durch das Institut eingegangenen Risiken. Dies umfasst unter anderem die Konkretisierung der Compliance-Funktion und der Risikokontrolle (Rz. 80 und 81 EBK-RS 06/6).

(50)    Eine Compliance-Funktion wird unter der Verantwortung der Geschäftsleitung von jedem Institut unterhalten (Rz. 81 und 100 EBK-RS 06/6). Als Compliance gilt das Einhalten von gesetzlichen, regulatorischen und internen Vorschriften sowie die Beachtung von marktüblichen Standards und Standesregeln. Das Risiko von Verstössen gegen Vorschriften, Standards

und Standesregeln und entsprechenden rechtlichen und regulatorischen Sanktionen, finanziellen Verlusten oder Reputationsschäden wird deshalb auch Compliance-Risiko genannt (Rz. 97 und 98 EBK-RS 06/6).

(51)    Zu den Aufgaben der Compliance-Funktion gehören in der Regel die Unterstützung und Beratung der Geschäftsleitung sowie der Mitarbeiter bei der Durchsetzung und Überwachung der Compliance, die mindestens jährliche Einschätzung des Compliance-Risikos der Geschäftstätigkeit des Instituts sowie die Feststellung und Untersuchung von schwerwiegenden Verletzungen der Compliance und Unterstützung der Geschäftsleitung bei der Wahl der zu treffenden Anordnungen oder Massnahmen (Rz. 107–109 und 111 EBK-RS 06/6). Namentlich bei geringer Geschäfts- und Organisationskomplexität und tiefem Compliance-Risiko kann die Compliance-Funktion auch in einem Outsourcing-Verhältnis betrieben werden.

(52)    Die Geschäftsleitung trägt die Verantwortung für die Umsetzung angemessener interner Systeme und Prozesse zur Gewährleistung der Compliance im Institut. Sie trifft die entsprechenden betrieblichen Massnahmen und Vorkehrungen, sorgt insbesondere für ein zweckmässiges Weisungswesen und ordnet die stufengerechte Einbindung aller Mitarbeiter in die Aufrechterhaltung der Compliance an (Rz. 99 EBK-RS 06/6).


3.      Mängel bei der C._____ AG

(53)    Die Bank unterhielt vertragliche Beziehungen zu 310 Vermittlern, von welchen ein Grossteil in Deutschland ansässig ist. Damit stellt sich die Frage, ob durch die Tätigkeit in Deutschland die Vermittler oder die Bank einer Erlaubnispflicht durch die BaFin unterstehen. Es ist davon auszugehen, dass ein Grossteil dieser Vermittler einer Erlaubnispflicht durch die BaFin unterstand. Sowohl der Verwaltungsrat als auch die Geschäftsleitung waren sich bewusst, dass die C._____ AG mit einer Vielzahl von deutschen

Vermittlern zusammenarbeitete. Der Verwaltungsrat gab indes an, über die zum Teil vorliegenden Vermögensverwaltungsvollmachten bei deutschen Vermittlern in Unkenntnis gewesen zu sein.

(54)    Die Bank hatte per Januar 2009 weder dokumentiert bzw. abge-klärt, ob eine Erlaubnispflicht besteht, noch ob die Vermittler über eine Erlaubnis verfügten. Überhaupt wurde die aufsichtsrechtliche Situation in Deutschland nie genau eruiert. Die C._____ AG war somit durch die Art der Zusammenarbeit mit deutschen Vermittlern einem beträchtlichen Reputationsrisiko ausgesetzt. Die Geschäftsleitung wurde von der SBVg mit Brief vom 3. November 2004 zwar auf die Risiken im Zusammenhang mit der Zusammenarbeit mit ausländischen Vermittlern hingewiesen, was sie aber nicht dazu bewegte, die rechtliche Situation in Deutschland ge-nau abzuklären. Sie begnügte sich mit der Feststellung, dass im Bereich der grenzüberschreitenden Dienstleistungserbringung Rechtsunsicherheit bestehe. Das Reputationsrisiko wurde somit von der Geschäftsleitung und dem Verwaltungsrat in fahrlässiger Weise eingegangen.

(55)    Durch grenzüberschreitende Zusammenarbeit mit deutschen Ver-mittlern kann für ein ausländisches Institut direkt eine Erlaubnispflicht ent-stehen. Mit Bezug auf die C._____ AG hält das Gutachten fest, dass die grosse Anzahl von Vermittlern die Gefahr berge, dass die BaFin auf das Vorliegen einer Vertriebsorganisation und damit auf eine Erlaubnispflicht für die C._____ AG schliessen könnte. Es ist daher möglich, dass die C._____ AG in der Vergangenheit durch die Art der Zusammenarbeit mit deutschen Vermittlern selbst in Deutschland erlaubnispflichtig gewor-den ist. Per Januar 2009 hat die C._____ AG diese Frage nicht durch einen im deutschen Aufsichtsrecht spezialisierten Gutachter abklären lassen und war sich somit auch nicht klar über die spezifischen Kriterien, welche zu einer Erlaubnispflicht führen. Die Bank war somit einem erheblichen Rechts- und Reputationsrisiko ausgesetzt.

(56)     Die ungenügende Abklärung des anwendbaren ausländischen Rechts und das damit einhergehende fahrlässige Eingehen von Rechts- und Reputationsrisiken sind mit der Gewähr für eine einwandfreie Geschäftsführung nicht vereinbar.

(57)     Zudem hat die C._____ AG in erheblichem Ausmass und über eine längere Periode hinweg systematisch tatsachenwidrige Bescheinigungen von Bartransaktionen im Ausland ausgestellt. Dies ist mit dem Gewährserfordernis nicht zu vereinen.

(58)     Trotz der strategischen Ausrichtung der C._____ AG auf das grenzüberschreitende Vermögensverwaltungsgeschäft mit Retailkunden bzw. auf bestimmte grenzüberschreitende Dienstleistungen waren nicht einmal die Grundzüge des Risikomanagements im Bereich der grenzüberschreitenden Dienstleistungserbringung Gegenstand des Weisungswesens der Geschäftsleitung im Sinne von Rz. 99 EBK-RS 06/6. Die Compliance-Funktion rapportierte zudem der Geschäftsleitung und dem Verwaltungsrat nicht mit Bezug auf die Überwachung der Image- und Rechtsrisiken im Bereich der grenzüberschreitenden Dienstleistungen (Rz. 107 ff. EBK-RS 06/6). In diesem Bereich lagen aufgrund des Geschäftsmodells die grossen Risiken. Auch war eine Risikokontrolle mit Bezug auf diese Bereiche in den Unterlagen der Compliance nicht ersichtlich. Die Risikobeurteilung im Sinne von Rz. 70 EBK-RS 06/6 der internen Revision für das Jahr 2008 fehlte gänzlich und konnte somit dem Verwaltungsrat auch nicht vorgelegt werden. Das interne Kontrollsystem war somit der Art und dem Umfang der Geschäftstätigkeit der Bank nicht angepasst. Die Bank war daher mit Bezug auf ihre Geschäftstätigkeit nicht angemessen organisiert.

(59)     Somit steht fest, dass die Bank in schwerer Weise die Bewilligungsvoraussetzungen hinsichtlich Gewähr und angemessener Organisation verletzt hat.

4.       Verantwortlichkeit für die Mängel

4.1      Muttergesellschaft

(60)      Die B._____ Gen. ist alleinige Eigentümerin der C._____ AG und stellte mit E._____ den Präsidenten des Verwaltungsrats, wie dies bereits bei seinem Vorgänger der Fall war. Sie hat die C._____ AG strategisch bewusst als «Offshore»-Standort auf die Bearbeitung der Region X._____ ausgerichtet. Diese Strategie hat die von der Geschäftsleitung angewandten Praktiken der Bank mit Bezug auf den umfassenden Einsatz von Vermittlern zumindest begünstigt, wenn sie nicht gar dafür ursächlich war. Die von der Muttergesellschaft vorgegebene Strategie hätte jedoch auch anderweitig, d. h. ohne das Eingehen von Rechts- und Reputationsrisiken, verfolgt werden können. Die Muttergesellschaft ist somit nur indirekt verantwortlich für die Mängel der C._____ AG in der grenzüberschreitenden Dienstleistungserbringung.

4.2      Der Verwaltungsrat

(61)      Bei der C._____ AG bestanden im Zusammenhang mit den Erfordernissen für die Überwachung des internen Kontrollsystems folgende Mängel:

a)       Interne Revision: Die Risikobeurteilung 2008 im Sinne von Rz. 70 EBK-RS 06/6 fehlte;

b)       Compliance-Reporting: Das Reporting, insbesondere die Einschätzung des Compliance-Risikos bezog sich nicht auf die Rechts- und Reputationsrisiken in der grenzüberschreitenden Dienstleistungserbringung (Rz. 109 EBK-RS 06/6);

c)       Risikokontrolle: Es wurde keine Kontrolle betreffend Risiken im Bereich der grenzüberschreitenden Dienstleistungserbringung durchgeführt (Rz. 122 EBK-RS 06/6).

(62)     Obwohl die Strategie der C._____ AG eine Fokussierung auf grenzüberschreitende Dienstleistungserbringung vorsieht, wurden die entsprechenden Risiken vom Verwaltungsrat nicht erkannt. Der Verwaltungsrat führt dies auch darauf zurück, dass viele Schweizer Banken seit jeher problemlos auf dem deutschen Markt tätig seien und bis Ende 2008 die grenzüberschreitende Tätigkeit der C._____ AG auch von der externen Prüfgesellschaft nicht beanstandet worden sei. Der Verwaltungsrat verkennt dabei, dass er die Verantwortung dafür trägt, dass die Bank ein ihrer Geschäftstätigkeit angemessenes internes Risikomanagement und eine wirksame Risikokontrolle implementiert.

(63)     Der Verwaltungsrat war über die problematischen Bartransaktionen und die diesbezüglichen tatsachenwidrigen Bescheinigungen sowie das Vorliegen von Vermögensverwaltungsvollmachten bei deutschen Vermittlern nicht informiert. Er hat nach Vorlage des Prüfberichts im Februar 2009 sofort und umfassend reagiert: Die problematischen Bartransaktionen im Ausland wurden sofort verboten, die Vermittlerverträge sistiert und neu überarbeitet, die Geschäftsleitung wurde ausgewechselt und die operative wie strategische Neuausrichtung der C._____ AG in Angriff genommen. Der Verwaltungsrat hat entschieden, die Banktätigkeit in Zukunft auf das Onshore-Geschäft zu konzentrieren. Auf die Zusammenarbeit mit ausländischen Vermittlern soll gänzlich verzichtet werden. Schliesslich hat sich der Verwaltungsrat im Verfahren von Beginn weg kooperativ verhalten.

(64)     Zusammenfassend kann festgehalten werden, dass der Verwaltungsrat für die Mängel am internen Kontrollsystem mitverantwortlich ist. Das Versagen der Kontrollmechanismen ist jedoch nicht vollständig auf ihn zurückzuführen. Durch sein Verhalten bei Bekanntwerden der aufsichtsrechtlich relevanten Mängel hat der Verwaltungsrat seine Rolle korrekt wahrgenommen. Für die Zukunft kann somit davon ausgegangen werden, dass die verbleibenden, mit der Verwaltung betrauten Personen im Sinne von Art. 3 Abs. 2 Bst. c BankG Gewähr für eine einwandfreie Geschäftstätigkeit bieten.

### 4.3     Die Geschäftsleitung

(65)     Die Konkretisierung der strategischen Ausrichtung durch das ope-
rative Geschäft obliegt der Geschäftsleitung. Die konkrete Ausgestaltung
der Zusammenarbeit mit Vermittlern sowie die Art der Bescheinigung der
Entgegennahme und Auszahlung von Kundengeldern ist Teil des opera-
tiven Geschäfts und gehört somit primär zum Verantwortungsbereich
der Geschäftsleitung. Auch das Weisungswesen sowie die Compliance-
Funktion sind Bereiche, für welche die Geschäftsleitung verantwortlich
ist (Rz. (49) ff. EBK-RS 06/6). Obwohl die Geschäftsleitung durch das
Schreiben der SBVg vom 3. November 2004 auf die Problematik der Risiken
bei der Vermittlertätigkeit hingewiesen wurde, hat sie die entsprechenden
Praktiken weiterhin beibehalten. Zudem holte sie auch keine Rechtsgutach-
ten ein, um die Risiken in der grenzüberschreitenden Dienstleistungserbrin-
gung genau abzuklären. Schliesslich unterliess es die Geschäftsleitung, den
Verwaltungsrat angemessen über die Risiken im grenzüberschreitenden
Dienstleistungsgeschäft nach Deutschland zu informieren. Die Geschäfts-
leitung ist somit die Risiken mit Bezug auf die Art der Vermittlertätigkeit
bewusst eingegangen, hat wissentlich die Ausstellung tatsachenwidriger
Bescheinigungen geduldet, wenn nicht gar gefördert, und trägt dafür die
volle Verantwortung. Mit der Erneuerung der Geschäftsleitung ist davon
auszugehen, dass die heute bei der C._____ AG mit der Geschäftsfüh-
rung betrauten Personen im Sinne von Art. 3 Abs. 2 Bst. c BankG Gewähr
für eine einwandfreie Geschäftstätigkeit bieten.

### 4.4     Schlussfolgerung

(66)     Es ergibt sich somit, dass den Verwaltungsrat eine Teilverantwortung
trifft. Die Hauptverantwortung für die Verletzung der aufsichtsrechtlichen
Bestimmungen liegt bei der Geschäftsleitung, welche die entsprechenden
Praktiken im Bewusstsein ihrer Risiken betrieben hatte.

5.      Massnahmen

5.1     Verzicht auf Bewilligungsentzug

(67)     Gemäss Art. 37 FINMAG entzieht die FINMA einem Beaufsichtigten die Bewilligung, wenn dieser die Voraussetzungen für die Tätigkeit nicht mehr erfüllt oder aufsichtsrechtliche Bestimmungen schwer verletzt. Es wurde festgestellt, dass die Bank zumindest bis Anfang 2009 weder über eine in Art und Umfang ihrer Geschäftstätigkeit angepasste Verwaltungsorganisation verfügte, noch Gewähr für eine einwandfreie Geschäftstätigkeit bot (Rz. (66)). Die Anordnung eines Bewilligungsentzugs wäre daher eine mögliche Massnahme, um den rechtmässigen Zustand wiederherzustellen.

(68)     Allerdings spricht vorliegend Folgendes gegen diese einschneidende Massnahme: Die C._____ AG, insbesondere der Verwaltungsrat, zeigte sich während des ganzen Verfahrens kooperativ. Die problematischen Bartransaktionen im Ausland wurden sofort bei Vorlage des Entwurfs des Prüfberichtes eingestellt. Die beschränkten Vollmachten der Vermittler wurden umgehend sistiert. Die Mitarbeiter wurden entsprechend instruiert und die Durchsetzung der Massnahmen durch die interne Revision kontrolliert. Die Vermittlerverträge wurden anhand der Empfehlungen des Gutachters neu erstellt und von diesem in Hinsicht auf das deutsche Aufsichtsrecht überprüft. In Zukunft will der Verwaltungsrat gänzlich auf die Zusammenarbeit mit ausländischen Vermittlern verzichten. Darüber hinaus wurden das Weisungswesen, die Risikokontrolle und die Compliance an die EBK-RS 06/6 angepasst. Ausserdem wurden sowohl die strategische als auch die operative Neuausrichtung der Gesellschaft beschlossen. Nachdem der Verwaltungsrat festgestellt hatte, dass die problematischen Bartransaktionen trotz seines Verbots weiterhin abgewickelt wurden, beschloss er, sich von den damaligen Mitgliedern der Geschäftsleitung zu trennen. Seit dem (…) wird die C._____ AG durch einen neuen Geschäftsleiter operativ geführt. Die strategische sowie operative Neuausrichtung ist mittlerweile in vollem

Gang, wobei die Verantwortung für die operative Umsetzung der getrof-
fenen Massnahmen einer Person aus der Geschäftsleitung, U._____,
übertragen wurde. Die strategische Neuausrichtung obliegt insbesondere
dem Vorstand der Muttergesellschaft, der B._____ Gen., dem auch
E._____ (Verwaltungsratspräsident C._____ AG) bzw. sein Nach-
folger H._____ angehört. Die B._____ Gen. unterstützt die vom
Verwaltungsrat beschlossenen Massnahmen und ist bereit, die C._____
AG in dieser Phase nötigenfalls auch finanziell zu unterstützen. (…) In An-
betracht all dieser Elemente kann auf einen Bewilligungsentzug verzichtet
werden.

## 5.2     Personelle Massnahmen

(69)     Nachdem die gesamte Geschäftsleitung im Verlauf des Jahres 2009
ausgewechselt wurde, erübrigt sich die Anordnung personeller Massnah-
men. Auch die bankinterne Compliance-Verantwortung wurde bereits von
der Bank selbst einer neuen Person anvertraut, womit auch hier keine per-
sonellen Massnahmen zu treffen sind. Die Verantwortung des Verwaltungs-
rats wiegt im Vergleich zur Geschäftsleitung weniger schwer. Zudem ist zu
berücksichtigen, dass G._____ erst nachträglich in den Verwaltungsrat
der Bank gewählt wurde und dass der in erster Linie für die Belange des Ver-
waltungsrats verantwortliche E._____ im Dezember 2009 seinen Rück-
tritt aus dem Verwaltungsrat vollzog. Vor diesem Hintergrund erübrigen sich
auch gegenüber dem Verwaltungsrat der C._____ AG personelle Mass-
nahmen, obwohl an dieser Stelle festzuhalten ist, dass F._____ während
seiner langen Amtszeit mehrmals Gelegenheit und Anlass gehabt hätte, die
problematische Ausrichtung der Geschäftstätigkeit zu thematisieren.

## 5.3     Rüge und Umsetzungskontrolle

(70)     Im vorliegenden Fall war die C._____ AG durch die Art der
Geschäftstätigkeit   im   grenzüberschreitenden   Vermögensverwaltungs-

geschäft mit deutschen Retailkunden bei der systematischen und lange andauernden Zusammenarbeit mit deutschen Vermittlern grossen Rechts- und Reputationsrisiken ausgesetzt, ohne dass dies der Bank bzw. dem Verwaltungsrat bewusst gewesen wäre. Dazu wurde im Zusammenhang mit Bartransaktionen nicht tatsachengetreu bescheinigt. Damit hat die Bank in schwerer Weise gegen das Gewährs- und Organisationserfordernis im Sinn von Art. 3 BankG verstossen. Diese Missstände sind ausdrücklich zu rügen (Art. 32 FINMAG).

(71)    Zudem hat die C._____ AG ihre Prüfgesellschaft zu beauftragen, der FINMA bis spätestens Ende August 2010 über die effektive Umsetzung der angekündigten operativen und strategischen Neuausrichtung der C._____ AG einen separaten Bericht zu erstatten.
(…)

Dispositiv

# 7 Rückstellungen in der Krankenzusatz- versicherung bei unbewilligter Tätigkeit

**VERFÜGUNG der Eidgenössischen Finanzmarktaufsicht FINMA vom 29. März 2010**

**Aufsicht nach dem Versicherungsvertrags- und Krankenversicherungsgesetz; Rückstellungen; Hinterlegungspflicht als Massnahme.**

1. Im Bereich der Krankenzusatzversicherungen ist die FINMA zuständige Aufsichts- sowie Bewilligungsbehörde und namentlich auch zuständig, wenn Versicherungen Zusatzversicherungen ohne eine entsprechende Bewilligung vertreiben (Rz. 22 ff.).

2. Zur Sicherung von allfällig unerwartet auftretenden Spätschäden kann die FINMA Krankenversicherer verpflichten, entsprechende versicherungstechnische Rückstellungen zu bilden (Rz. 29 ff.).

**Surveillance au sens de la loi sur le contrat d'assurance et de la loi sur l'assurance-maladie ; provisions ; obligation de dépôt en tant que mesure.**

1. Dans le domaine des assurances-maladie complémentaires, la FINMA est l'autorité compétente en matière de surveillance et d'autorisation. Elle est notamment compétente lorsque des compagnies d'assurance distribuent des assurances complémentaires sans disposer d'une autorisation correspondante (Cm 22 ss).

2. Afin de couvrir d'éventuels dommages tardifs imprévus, la FINMA peut en conséquence obliger les compagnies d'assurance-maladie à constituer des provisions techniques (Cm 29 ss).

**Vigilanza conformemente alla Legge sul contratto d'assicurazione e alla Legge sull'assicurazione malattie; riserve; misura dell'obbligo di deposito.**

1. La FINMA è l'autorità di vigilanza e di autorizzazione nel campo delle assicurazioni malattia complementari. Nella sua competenza rientrano in particolar modo anche i casi in cui le assicurazioni distribuiscono assicurazioni complementari senza disporre della necessaria autorizzazione (m. 22 segg.)

2. La FINMA può obbligare gli assicuratori malattie a costituire adeguate riserve tecniche al fine di garantire eventuali danni tardivi imprevisti (m. 29 segg.)

**Zusammenfassung des Sachverhalts**

Die KK Y._____ hat gemäss eigenen Angaben in den Jahren 1998 bis 2008 auf eigene Rechnung die «Zusatzversicherung (…)» angeboten. Im Dezember 2007 stellte das BPV fest, die KK Y._____ betreibe ohne Bewilligung das Zusatzversicherungsgeschäft. Es nahm zur Kenntnis, dass die KK Y._____ kein Bewilligungsgesuch für den Betrieb des Krankenzusatzversicherungsgeschäfts stellen werde, und wies diese an, die Risikoträgerschaft im Rahmen der bestehenden Versicherungsverträge auf einen Partner abzugeben, der über die notwendige Bewilligung verfügt. Der Antrag um Weiterführung des ohne Bewilligung betriebenen Zusatzversicherungsgeschäfts bis Ende 2008 wurde abgewiesen. Die KK Y._____ bestätigte im März 2008, sie werde künftig keine neuen Zusatzversicherungen mehr abschliessen, und wies darauf hin, sie beabsichtige weiterhin eine Zusammenarbeit mit der KK Z._____. Im März 2009 verlangte die FINMA von der KK Y._____ eine Bestätigung, dass sämtliche Versicherten, welche das Produkt «Zusatzversicherung (…)» nicht gekündigt hatten, neu bei der KK Z._____ versichert seien. Um eine ordnungsgemässe Abwicklung der Altschäden sicherzustellen, forderte die FINMA die KK Y._____ zudem auf, Rückstellungen nach dem VAG (Bilanzposten «Zusatzversicherung») auf ein Sperrkonto einer von der FINMA beaufsichtigten Bank zu überweisen. Die KK Y._____ bestätigte die Übertragung des Versichertenbestandes, opponierte jedoch gegen die Verpflichtung zur Bildung von Rückstellungen.

**Aus den Erwägungen**

1.   Zuständigkeit

(22)   Am 1. Januar 2009 trat die Eidgenössische Finanzmarktaufsicht FINMA als Behörde für die Aufsicht über den Finanzmarkt an die Stelle

des BPV. Die FINMA übernimmt alle Verfahren des BPV, die bei Inkraft-
treten des Bundesgesetzes über die Eidgenössische Finanzmarktaufsicht
(FINMAG; SR 956.1) hängig sind (Art. 58 FINMAG). Nach Art. 1 Abs. 1
Bst. b und g FINMAG ist die FINMA unter anderem Aufsichtsbehörde nach
dem Versicherungsvertragsgesetz (VVG; SR 221.229.1) und dem Versiche-
rungsaufsichtsgesetz (VAG; SR 961.01) und damit insbesondere im Bereich
der Zusatzversicherungen zuständige Aufsichtsbehörde (vgl. unten Rz. 24).

(23)    Verletzt eine Beaufsichtigte oder ein Beaufsichtigter die Bestimmun-
gen des FINMAG oder eines der Finanzmarktgesetze nach Art. 1 FINMAG
oder bestehen sonstige Missstände, so sorgt die FINMA für die Wiederher-
stellung des ordnungsgemässen Zustands (Art. 31 FINMAG i. V. m. 46 und
51 VAG). Die ihr übertragenen Aufgaben sind nicht auf die von ihr bewil-
ligten Institute beschränkt. Gemäss Art. 3 Bst. a FINMAG unterstehen der
Finanzmarktaufsicht alle natürlichen und juristischen Personen, die nach
den Finanzmarktgesetzen eine Bewilligung, eine Anerkennung, eine Zulas-
sung oder eine Registrierung der Finanzmarktaufsichtsbehörde benötigen.
Soweit ihr Aufgabenbereich reicht, hat die FINMA somit die Befugnis, gene-
rell die im Gesetz vorgesehenen Mittel zur Durchsetzung auch gegenüber
nicht formell unterstellten Instituten und Personen einzusetzen (vgl. auch
BGE 131 II 314 f. m. w. H.).

2.    Bewilligungspflichtige Versicherungstätigkeit

(24)    Gemäss Art. 12 Abs. 1 des Krankenversicherungsgesetzes (KVG;
SR 832.10) sind Krankenkassen juristische Personen des privaten oder öf-
fentlichen Rechts, die keinen Erwerbszweck verfolgen, hauptsächlich die
soziale Krankenversicherung durchführen und vom Eidgenössischen Depar-
tement des Inneren anerkannt sind. Nach Art. 12 Abs. 2 KVG steht es den
Krankenkassen frei, neben der sozialen Krankenversicherung Zusatzversi-
cherungen anzubieten; ebenso können sie im Rahmen der vom Bundesrat

festgesetzten Bedingungen und Höchstgrenzen weitere Versicherungsar-
ten betreiben (Art. 12 Abs. 2 KVG). Diese Versicherungen unterliegen dem
VVG. Ihre Durchführung wird von der FINMA nach der Gesetzgebung über
die privaten Versicherungseinrichtungen beaufsichtigt (Art. 21 Abs. 2 KVG).

(25)    Der Aufsicht gemäss VAG unterstehen schweizerische Versiche-
rungsunternehmen, welche die Direktversicherung oder die Rückversi-
cherung betreiben (Art. 2 Abs. 1 Bst. a VAG). Jedes schweizerische Versi-
cherungsunternehmen, das der Aufsicht untersteht, bedarf zur Aufnahme
der Versicherungstätigkeit einer Bewilligung der Aufsichtsbehörde (Art. 3
Abs. 1 VAG). Das Versicherungsunternehmen, das eine Bewilligung zur
Versicherungstätigkeit erlangen will, hat der Aufsichtsbehörde ein Gesuch
zusammen mit einem Geschäftsplan einzureichen (Art. 4 Abs. 1 VAG). Die
Bewilligung wird erteilt, wenn die gesetzlichen Anforderungen erfüllt und
die Interessen der Versicherten gewahrt sind (Art. 6 i. V. m. Art. 7 ff. VAG).
Diese Voraussetzungen für die Bewilligungserteilung bzw. die Aufsicht
bestand schliesslich auch bereits unter dem bis zum 31. Dezember 2005
gültigen Versicherungsaufsichtsgesetz vom 23. Juni 1978 (vgl. Art. 3, 7, 8
und 9 aVAG [AS 1978 1836]).

(26)    Das Gesetz definiert den Versicherungsbegriff nicht, sondern über-
lässt dessen Umschreibung (wie bereits im aVAG) der Praxis (vgl. Botschaft
zum VAG, BBl 2003 3808). Nach konstanter Rechtsprechung des Bundes-
gerichts wird die Versicherung mit den folgenden fünf begriffsnotwendi-
gen Merkmalen umschrieben (vgl. BGE 107 Ib 56 E. 1b und 114 Ib 244
sowie Heinrich Honsell, Bundesgesetz über den Versicherungsvertrag, Basel
2001, allgemeine Einleitung Rz. 6 ff. und Rolf H. Weber/Patrick Umbach,
Versicherungsaufsichtsrecht, Bern 2006, S. 54 ff.):

•       Risiko: Gegenstand einer Versicherung ist immer ein Risiko oder eine
Gefahr, d. h. ein Ereignis, bei dem der Eintritt oder die Zeit des Eintritts unge-
wiss ist (BGE 92 I 126, 133). Beispiele von Versicherungen mit ungewissem

Ereigniseintritt sind die Sachversicherungen, die Haftpflichtversicherungen und die Erwerbsausfall- und Heilungskostenversicherungen bei Unfall und Krankheit.

• Leistung des Versicherers: Die Leistung des Versicherers umfasst die Übernahme des Risikos bzw. die Tragung der Gefahr und die Erbringung der vereinbarten Leistung bei Eintritt des versicherten Ereignisses, zu der sich der Versicherer rechtlich verpflichtet.

• Prämie: Die Prämie ist die Gegenleistung des Versicherungsnehmers für die Sicherheit, die der Versicherer durch die Übernahme des Risikos gewährt.

• Selbständigkeit der Operation: Mit dem Erfordernis der Selbständigkeit der Operation wird die Versicherung gegenüber anderen Rechtsgeschäften abgegrenzt, bei denen die Verpflichtung zur Erbringung einer Leistung im Schadenfall bloss eine Nebenabrede oder Modalität des anderen Vertragsbestandteils darstellt (BGE 114 Ib 244, 247).

• Planmässiger Geschäftsbetrieb: Eine Versicherung im Sinne des VAG liegt erst dann vor, wenn die Übernahme des Risikos durch das Versicherungsunternehmen planmässig erfolgt, d.h., wenn das Versicherungsunternehmen das Risiko in der einen oder anderen Form kompensiert, zum Beispiel durch den Abschluss einer Vielzahl entsprechender Geschäfte (BGE 107 Ib 54, 61).

(27) Bei der «Zusatzversicherung (…)» handelt es sich um eine Zusatzversicherung zur obligatorischen Krankenpflegeversicherung nach KVG. Die Leistungen, welche im Ereignisfall versprochen werden, umfassen gemäss Leistungsübersicht der KK Y._____ unter anderem die Bereiche Alternativmedizin, Geburtsvorbereitung, Impfungen, Physiotherapie, Zahnbehandlungskosten usw. Es handelt sich um eine branchenübliche Versiche-

rung, welche von Versicherungsunternehmen gewöhnlich in einer Vielzahl (wie hier von der KK Y._____) angeboten werden. Da die Merkmale einer Versicherung (1) Risiko, (2) Leistung des Versicherungsunternehmens, (3) Prämie, (4) Selbständigkeit der Operation und (5) planmässiger Geschäftsbetrieb vorliegend gegeben sind, handelt es sich bei der von der KK Y._____ angebotenen «Zusatzversicherung (…)» um eine Versicherung im Sinne der bundesgerichtlichen Rechtsprechung und damit um eine Zusatzversicherung nach VVG. Da die KK Y._____ es unterliess, für den Vertrieb dieses Produkts beim BPV resp. heute der FINMA eine Bewilligung gemäss VAG einzuholen, bot sie unerlaubt Versicherungen gemäss VVG an. In ihrer Stellungnahme vom 26. Oktober 2009 bestreitet die KK Y._____ im Übrigen nicht, die «Zusatzversicherung (…)» über mehrere Jahre auf eigene Rechnung angeboten zu haben.

(28)     Es wird somit festgestellt, dass die KK Y._____ ohne Bewilligung in den Jahren 1998 bis 2008 eine bewilligungspflichtige Versicherungstätigkeit ausgeübt und damit gegen das VAG und das aVAG verstossen hat.

3.     Bildung von Rückstellungen

(29)     Nach Art. 16 VAG ist ein Versicherungsunternehmen verpflichtet, für die gesamte Geschäftstätigkeit ausreichende versicherungstechnische Rückstellungen zu bilden. Die versicherungstechnischen Rückstellungen setzen sich grundsätzlich aus zwei Elementen zusammen: den versicherungstechnischen Rückstellungen zur Abdeckung der erwarteten Verpflichtungen (u. a. Schadenrückstellungen) und den Schwankungsrückstellungen (Art. 54 Abs. 1 und Art. 69 der Verordnung über die Beaufsichtigung von privaten Versicherungsunternehmen [AVO; SR 961.011]). Das Versicherungsunternehmen muss die Ansprüche aus Versicherungsverträgen durch ein gebundenes Vermögen sicherstellen (Art. 17 Abs. 1 VAG).

(30) Da die KK Y._____ durch ihr unerlaubtes Betreiben von Versicherungsprodukten dem VAG untersteht, hätte sie die Ansprüche aus Versicherungsverträgen nach Art. 17 VAG sowie nach den entsprechenden Ausführungsnormen durch ein gebundenes Vermögen sicherstellen müssen. Den Betrieb der «Zusatzversicherungen (…)» hat sie zwar in der Zwischenzeit auf die KK Z._____ übertragen, jedoch verbleiben der KK Y._____ die Risiken für die Spätschäden und die damit verbundenen Rückstellungen.

### 4. Massnahmen

(31) Damit die FINMA vorliegend Massnahmen im Rahmen des FINMAG bzw. des VAG ergreifen kann, genügt die Feststellung, dass die KK Y._____ – wenn auch unerlaubt – eine bewilligungspflichtige Versicherungstätigkeit ausübte (vgl. Rz. 28 oben). Für das von ihr betriebene Zusatzversicherungsgeschäft untersteht sie jedenfalls der Aufsicht der FINMA.

(32) Im Rahmen ihrer Verfügungskompetenz wählt die FINMA die Massnahmen, die sie für angemessen erachtet, um den Zweck des Gesetzes zu erreichen (vgl. BGE 130 II 351 E. 2.1 und EBK-Bulletin 47 S. 49 ff.). Der Schutz der Versicherten und das Vertrauen, welches das Publikum in das Finanzsystem setzt, bilden dabei die Hauptkriterien. In der Wahl der geeigneten Massnahmen hat die FINMA das Verhältnismässigkeitsprinzip zu wahren und die Massnahmen zu wählen, die am wenigsten in die Rechte der Betroffenen eingreifen, ihren Zweck jedoch trotzdem erreichen. Die FINMA hat dabei im Rahmen der allgemeinen Verwaltungsgrundsätze in erster Linie den Hauptzwecken der finanzmarktrechtlichen Gesetzgebung, vorliegend dem Schutz der Versicherten, Rechnung zu tragen. Die Frage, wie sie ihre Aufsichtsfunktion im Einzelfall wahrnimmt, ist ihrem «technischen Ermessen» überlassen (Urteil des Bundesgerichts vom 22. Mai 2002 2A 65/2002 E. 3.2).

(33)   Kommt ein Versicherungsunternehmen den Vorschriften des VAG nicht nach oder scheinen die Interessen der Versicherten anderweitig gefährdet, so trifft die FINMA die sichernden Massnahmen, die zur Wahrung der Interessen der Versicherten erforderlich erscheinen. Sie kann namentlich auch die Hinterlegung von Vermögenswerten anordnen (Art. 51 Abs. 1 und 2 Bst. b VAG).

(34)   Da die FINMA bei der KK Y._____ aufgrund deren unbeaufsichtigter Tätigkeit keine Tarifprüfung nach Art. 38 VAG durchgeführt hat, können deren finanzielle Verhältnisse nicht abschliessend beurteilt werden. Um den nach der Übertragung der Zusatzversicherungen für die KK Y._____ verbleibenden Verpflichtungen vollumfänglich nachzukommen und da vorliegend nicht im Einzelnen festgestellt werden kann, ob die ausgewiesenen Schadenrückstellungen zur Finanzierung der Altschäden ausreichen, hat die KK Y._____ somit entsprechende Sicherheiten zu leisten.

(35)   Die KK Y._____ hat gemäss ihren Angaben im Jahr 2009 bereits Leistungen von rund CHF (…) für die «Zusatzversicherungen (…)» bezahlt. Entgegen deren Ansicht ist indes nicht auszuschliessen, dass noch mehr Altschäden anfallen werden. Sicherheiten in der Höhe von CHF (…) sind im vorliegenden Fall somit angemessen, nicht zuletzt auch deswegen, weil gemäss Leistungsübersicht der KK Y._____ teure Einzelfälle (Transport-, Rettungs-, Such- und Bergungsaktionen: max. CHF 10'000.– pro Kalenderjahr) nicht mit Sicherheit ausgeschlossen werden können.

(36)   Da sich der zu leistende Betrag im kleinen Rahmen hält und die KK Y._____ über die nötigen flüssigen Mittel verfügt, wird die verlangte Sicherheitsleistung keine erhebliche finanzielle Belastung mit sich bringen. Zudem handelt es sich dabei lediglich um eine Sicherheitsleistung, welche – sofern keine unerwarteten Spätschäden anfallen – zum gegebe-

nen Zeitpunkt wieder freigegeben wird. Diese Massnahme stellt lediglich einen geringfügigen Eingriff in die Rechte der KK Y._____ dar und soll in erster Linie dem Schutz der Versicherten Rechnung tragen.

(37)   Die KK Y._____ gibt denn auch keine zwingenden Gründe an, weshalb sie die verlangten Sicherheiten nicht leisten will. Sie weist lediglich darauf hin, es würden nebst der von ihr bezahlten Leistungen für die «alte Zusatzversicherung (…)» von CHF (…) «kaum mehr grössere Beträge» hinzukommen. Zudem hält sie fest, sie habe bereits CHF (…) an die KK Z._____ überwiesen, was vorliegend unerheblich ist, da es sich bei dieser Leistung um Schwankungsrückstellungen für das Produkt Kombi 1 und für das Produkt «Zusatzversicherung (…)» und nicht um Schadenrückstellungen zur Finanzierung von Altschäden handelt. Der KK Y._____ ist es im Übrigen freigestellt, diesen Betrag allenfalls auf zivilrechtlichem Weg bei der KK Z._____ zurückzufordern.

(38)   Die KK Y._____ wird im Rahmen von Art. 51 VAG i. V. m. Art. 31 FINMAG somit angewiesen, eine Bareinlage in der Höhe von CHF (…) auf ein Sperrkonto einer von der FINMA beaufsichtigten Bank zu überweisen. Die Überweisung auf ein Sperrkonto ist innert Frist der FINMA anhand von entsprechenden Beweismitteln zu bestätigen. Die KK Y._____ hat der FINMA zudem eine Abrechnung über die Abwicklung der Altschäden für den Zeitrahmen bis Anfang 2011 einzureichen, welche von einer Prüfgesellschaft mit Spezialzulassung der FINMA zu prüfen ist.
(…)

Dispositiv.



**finma**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 08-60322-CR-COHN

UNITED STATES OF AMERICA,
             Plaintiff,

vs.

RAOUL WEIL,
             Defendant

_____/

## **AFFIDAVIT OF ACCURACY**

I, Arnold Winter, being duly sworn, and as an independent contractor to Geotext Translations,

Inc., hereby declare that,

- I am a professional German-into-English translator, with approximately 10 years' experience;

- I hold a J.D. degree from Duke University, North Carolina, and an M.A. degree from the Free University Berlin, Germany; and

- To the best of my knowledge and belief, the foregoing is a true and accurate translation from German into English of the cover page, pages 1 through 5, 76 and 77, and 80 through 101 of a January 2010 document titled "FINMA Bulletin", and in particular the section titled "Legal and Reputation Risks in Connection with the Implementation of the Qualified Intermediary Agreement", found at: https://www.finma.ch/d/aktuell/Seiten/aktuell-bulletin-20101012.aspx, a site I last visited on July 9, 2014, and a copy of which is attached hereto.

Arnold Winter
Independent Translator

Sworn to and subscribed before me

this  10  day of   July  , 20 14 .

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
CHRISTINE ZAENGLE
Notary Public
MEDIA BORO., DELAWARE COUNTY
My Commission Expires Jun 3, 2018



Eidgenössische Finanzmarktaufsicht FINMA
Autorité fédérale de surveillance des marchés financiers FINMA
Autorità federale di vigilanza sui mercati finanziari FINMA
Swiss Financial Market Supervisory Authority FINMA

# BULLETIN
# 1/2010



**BULLETIN**
**1/2010**

**Masthead**

**Publisher:**          Swiss Financial Market Supervisory Authority - FINMA
Einsteinstrasse 2
CH-3003 Bern
Tel: + 41 (0) 31 327 91 00
Fax: + 41 (0) 31 327 91 01
info@finma.ch
www.finma.ch

**Design:**          BBF AG, Basel

**Printing:**          Jost Druck AG, Hünibach

09.10 2000 860249180

# Contents

Preface  [German version]                                                                4

Preface  [French version]                                                                6

Preface  [Italian version]                                                               8

1   Group Issuing Activity                                                              10

2   FINMA's Authority to File Complaints                                               36

3   Decision Finding a Serious Infringement of the Right to Supervise [the            44
    Financial Markets]

4   Differentiated Contestability of Temporary Injunctions                            60

5   Legal and Reputation Risks in Connection with the Implementation of               76
    the Qualified Intermediary Agreement

6   Legal and Reputation Risks in the Cross-Border Business                          102

7   Provisions for Supplementary Health Insurance in Connection with                 122
    Unauthorized Work

## Preface

When it commenced operations on January 1, 2009, the Swiss Financial Market Authority ("FINMA") took the place of the Swiss Federal Banking Commission ("EBK"), the Federal Agency for Private Insurance (BPV), and the Swiss Anti-Money Laundering Control Authority ("Kst GwG"). To maintain continuity, however, this did not upend everything; instead, the new agency based its activities on the tried and true and continued meaningful approaches. As a result, the bulletin of the Banking Commission, which had informed a wide audience of experts about the regulatory agency's activities for years until issue no. 51/2008, will not be simply discontinued. Instead, it will be continued in the form of the FINMA Bulletin—particularly with the aim of not only publishing decisions that are significant not just to the banking sector but also providing an overview of the regulatory agency's activities pursuant to Swiss financial market laws under the umbrella of the Swiss Financial Market Supervisory Act [*Finanzmarktaufsichtsgesetz*] (FINMAG). While the outer appearance of the FINMA Bulletin is new, in conceptual terms it will largely follow the example of the EBK Bulletin.

The FINMA Bulletin seeks to inform a wide range of experts about important decisions of FINMA that have the force of law as well as about rulings of the Swiss Federal Administrative Court [*Bundesverwaltungsgericht*] and the Swiss Federal Court [*Bundesgericht*] that are material to the further development of practices.

Some of the considerations in the decisions and rulings are presented in abbreviated form. In each case, they are preceded by a synopsis and a summary of the facts. If a ruling has been published by the court itself, the FINMA Bulletin will also include the court's synopsis as well as a summary of the facts.

While FINMA's decisions that are published in the FINMA Bulletin will always be anonymized, decisions pertaining to the dissolution of an entity or the institution of insolvency proceedings against it will be anonymized solely to the extent that natural persons are involved. Court rulings will be published in the FINMA Bulletin in accordance with their publication.

The first Bulletin addresses central topics that FINMA has dealt with in recent years, e.g. how to deal with legal and reputation risks in connection with cross-border business transactions. In addition, the Bulletin also discusses new regulatory tools that were made available to FINMA by means of the FINMAG, e.g. the declaratory order. Finally, rulings relevant to FINMA's regulatory activities that have been handed down by the courts at various levels shall also be included in this publication.

Urs Zulauf
General Counsel

Kathrin Tanner
Director, Law and Compliance

# 5   Legal and Reputation Risks in Connection with the Implementation of the Qualified Intermediary Agreement

**ORDER dated December 21, 2008, of the Swiss Banking Commission**

**Cross-border business transactions with private clients in the United States; inadequate organization due to poor risk management, guarantee regarding the proper conduct of business (Article 3(2) c Swiss Banking Act [*Bankengesetz*] (BankG)).**

1.   Violation of the guarantee and organizational requirements of the Swiss Banking Act.

2   Insufficient recording, limiting, and monitoring of the legal risks related to cross-border business transactions with private U.S. clients.

## Summary of the Facts

The main issue in the proceedings in the matter of A. ___ AG was whether A. ___ AG had adequately recorded, limited, and monitored the legal and reputation risks arising from both the implementation of the Qualified Intermediary Agreement ("QIA") and U.S. regulatory restrictions pertaining to cross-border business transactions with U.S. persons ("SEC Restrictions").

The EBK held in its order that A. ___ AG had violated the guarantee and organizational requirements of the Swiss Banking Act. In a limited number of cases, some employees of A. ___ AG, contrary to the provisions of the QIA, had deemed client documentation that had been prepared for U.S. tax purposes to be sufficient even though they knew, or should have known, that it did not accurately reflect the client's U.S. tax status. In addition, for quite some time they ignored the SEC Restrictions, according to which an approval process is mandatory for cross-border financial services rendered to U.S. investors. In doing so, A. ___ AG exposed itself to massive legal and reputation risks that came to the fore in various proceedings brought by U.S. government agencies.

However, during its investigation the EBK did not find that A. ___ AG had improperly implemented the QIA. Nor did the EBK conclude that the uppermost management level of A. ___ AG had known of the aforementioned deceptive maneuvers of U.S. clients to the detriment of the U.S. fiscal authorities and of some employees' violations of the SEC Restrictions contrary to instructions. In its order, however, the EBK prohibited A. ___ AG from further pursuing the cross-border private banking business with persons residing or domiciled in the United States. It obligated A. ___ AG to adequately record, limit, and monitor all legal and reputation risks inherent in the rendering of cross-border services and ordered the company to audit the implementation of these orders.

## From the Considerations

1.      Parties to the Proceedings

(51)    In the case at hand, A. ___ AG is the sole party as defined in Article 6 of the Swiss Administrative Procedures Act [*Verwaltungsverfahrensgesetz*] (VwVG; SR 172.021). EBK's investigation was aimed at ascertaining by means of an order whether or not the bank had violated the licensing requirements or other statutory requirements. In contrast, the proceedings did not focus on the extent to which the corporate officers X. ___, Y. ___, or Z. ___ are accountable for the events that transpired. Nonetheless, the findings of the investigation do enable drawing certain conclusions with regard to that matter, even though these individuals are not formally a party to the proceedings.

2.      Approval Duty and Licensing Requirements

(52)    Approval duty: Pursuant to Article 3 BankG (SR 952.0), the operating of a bank is subject to the approval of the Swiss Banking Commission. Article 3 (2) BankG describes the licensing requirements related to the operating business of a bank that must be complied with on an ongoing basis. If a bank also engages in commercial securities trading, it also needs to be licensed as a securities dealer as defined in Article 10 of the Swiss Stock Exchange Act [*Börsengesetz*] (BEHG; SR 954.1). The requirements of Article 3e et seqq. BankG must also be complied with if the bank is an integral part of a finance group or heads a finance group that is managed from Switzerland (Article 3c and 3d (1) BankG).

(53)    Organizational requirement: Pursuant to Article 3 (2)(a) BankG, the licensing requirements that must be complied with on an ongoing basis include the requirement that the bank must possess an administrative organization adequate to its business activities. Moreover and in particular, a finance group that is subject to the EBK's group monitoring

must be organized such that it is capable of recording, limiting, and monitoring all material risks (Article 3f (2) BankG). The same applies to securities dealers under Article 10 (2)(a) BEHG. An adequate organizational structure includes, inter alia, a well-established system of instructions that entails clear rules pertaining to tasks, responsibilities, and conduct. The bank is required to ensure that its instructions and guidelines are carried out and complied with on an ongoing basis. Finally, a bank having the significance and size of A. ___ AG is obliged to notify the EBK immediately of important events at the bank that have the potential (whether justifiably or not) to undermine the confidence of the regulatory authorities or the public in the bank. In particular, this includes providing information on the bank's potential risks at home and abroad.

(54)   Guarantee requirement: Pursuant to Article 3 (2)(c) BankG, the persons tasked with the administration and management of the bank and, pursuant to Article 3f (1) BankG, the persons tasked with the bank's management, for one, and the overall management, supervision, and control of the finance group, for another, must have a good reputation and guarantee the proper conduct of the business ("Guarantors") ["*Gewährsträger*"]. They must have the requisite expertise, properly conduct themselves in business transactions, and possess attributes that make them suitable for engaging in the banking business. The guarantee requirement pursuant to Article 10 (2)(d) BEHG regarding a securities dealer's employees in positions of responsibility is identical to that under the Swiss Banking Act. That which applies to individual corporate officers, relevant participants, or employees in positions of responsibility also applies to the bank on the whole. In its capacity as a corporate entity, it must also satisfy the licensing requirement regarding the proper conduct of business (EBK order dated August 30, 2000; published in EBK Bulletin 41/2000, p. 15 et seqq. (esp. p. 20); and EBK order dated June 25, 2002, against A. ___ AG, consideration no. 1).

(55)   Principles of internal organization: Pursuant to Article 3 (2)(a) BankG, the licensing requirements that a bank must comply with on an ongoing basis include the requirement that the bank must provide a precise description of the parameters of its business in its by-laws, articles of incorporation, and rules and regulations and that it must possess an administrative organization adequate to its business activities. In turn, the bank's activities must correspond to both its organizational structure and its resources. The organizational requirement applicable to securities dealers follows from Article 10 (2)(a) BEHG. In addition, Swiss regulatory statutes also require separating, in terms of both functions and personnel, the bank's strategic control and supervision (board of directors) from its operational management (central management and control); Article 3 (2)(a) BankG in conjunction with Article 8 Swiss Regulation on Banks and Savings & Loans [*Verordnung über die Banken und Sparkassen/Bankenverordnung*] (BankV; SR 952.02); also Christoph Winzeler, *Basler Kommentar zum Bankengesetz* [Basel Commentary on the Swiss Banking Act], published by Watter/Vogt/Bauer/Winzeler, Basel 2005, margin no. 8 regarding Article 3). The powers of the board of directors and the management must be delineated such that the board of directors is capable of overseeing the management (see Article 3 (2)(a) BankG). For the rest, functions such as trading, asset management, and clearing must be effectively separated from one another (Article 9 (1) BankV and Article 19 (1) Swiss Regulation on Stock Exchanges and Securities Trading [*Verordnung über die Börsen und den Effektenhandel/Börsenverordnung*]; BEHV, SR 954.11).

(56)   Risk management: A suitable internal organizational structure includes the requirement that a bank ensure adequate risk management. The fundamentals of such risk management as well as the responsibilities and procedures for approving risky transactions must be set forth in rules and regulations or internal guidelines. Market, credit, default, clearing, liquidity, and image risks, as well as operational and legal risks, must be recorded, limited, and monitored (Article 9 (2) BankV; Article 19 (3) BEHV in conjunction with Article 26 (1) BEHV).

(57)   Internal control system: Furthermore, both the bank and the securities dealer must put in place an effective internal control system. In particular, they must appoint an internal auditing department (inspectorate) that is independent of management (Article 9 (4) BankV and Article 20 (1) BEHV). Up to December 31, 2006, the requirements regarding the internal control system had been laid out in two decrees: EBK-RS 95/1 "Internal Auditing Department" as well as the June 2002 "Guidelines on the Internal Control System [*Richtlinien zur internen Kontrolle*]" of the Swiss Banking Association [*Schweizerische Bankiervereinigung*] ("Guidelines on the Internal Control System"), which the EBK had recognized as the minimum regulatory standard (see EBK-RS 96/3 "Audit Report [*Revisionsbericht*]", Appendix I: *Selbstregulierung* [Self-Regulation]; replaced as of April 21, 2004, by EBK-RS 04/2 "*Selbstregulierung als Mindeststandard* [Self-Regulation as the Minimum Standard]." As of January 1, 2007, these two sets of rules and regulations were replaced by EBK-RS 06/6 "*Überwachung und interne Kontrolle* [Monitoring and Internal Control System]," whose requirements must be implemented in full by January 1, 2008. In large part, the first two sets of rules and regulations are material to the assessment of the issues under discussion.

(58)   Elements of an effective internal control system: The concept of an internal control system or of internal controls covers all procedures, methods, and actions ordered by the board of directors, the management, and other executives that serve to ensure proper business operations. This includes not only actual monitoring activities but also steering and planning activities. Inter alia, the internal control system helps to comply with statutory and other requirements (see margin no. 59 below), prevent, minimize, and identify mistakes and irregularities, protect the business's assets, and ensure reliable and complete accounting, timely and reliable preparation of financial reports, achievement of corporate goals, and effective and efficient management (see 2002 Guidelines on the Internal Control System).

(59)   Compliance: Banks and securities dealers must work toward ensuring compliance with all laws and other requirements ("compliance") by putting in place suitable precautions and controls. In particular, this includes a suitable internal instruction system that provides clearly delineated rules and regulations regarding tasks, responsibilities, and conduct. The corporate officers and all other persons tasked with matters related to compliance must ensure that their instructions and guidelines are implemented and that all employees comply with them on an ongoing basis. This applies all the more to larger banks and groups. The compliance requirements (in the sense of both compliance with legal requirements and the function itself) are a direct outcome of the organizational requirement pursuant to Article 3 (2)(a) BankG and have now been laid out in greater detail in margin no. 97 et seqq. of EBK-RS 06/6 Monitoring and Internal Control System, but they already applied mutatis mutandis earlier on based on the organizational requirement.

(60)   Board of Directors [*Verwaltungsrat*]: The board of directors has responsibilities that are compulsory and cannot be delegated (see Article 716a (1) Swiss Law of Obligations [*Obligationenrecht*] (OR)). Inter alia, the core responsibilities of the board of directors entail acting as the company uppermost management and issuing the requisite instructions, determining the entity's organizational structure, designing the accounting, controlling, and financial planning system, appointing and dismissing the persons tasked with management and representation, and monitoring the persons tasked with managing the company, specifically with respect to compliance with laws, statutes, rules and regulations, and instructions. The internal auditing system (inspectorate) is the most important of the monitoring tools available to it. Finally, the responsibilities of the board of directors also include creating and maintaining a suitable internal control system (see 2002 Guidelines on the Internal Control System, Article 9 (4) BankV, and Article 20 (1) BEHV; also see margin no. 57 above).

(61)   The management: The management is tasked with running the bank's operations. This means that it is responsible for carrying out the strategies and corporate policies as determined by the board of directors.

Management is also tasked with certain monitoring functions. It must ensure that all laws, by-laws, rules and regulations, instructions, etc. are implemented and complied with. It does so with the support of Compliance (see margin no. 59 above). Furthermore, as part of the internal control system, management also ensures that an organizational structure, which unequivocally delineates tasks, responsibilities, and information flows, is maintained and documented. Management develops suitable processes for handling risks and monitors the best possible utilization of resources, in both quantitative and qualitative terms, in the area of the internal control system (see 2002 Guidelines on the Internal Control System).

3.     The EBK's Powers

(62)   Restore proper order: The Swiss Banking Commission issues the orders necessary for carrying out the law and monitors compliance with statutory requirements (Article 23$^{bis}$ (1) BankG). When it learns of violations of the law or other irregularities, the EBK issues all orders necessary for restoring due order and eliminating the irregularities (Article 23$^{ter}$ (1) BankG). The EBK has large statutory discretion in ordering actions within the parameters of its statutory mission (see BGE 131 II 306, BGE 126 II 111, consideration no. 3b, and ruling 2A.91/2005 dated February 9, 2005, of the Swiss Federal Court [published only in EBK-Bulletin 49, p. 36 et seqq.]), as well as ruling B-3708/2007 E.3.3 dated March 4, 2007, of the Swiss Federal Administrative Court).

(63)   General powers to take action: The authorizations granted under Article 23$^{bis}$ (1) and 23$^{ter}$ (1) BankG are general authorizations to take those actions in preventive fashion that are designed to ensure that a bank fulfills statutory requirements and that creditors are protected. The powers to take action

are specified in greater detail in some areas. For example, Article 23$^{septies}$ (1) BankG provides that, to enforce the Swiss Banking Act, the EBK may carry out direct audits of foreign branches of banks that are subject to its consolidated control or assign any such audit to auditors based on its power to check the origin of funds. It follows from the aforementioned principles that the EBK itself may directly audit banks that are subject to its regulatory authority in Switzerland if doing so furthers its regulatory purpose (see consideration no. 6 of the EBK's order dated June 25, 2002, against A. ___ AG in the matter of …).

(64)    No sanctions: In contrast to many foreign banking regulatory agencies, among them the New York Federal Reserve ("FED"), the EBK cannot under applicable law impose any financial penalties on banks and their employees who have committed egregious violations of regulatory requirements (see the ruling dated February 2, 2000, of the Swiss Federal Court in the matter Credit Suisse Group and Credit Suisse First Boston (Biber Holding AG), EBK-Bulletin 40/2000, p. 37 et seqq. (esp. consideration no. 9), the May 2003 "EBK Sanctions Report" that was published on its website, as well as Urs Zulauf, David Wyss, and Daniel Roth: *Finanzmarktenforcement* [Financial Market Enforcement], Bern 2008, p. 25 et seqq.). This applies both to the imposition of fines and the confiscation of gains achieved by unlawful means.

4.      Violation by A. ___ AG of the Licensing Requirements

(65)    A. ___ AG must be held accountable for the actions of its employees: All of the following findings with respect to violations of regulatory requirements concern A. ___ AG in its capacity as the licensee, even if individual actions can be directly allocated to individual employees, especially the client managers and individuals responsible for the NAM[1] business as well as their immediate supervisors.

---

[1] NAM = North America

A. ___ AG must accept that it is held accountable for the actions of the respective individuals because, in its capacity as a licensed bank, it was and still is obliged to ensure compliance with all requirements applicable to the bank using suitable internal control mechanisms and to ensure that legal and reputation risks arising from noncompliance are recorded, limited, and monitored.

4.1      Incomplete Compliance with the Obligations under the QIA

(66)     Violation of the guarantee and organizational requirement: In connection with the implementation of its obligations under the QIA, A. ___ AG violated the guarantee and organizational requirements of the Swiss Banking Act because it incurred legal and reputation risks which, though limited, were not manageable in some cases, and over a longer time period. In this connection, the management of the NAM business failed to notify the uppermost management of A. ___ AG in due time and in full, thus preventing informed decision making. Particularly egregious are specific cases where the bank played an active role, through its client managers, in giving (tax) advice to U.S. clients and also in providing assistance to them. At a minimum, this is highly problematic in that it may have participated actively in U.S. persons' potential noncompliance with U.S. tax laws, and it is unacceptable in terms of risk management and the bank's justifiably strict compliance policies (…) [*sic*].

(67)     Tolerance and knowing support by middle management: The client managers and bank officers having direct contact to clients were responsible for the specific deviations from the goal of implementing the QIA in full. Both the immediate supervisors and the management echelons responsible for the NAM business encouraged the actions by the client managers, in part expected them, and in part at least

tolerated them. Moreover, experts were involved as well, above all from Financial Planning, and outside counseling was also sought in this area.

(68)    Lack of independent controls of the client managers: Extensive responsibilities were imposed on the client managers with respect to the question of clarifying clients' U.S. tax status, potentially giving rise to abusive practices. While the bank had trained the client managers with respect to categorizing client relationships, subsequently it failed to ensure by means of random, in-depth independent reviews that the client managers accepted their clients' statements solely in those cases where doing so was justified. Even the bank believes that independent controls would have prevented potential violations of the QIA by the bank in a limited number of cases.

(69)    Noncompliance with 1099 reporting duties in connection with W-9[2] clients: In 2002, to be on the safe side, the bank assumed that the "Deemed Sales Rules" applied and adjusted its business model accordingly. However, with respect to its W-9 clients, the bank knowingly accepted the possibility that it would not fulfill its 1099 reporting duties in connection with transactions by W-9 clients involving non-U.S. securities because it supposedly was not in a position to do so in technical terms. Upon request, the bank made income statements available to the clients. The bank categorized this violation as "underreporting" and, as a result, did not believe that any proceedings the Internal Revenue Service ("IRS") might bring against it would have serious consequences. Today the bank believes—also with the support of its U.S. counsel—that the tax-related Deemed Sales Rules do not apply under the QIA. Apparently this is a disputed issue under U.S. tax law.

---

[2] U.S. citizens who maintain an account with a foreign bank must disclose their identity to the U.S. tax authority using form W-9.

## 4.2    Domiciliary Companies in Private Banking and the "Switches"

(70)    Permissibility of the use of domiciliary companies: The utilization of structures such as domiciliary companies, trusts, and foundations in connection with a private banking client relationship meets clients' needs and certainly is legally permitted. If the bank's client is a non-operating domiciliary company—and not a natural person, an association, a not-for-profit foundation, or an operational or general partnership—then the bank must ensure that it duly identifies the entity's beneficiaries in accordance with the applicable requirements under anti-money laundering legislation and clarifies the source of the funds. In general, the bank need not concern itself with the tax status of the domiciliary company and its beneficiaries. However, in exercising its duty of due care the bank must be in a position to rule out that the funds deposited with it do not stem from a crime (Article 305[bis] item 1 of the Swiss Criminal Code [*Strafgesetzbuch*] (StGB), SR 311.0) or that accepting the funds does not otherwise entail uncontrollable legal and reputation risks for the bank. Finally, in application of Article 8 of the Swiss Agreement on Banks' Duty of Due Care [*Vereinbarung über die Sorgfaltspflicht der Banken*] (VSB), banks may not encourage deceptive maneuvers on the part of their clients vis-à-vis government agencies at home and abroad, especially vis-à-vis tax agencies, by providing incomplete attestations or attestations that are misleading in other respects.

(71)    Problematic scenarios: Scenarios where a bank or its client managers do not strictly refer their clients to outside advisers but instead provide intensive advisory services themselves, or take actions that come close to contributing to a tax offense under foreign or even Swiss law, are problematic in regulatory terms. Cases where a bank has taken on certain duties directly vis-à-vis a domestic or foreign tax agency—for instance, by signing the QIA relative to the IRS—and then subsequently ignores its duties are even more problematic.

(72)   Domiciliary companies and the QIA: It clearly follows from the Qualified Intermediary Agreement—which, in terms of material questions of interpretation, refers to the U.S. Tax Code and, in terms of questions of application, fully subjects the Qualified Intermediary ("QI") to U.S. law—between the IRS and A. ___ AG as the QI that the IRS expects the QI, in its capacity as a trustworthy partner, not only to refrain from providing any assistance to clients who engage in deceptive maneuvers when filling out the relevant forms for the QI client documentation but also to refrain from silently tolerating any such ploys. Accordingly, against the backdrop of the U.S. Tax Code, the QIA expressly stipulates that a QI may not rely on QI client documentation when it knows that statements made therein are false. At the same time, however, it must be noted that the use of offshore structures is not prohibited under the QIA or under U.S. tax law. Moreover, at the time the negotiations regarding the design of the QI system were being conducted with the Swiss Bankers' Association (SBVg), among others, the IRS was aware of the fact that offshore structures play a significant role in private banking. The fact that the IRS assumed that the use of offshore structures is permissible is demonstrated in particular by the fact that U.S. politicians are now criticizing it for the position it adopted.

(73)   Violations of contractual duties: In the case here, A. ___ AG—through a few client managers and with the knowledge of a few immediate supervisors—in a limited and specific number of cases actively assisted its clients in ways deemed improper under the requirements of the QIA and/or, at a minimum, turned a blind eye in ways deemed improper and, against its better judgment, included an incorrect statement regarding the U.S. tax status of an offshore structure in given client's QI documentation. In doing so, A. ___ AG violated the contractual obligations it had voluntarily entered into with the IRS, which in turn constitutes a gross breach of the guarantee requirement and also was prohibited in terms of risk management and control. Whether the respective client managers

themselves have thereby committed an offense under U.S. tax law or actively and culpably aided and abetted a U.S. person in committing an offense need not be assessed here.

### 4.3 Partial Noncompliance with the SEC Restrictions

(74)    Acceptance of potential noncompliance with the SEC Restrictions: It was noted within the bank as early as in 1999 that customary practices in the cross-border private banking business involving the United States entailed significant noncompliance risks with respect to the SEC Restrictions. A serious attempt to bring this business into "compliance" was made (only) in 2002 when the decision was made to introduce the "Revised Business Model" for the non-W-9 business. However, this decision was not implemented consistently. In particular, the NAM management did not enforce compliance with the Revised Business Model, and no periodic independent audits were performed.

(75)    Country Paper on the United States (2004)—training but no monitoring: The bank prepared a "Country Paper on the United States" with the help of outside consultants in an attempt to further sensitize its personnel to the issue. The client managers were trained with respect to the content of the Country Paper, but it was not distributed to them at first. It was uploaded to the bank's intranet only later on—without any accompanying information. Neither the management directly responsible for the matter nor the senior management subsequently called for and monitored strict compliance with the Country Paper. When the Country Paper was uploaded to the intranet without further comment, some of the client managers apparently got the impression, according to their statements made to the EBK, that the bank was primarily interested in covering itself but was otherwise continuing to push the cross-border business. This is at least how individual client managers described the situation to the EBK in the fall of 2008.

- Travel: Extracts from the IT system on client history show that some client managers did not always comply with the SEC Restrictions when traveling. For example, client managers discussed investment opportunities, met with potential clients, had meetings with clients who had outside advisers to discuss tax matters, or pushed their clients to sign asset management agreements, etc.

- Phone contact: Some client managers continued to accept telephone orders from certain clients regarding the purchase or sale of U.S. or non-U.S. securities.

- Postal mail to the United States: Contrary to instructions, some client managers also continued to send bank and securities account statements and confirmations regarding securities transactions by mail to the United States, in some cases even despite instructions to hold the statements at the bank.

(76) "Light" enforcement of the Country Paper on the United States (2004): Even before the "E. __ Whistleblowing" investigation, the NAM management reviewed possible ways of enforcing the Country Paper on the United States (2004) and conducting audits to ensure compliance ("Project Globus"). The actions in question were categorized and assessed according to their effects on the NAM business. There was a consensus within the bank that only those steps would be implemented that had been classified as having an appreciable effect on the business, but not those that would cause the business to stagnate or even bring it to a standstill. In these discussions, however, the decision-makers were not starting out from the assumption that there was an unlawful situation but instead that the extant compliance was basically in line with U.S. regulations but ought to be strengthened.

(77)    Delay of the Country Paper on the United States (2007): Upon completion of the "E. __ Whistleblowing" investigation in the summer of 2006, there was a consensus within the bank's management that the Country Paper on the United States (2004) had to be revised and that compliance with the requirements of the (new) Country Paper had to be audited by an independent entity. While the revisions of the Country Paper proceeded rapidly so that first drafts were already available in October 2006 and the staff pertinent to the NAM business could be trained anew with respect to the Country Paper's content, it did not come into force until the summer of 2007. The management of the NAM business had also made known its view that it was necessary to play for time because the revised Country Paper would have a highly negative impact on the business.

(78)    Too little leadership with respect to the enforcement of compliance: The management of the NAM business was responsible for compliance with U.S. rules and regulations and for preparing the respective internal instructions (e.g. the Country Paper on the United States). It was supported by specialists from Group Tax, Financial Planning and Wealth Management, and Legal and Compliance, as well as by outside U.S. counsel, all of whom served as advisers or assisted in the preparation of specific instructions. Inter alia, this resulted in the "Guidelines for the Implementation of the Revised Business Model" and the "Deemed Sales FAQs." Neither the uppermost line managers nor the respective staff positions within GWM&BB[3] took an active leadership role with respect to the recording and limitation of risks in the cross-border business involving the United States or unequivocally to their subordinates that full compliance with the course of conduct described in the Country Paper on the United States was an absolute requirement. As a result, no effective compliance audits were performed independently of the NAM unit. It is telling that the Group General Counsel, F. __, who was responsible for matters pertaining to the group, had not agreed on additional measures aimed at improving compliance with representatives of GWM&BB (specifically, D. __, G. __, and H. __) by the time of the discussion on the findings of the "E. __ Whistleblowing" investigation.

---

[3] Global Wealth Management & Business Banking

Even after that, responsibility for ensuring compliance with the requirements set forth in the Country Paper on the United States rested mainly with the NAM unit (specifically, I. __, C. __ or J. __, and D. __) as well as certain specialists from Legal and Compliance. The audit by Group Internal Audit ("GIA"), which was planned in result of the E. __ investigation and was supposed to take place once the Country Paper on the United States (2007) had come into force, was subsequently overtaken by events.

(79)    Assessment based on Swiss regulatory law: By tolerating violations of the SEC Restrictions or relevant internal instructions by the client managers, A. ___ AG incurred incalculable legal and reputation risks, thus violating not only the guarantee requirement under the Swiss Banking Act but also the organizational requirement.

4.4     Responsibility at the Management Level

(80)    Increased risk due to simultaneous onshore and offshore business: It was noted within the bank after the acquisition of (…) [*sic*] that this would result in increased reputation risks because the bank was engaging in both the onshore and the offshore business. A. ___ AG basically reacted to this challenge by taking two steps: (a) adopting the Revised Business Model for the non-W-9 business in 2002, and (b) forming (…) [*sic*] for the W-9 business, an entity that nonetheless did not become operational until 2005. In both cases, however, the envisioned compliance was not ensured by means of independent and effective instruments of control. In the final analysis, therefore, the bank was partially noncompliant for a number of years—during which it was implementing the aforementioned measures—and thus knowingly incurred large legal and reputation risks that it was unable to control.

(81)    Large engagement with respect to QI compliance: In 2001 and 2002, the bank made tremendous efforts to ensure that

it satisfied its obligations under the QIA in full. H. __, in his capacity as the then CEO of (…) [*sic*], unequivocally told the QI Coordination Committee with respect to the QI documentation of the client relationships, which constituted a fundamental requirement under the QIA: "Non-compliance is not an option." With a view toward the imminent QI audit and the audit under Swiss banking law, at the PBI Business Committee Meeting on August 7, 2002, G. __ also made clear that there would be "zero tolerance" for noncompliance.

(82)   W-9 clients and compliance prior to January 1, 2005: In early 2002, the bank also reviewed its options with respect to the W-9 business in connection with its realignment of the U.S. offshore business. The bank came to the conclusion that the new, limited range of services under the Revised Business Model, which was envisioned for non-W-9 clients, was not sufficiently attractive for W-9 clients. It assumed that these clients expected a more active range of products and services. As the bank saw it, in the long term it would be able to offer such products and services solely by establishing a financial intermediary registered with the SEC, which led to the creation of (…) [*sic*]. Compliance with the SEC Restrictions in the W-9 business had been incomplete before this entity became operational on January 1, 2005.

(83)   Wrong incentives—corrections made too late: According to the statements of some of the client managers to the EBK, the fact that the management of K. __ had introduced a new incentive system in 2004, which gave absolute priority to the drive to generate "net new money," put them under additional pressure as to the non-W-9 business. While management revised the parameters in 2007, this did not change anything with respect to the fact that between 2004 and early 2007 these incentives, along with the absence of any compliance controls, apparently gave some client managers the incentive to work actively toward acquiring new clients in the United States as well, which was difficult to do without violating the Country Paper on the United States or the SEC Restrictions.

(84)    Long delay in the decision on the future of the non-W-9 business: The management directly responsible for the U.S. offshore business started discussing the future of the bank's business involving non-W-9 clients for the first time in the fall of 2001. After having weighed strategic as well as specific considerations regarding the future of the non-W-9 business as early as in 2002, and after having dismissed the idea to sell the unit, the individuals in positions of responsibility returned to the topic in 2006. While they felt that the "E. __ Whistleblowing" investigation had improved their understanding, no decision was made and there was no immediate search for a long-term solution. An order regarding the tightening of compliance ahead of anything else was issued, and it gained traction starting in mid-2007 when the Country Paper on the United States (2007) came into force. Over a fairly long period of time until the decision in August 2007 to get out of the business, questions on how to spin it off (management buyout, sale to third parties, pricing) and how this should be communicated dominated discussions of the business's strategic future.

(85)    Observance of foreign requirements and risk management: On the whole, between 2000 and 2007 the bank repeatedly had reason to deal in depth with the topics of QIA, SEC Restrictions, and the parameters of the U.S. offshore business. However, the management of the business unit in question—D. __ and B. __, as well as the latter's successor, C. __—were not unconditionally determined to adjust to the U.S. regulatory requirements with no ifs and buts. In particular, C. __, and later on I. __ as well, had great personal responsibility with respect to compliance with the SEC Restrictions. Compliance with foreign legal requirements certainly does not follow directly from Swiss regulatory law, and it must also be noted that some of the applicable provisions of U.S. law are alien to Swiss regulatory law. Nevertheless, given the very large exposure of A. ___ AG in the United States, consistent compliance with U.S. law was an absolute

necessity from the standpoint of risk management. The highest management level had also clearly espoused this view.

(86)   The bank's risk assessment was inadequate in retrospect: While the bank did identify the risks associated with the cross-border U.S. business to some extent, it must be said in retrospect that it failed to assess them accurately. The executives responsible for these matters set a disastrous example by failing to punish internally known or easily foreseeable violations of U.S. law (e.g. communications using "U.S. jurisdictional means" or noncompliance with the reporting duties for W-9 clients) or by failing to rectify the fact that matters were not in compliance with the applicable requirements for quite some time. The effect was magnified (unintentionally by the uppermost management) by the fact that, owing to the design of the incentive structure within the K. __ business unit, the client managers in the NAM unit responsible for the U.S. cross-border business were put under additional pressure to acquire new money.

(87)   Serious cultural problem: The mere fact that "upgrades" of structures (see above item 66) were seriously discussed within A. ___ AG in 2002 without anyone—anyone at all—intervening firmly and effectively shows that there was a serious cultural problem, at least in parts of a bank that had embraced absolute compliance in its official statements. The same applies to the handling in the field until at least the end of 2006 of the Country Paper on the United States and the Deemed Sales Guidelines that preceded it. C.__, who at the time was actually responsible for compliance with the restrictions set forth in the Country Paper by virtue of his management responsibilities, said in an internal email exchange that the adoption of the revised Country Paper on the United States should be delayed as long as possible. The bank's present-day realization that the Country Paper

should not have been adopted as a "soft" instruction but rather as a "hard" policy also indicates that the bank did not succeed, at least not in the NAM business, to bring about the urgently needed change among the private bankers with respect to their roles. Here, both the uppermost management and the line managers in the middle and lower echelons, as well as the related staff positions, failed not only to demand merely rhetorically that the change be made but also to rigorously bring it about in actual fact by exercising visible and noticeable leadership and utilizing appropriate instruments of control.

4.5     No Indications of Criminal Offenses by Corporate Bodies

(88)     The EBK's investigation did not produce any evidence of criminal offenses by the corporate officers, G. __, H. __, and F. __ under Swiss or U.S. law. To the extent that the U.S. Department of Justice (DoJ) relies on the same files as the EBK, it is not comprehensible why G. __ was indicted and why H. __ and F. __ are noticeably mentioned in the indictment as—unindicted—co-conspirators. It is worth mentioning in this connection that the DoJ's indictment of G. __ is largely based on two testimonies, specifically, that of E. __, who was indicted in the United States for crimes and had left A. ___ AG over a dispute, and that of D. __, who was detained in the United States from May to October 2008 as a "material witness" and bears great personal managerial responsibility for the known cases of noncompliance.

5.      Actions by the EBK

(89)    No action against Guarantors [*Gewährsträger*]: The egregious deficiencies must be attributed to actions by individual employees far below the echelon of the Guarantors and of which the uppermost corporate officers were unaware. The investigation by the EBK has not brought to light any evidence that it would be possible to bring sufficiently strong accusations against the corporate officers F. __, H. __, or even G. __ that would justify issuing a formal censure against them personally or ordering even stricter regulatory measures. No doubt has been cast on the guarantee of G. __, H. __, and F. __.

(90)    Finding against the bank: The severity of the defects in risk management and risk control, however, require a formal finding thereof. In their capacity as corporate officers having full responsibility for the company, the Guarantors are responsible for the defects within A. ___ AG that have been ascertained.

(91)    Prohibition of the non-W-9 business: Although A. ___ AG has declared of its own volition that it will discontinue this business, it must be formally barred from pursuing the non-W-9 business with U.S. persons. The bank must do everything in its power to unwind these client relationships as soon as possible.

(92)    Creation of a cross-border risk management and risk control system: Finally, the bank must be compelled to take suitable steps with respect to the management and control of the legal and reputation risks associated with its extensive cross-border business activities in numerous countries and subsequently to have the effectiveness of its measures audited. In this connection, A. ___ AG will also have to acquiesce to on-site audits

by the EBK's legal successor, the Swiss Financial Market Supervisory Authority (FINMA).
(…) [*sic*]

Statement of disposition